IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| US MAGNESIUM, LLC,<br><br>　　　　　　　　　Plaintiff,<br>v.<br><br>PVS CHLORALKALI, INC.,<br><br>　　　　　　　　　Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:16-cv-1021-JNP-DBP<br><br>District Judge Jill N. Parrish |

Before the court is a Motion for Summary Judgment filed by Defendant and Counterclaim Plaintiff PVS Chloralkali, Inc. ("PVS"). [Docket 47]. PVS's motion for partial summary judgment is DENIED.

## BACKGROUND

On June 13, 2013, PVS and US Magnesium ("USMAG") entered into a five-year agreement (the "Commercial Agreement"), under which USMAG would supply hydrochloric acid to PVS. On July 28, 2015, the parties executed a new agreement for the sale of hydrochloric acid (the "Sales Agreement"). The Sales Agreement, which was backdated to June 1, 2015, expressly terminated the Commercial Agreement. It further required PVS to purchase a minimum of 600 tons of hydrochloric acid per week from USMAG. Also on July 28, 2015, PVS and USMAG executed three railcar sublease agreements (the "Sublease Agreements"). Under the Sublease Agreements, PVS subleased to USMAG sixty hydrochloric acid railcars for a period running from June 1, 2015, to May 31, 2018. Each of the Sublease Agreements conveyed to USMAG a sublease in hydrochloric railcars that PVS had leased from one of three hydrochloric acid railcar lessors.

On September 30, 2016, USMAG filed a complaint against PVS, alleging that PVS had breached the Sales Agreement and its implied duty of good faith and fair dealing. USMAG also sought a declaration that it was excused from further performance under the Sales Agreement and the Sublease Agreements.

PVS answered USMAG's complaint, asserted a counterclaim for breach of the Sublease Agreements, and sought a declaration that the Sublease Agreements are valid and enforceable, regardless of the enforceability of the Sales Agreement. In its answer, USMAG conceded that it had stopped paying rent under the Sublease Agreements but argued that payment under the Sublease Agreements was excused as a result of PVS's alleged breach of the Sales Agreement.

PVS filed a motion for partial summary judgment on all claims in its counterclaim. PVS argues that it is entitled to relief as a matter of law because USMAG stopped paying the monthly rent due to PVS and continued to retain and make use of the railcars in breach of the Sublease Agreements. In response, USMAG asserts that the Sales Agreement and the Sublease Agreements comprise a single agreement and that PVS materially breached the Sales Agreement, thus excusing USMAG's obligation to perform under the Sublease Agreements. In its reply, PVS argues that the Sales Agreement and the Sublease Agreements are separate contracts and that its alleged failure to perform under the Sales Agreement does not excuse USMAG's obligations under the Sublease Agreements.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden shifts to

the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).

## DISCUSSION

PVS moves for summary judgment on its counterclaim, alleging that USMAG breached three independent Sublease Agreements as a matter of law. USMAG asserts in its defense that the Sublease Agreements and Sales Agreement were sub-parts of one overarching agreement between the parties and argues that its obligations under the Sublease Agreements were excused when PVS allegedly breached the Sales Agreement. To prevail on its motion for summary judgment, PVS must therefore establish that the Sublease Agreements and the Sales Agreement were separate, independent contracts as a matter of law.

In support of its assertion that the parties executed one contract, USMAG argues that Utah courts have interpreted multiple agreements as a single contract in some circumstances. *Sacramento Baseball Club, Inc. v. Great N. Baseball Co.*, 748 P.2d 1058, 1060 (Utah 1987) ("An agreement may be a single contract even though it consists of several writings that the parties have never physically attached to each other."). Whether these contracts should similarly be read as one depends on the intentions of the parties and is therefore an issue of contract interpretation. *See id.*

Under Utah law, "[t]he cardinal rule in construing any contract must be to give effect to the intentions of the parties." *Atlas Corp. v. Clovis Nat. Bank*, 737 P.2d 225, 229 (Utah 1987). In giving effect to the intentions of parties to a contract, Utah courts look first to the language of the agreement. *Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991). If the language is unambiguous as to the parties' intentions, then Utah courts do not look beyond that language. *Id.* Interpretation of the contract in such cases is a question of law. *Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985). If, on the other hand, the court concludes that the language of the contract is ambiguous, then the court may look to extrinsic evidence in order to determine the parties'

intentions. *Atlas Corp.*, 737 P.2d at 229 (citing *Big Butte Ranch, Inc. v. Holm*, 570 P.2d 690 (Utah 1977)). The interpretation of an ambiguous contract using extrinsic evidence is a question of fact. *Kimball*, 699 P.2d at 716. So long as there is a genuine dispute as to the extrinsic evidence, summary judgment is precluded. *Grow v. Marwick Dev., Inc.*, 621 P.2d 1249, 1252 (Utah 1980).

**I.  The Language of the Sales Agreement and Sublease Agreements**

The language of an agreement is ambiguous if it is "capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms, or other facial deficiencies.'" *Winegar*, 813 P.2d at 108 (quoting *Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983)). The terms of an agreement are not ambiguous simply because "the parties differ as to the interpretation of [the] agreement." *Id.* at 109 (citing *Buehner Block Co. v. UWC Assocs.*, 752 P.2d 892, 895 (Utah 1988)). Rather, the alternative interpretations presented must be "plausible and reasonable in light of the language used." *First Am. Title Ins. Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 837 (Utah 1998). Whether the text of the agreement is ambiguous as to the parties' intentions is a question of law to be decided by the court. *Faulkner*, 665 P.2d at 1293 (citing *Morris v. Mountain States Tel. & Tel. Co.*, 658 P.2d 1199, 1200 (Utah 1983)).

Under Utah law, agreements that "were executed substantially contemporaneously and are clearly interrelated, . . . must be construed as a whole and harmonized, if possible." *See Atlas Corp.*, at 229 (citing *Mark Steel Corp. v. EIMCO Corp.*, 548 P.2d 892 (Utah 1976)). In this case, the Sublease Agreements and Sales Agreement were entered contemporaneously. Further, the agreements reference each other repeatedly and are seemingly interrelated. As a result, in determining the parties' intentions, the court must look at the contracts as a whole.

The court concludes that the language of the Sublease Agreements and the Sales Agreement creates ambiguity regarding whether the parties intended to create one overarching

agreement for which breach of any part constituted breach of the whole. Looking first to the Sublease Agreements, both parties focus on Recital A. Because this section is titled "Separate Sales Agreement," PVS argues that the parties considered the Sales Agreement to be an entirely separate contract. But USMAG points out that Recital A states that the Sublease Agreements were entered into "pursuant to the Sales Agreement." USMAG argues that this demonstrates an intention to create one overarching agreement, rather than four separate contracts.

USMAG also relies on Section 20(c) of the Sublease Agreements, which states that "all lawsuits related to or arising out of this Sales Agreement will be brought only in the state or federal courts located in the State of Utah, USA." But PVS argues that this use of "this Sales Agreement" was clearly a typographical error, as the rest of Section 20(c) refers only to "this Sublease Agreement."

Like the Sublease Agreements, the Sales Agreement arguably refers to the existence of one overarching agreement. In the Sales Agreement, a section of the Recitals states that "the Parties mutually agree to terminate the Existing Agreement and replace it with this Sales Agreement and separate Railcar Subleases (defined below), to be executed simultaneously with this Sales Agreement . . . ." PVS points out that this section explicitly refers to the Sublease Agreements as "separate" documents, plausibly suggesting that they are intended to be entirely separate contracts. USMAG, on the other hand, argues that this demonstrates the parties' intention to replace the pre-existing Commercial Agreement with one new agreement, consisting of the Sales Agreement and Sublease Agreements, to be executed simultaneously.

Both parties also rely on Section 5 of the Sales Agreement, titled "RAILCAR SUBLEASES." While this section, like the Recitals in the Sales Agreement, refers to the Sublease Agreements as "separate," USMAG argues that the section's existence demonstrates that the

Sublease Agreements were an "integral part of the deal." USMAG's position is bolstered by the inclusion of two Schedules to the Sales Agreement, the first of which identifies railcars to be subleased to USMAG and the second, which provides a model Sublease Agreement.

Finally, the parties rely on the integration clauses in the Sales Agreement and Sublease Agreements. PVS asserts that the existence of separate integration clauses in each of the contracts demonstrates the parties' intention that the contracts be read independently of each other. USMAG, on the other hand, points out that the Sublease Agreements' integration clauses include "the documents that are referred to in this Sublease" in the list of documents that "constitute the entire agreement between the parties pertaining to the subject matter" of the Sublease Agreements. Similarly, the Sales Agreement's integration clause states that "there are no representations or other agreements between the Parties with respect to the subject matter of this Sales Agreement, except as specifically set forth in this Sales Agreement." These integration clauses can plausibly be read to demonstrate the total independence of each contract. Alternatively, because the Sublease Agreements and Sales Agreement cross reference each other, the integration clauses could be read to integrate the multiple contracts in one overarching agreement.

Taken together, the language of these agreements does not make clear the parties' intentions regarding how the agreements relate to each other. While the fact that the parties provide conflicting interpretations of the language does not necessarily mean that the agreements are ambiguous, the language at issue does give rise to genuine uncertainty. PVS's position that the language indicates an intention to keep the Sales Agreement and Sublease Agreements separate is a reasonable one. Similarly, the repeated cross-references in the contracts render USMAG's interpretation plausible. In short, it is not clear from the language alone whether the parties

intended for these contracts to create one overarching agreement for which breach of any part by one party would excuse the non-breaching party from its obligation to perform under another part.

## II. Extrinsic Evidence of the Parties' Intentions

Because the agreements are ambiguous, the court must look to extrinsic evidence to determine the parties' intentions. This is a question of fact. *Kimball*, 699 P.2d at 716. When a contract is ambiguous, a court may only grant summary judgment "if the evidence, when viewed in the light most favorable to the nonmoving party, leaves no genuine issues of fact to be resolved." *Peterson v. Sunrider Corp.*, 48 P.3d 918, 927 (Utah 2002).

In examining whether parties intended to enter one overarching agreement, the Utah Supreme Court has focused on whether the multiple documents were executed by the parties for only one purpose. *Sacramento Baseball Club*, 748 P.2d at 1060. In this case, PVS and USMAG have presented conflicting extrinsic evidence of the parties' intentions to create either one overarching agreement or multiple separate contracts. Viewed in the light most favorable to USMAG, the evidence does not establish that the parties intended for each agreement to operate as a standalone obligation.

USMAG provides compelling evidence that the parties executed the agreements for the sole purpose of replacing the pre-existing Commercial Agreement. The deposition of Scott Trussell ("Trussell"), former President of PVS, suggests that the new contracts were entered solely because PVS wanted to renegotiate the original agreement. Further, Cameron Tissington ("Tissington"), USMAG Vice President of Sales, testified that the Sublease Agreements were executed for the purpose of ensuring that USMAG could perform under the Sales Agreement. He noted that PVS intended to "pull" the hydrochloric railcars that it had allowed USMAG to use

under the Commercial Agreement and that, without those cars, USMAG would be unable to perform.

Additionally, USMAG relies on extrinsic evidence relating to an additional agreement between the parties (the "CWT Commitment"). Under the CWT Commitment, PVS agreed that it would fulfill a portion of its obligations under the Sales Agreement by ordering hydrochloric acid on behalf of a third party. Emails between USMAG and PVS officials discussing this CWT Commitment suggest that the parties viewed the executed contracts, as well as the CWT Commitment, as sub-parts of a larger commercial transaction. For example, after signing the Sales Agreement and Sublease Agreements on behalf of USMAG, Tissington sent an email to Trussell in which he stated, "I am signing this agreement with the understanding that USMAG will receive a one year purchase order from PVS for 3 cars of HCL per week, delivered to CWT in California, at $90/ton." The existence of this CWT Commitment, the discussion around it, and this comment by the USMAG representative who signed the Sales Agreement and Sublease Agreements all suggest that the parties believed they were engaging in a single commercial transaction memorialized by multiple documents.

Viewed in the light most favorable to USMAG, the extrinsic evidence suggests that the parties executed the Sales Agreement and Sublease Agreements with the intention to create one contract. This creates a genuine issue of material fact rendering summary judgment improper. *Faulkner*, 665 P.2d at 1293 ("Of course, a motion for summary judgment may not be granted if a legal conclusion is reached that an ambiguity exists in the contract and there is a factual issue as to what the parties intended."); *Grow,* 621 P.2d at 1252 ("It is a well-settled principle of law that summary judgment can only be granted when there is no dispute as to a material fact.") (citations omitted).

## CONCLUSION AND ORDER

For the reasons articulated, PVS's motion for partial summary judgment is **DENIED**. [Docket 47].

Signed September 30, 2019

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge