Timothy C. Houpt (USB #1543)
Paul R. Smith (USB #14325)
JONES WALDO HOLBROOK & McDONOUGH, PC
170 S. Main Street, Suite 1500
Salt Lake City, Utah 84101-1644
Telephone: (801) 521-3200
Fax: (801) 328-0537
thoupt@joneswaldo.com
psmith@joneswaldo.com

Jonathan S. Taub (Admitted Pro Hac Vice)
PVS CHEMICALS, INC.
10900 Harper Avenue
Detroit, Michigan 48213
Telephone: (313) 924-2629
Fax: (313) 921-1378
jtaub@pvschemicals.com

*Attorneys for Defendant and Counter Claimant, PVS Chloralkali, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **US MAGNESIUM, LLC,**<br><br>Plaintiff and Counter Defendant,<br><br>vs.<br><br>**PVS CHLORALKALI, INC.,**<br><br>Defendant and Counter Claimant. | **DEFENDANT'S TRIAL BRIEF**<br><br>Case No. 2:16-cv-01021-JNP-DBP<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead |

Defendant and Counter Claimant PVS Chloralkali, Inc. ("PVS"), by and through its counsel of record, and pursuant to the Fourth Amended Trial Order [ECF 89] (the "Order"), hereby files its Trial Brief in advance of the parties' trial.

1780769.1

**INTRODUCTION**

Although US Magnesium ("USMAG") won the race to the courthouse, this case is not really about the alleged failure of PVS to buy enough hydrochloric acid (HCl) from USMAG. It's about railcars and PVS's counterclaim damages. USMAG entered into written subleases for railcars PVS leased from railcar lessors. USMAG unequivocally agreed to pay for those cars. When the market for HCl tanked and business between the parties did not go as USMAG had hoped, USMAG no longer wanted to pay for the railcars it subleased. So, it conjured up a breach of contract claim, not on account of the $350,000 in hypothetical lost profits it alleges, but as an excuse to stiff PVS on the railcar leases—while PVS continued to pay the railcar lessors—leaving PVS damaged in the amount of $1,215,455.48. At the conclusion of the trial, PVS is confident the Court will find PVS the prevailing party in this dispute.

To assist the Court in anticipating the issues that will arise in this case, a brief summary of the evidence to be presented follows.

## I.    The Parties

USMAG, as its name suggests, is in the business of manufacturing and selling magnesium. However, when it extracts the raw materials for its primary product, there's something extra attached—chlorine. So, USMAG runs this raw material through a process to isolate the magnesium from the chlorine. After selling its magnesium to its primary customers, USMAG has various options for disposing of its byproduct chlorine: It could, for example, sell the chlorine as is. Or, USMAG could combine its chlorine with other elements (*e.g.*, calcium or iron) to create new chemical products to be sold (calcium chloride or ferric chloride).

In 2012, USMAG began exploring the possibility of turning its chlorine byproduct into yet another compound—by combining its chlorine with hydrogen, USMAG could create hydrogen chloride (more commonly known as HCl). USMAG then began exploring ways in which it could both produce and sell HCl. To accomplish those goals, USMAG sought the help of PVS.

PVS is a reseller of HCl. In other words, PVS does not manufacture HCl; instead it: *first*, finds customers interested in purchasing HCl; *second*, purchases HCl from entities that are manufacturing and offering HCl for sale; and *third*, sells the HCl to the customers. When it comes to the second step—acquiring the HCl from a seller—PVS operates under two types of agreements: (1) revenue-share agreements, and (2) sales agreements. Under a revenue-share agreement, as the name suggests, PVS and the seller share in the net revenue generated by PVS's resale of the seller's HCl. Under a sales agreement, PVS and the seller simply agree on a specific sales price for the seller's HCl, and then, the seller sells, and PVS purchases, the seller's HCl for that price.

## II.    The Commercial Agreement

In 2013, PVS and USMAG began negotiating the terms of an HCl revenue-share arrangement, which concluded on June 13, 2013, when the parties entered into their Commercial Agreement. Under that Agreement, PVS agreed to purchase 50% of "USMAG's output of [HCl] produced at [USMAG's] Facility, . . . which 50 percent amount is estimated to be 57,000 Tons per Contract Year." Commercial Agreement § 3(a).[1] The parties further agreed that PVS would pay USMAG for that HCl by splitting the "Net Sales Revenue" generated from PVS's resales of the HCl, with PVS receiving 22.5% and USMAG receiving the remaining 77.5%. *Id.* at § 8(c). That

---

[1] USMAG retained the remaining 57,000 tons per year to sell itself.

3

1780769.1

Net Sales Revenue was calculated by multiplying the monthly sales volume by the "Net Back," *id.* at § 8(a)(ii), and the Net Back was calculated by taking the price charged to PVS's end customer and subtracting certain fees, including "Rail Car Fees," *id.* at § 1(m). The Rail Car Fees were to be $13/ton, and were "intended to reimburse the Party providing the railcars for at least a portion of the lease and maintenance costs involved." *Id.* at § 1(n).

The Commercial Agreement also provided that "[a]ll shipments of [HCl] from [USMAG's] Facility" were to be made by railcars "made available for such purpose by PVS." *Id.* at § 4. Therefore, in order to perform under the Agreement (and be capable of transporting from USMAG's facility 57,000 tons of HCl per year), PVS was required to make a substantial investment in specially-equipped railcars that could be used to transport HCl purchased from USMAG. And, given the specialized nature of these railcars (which can be used to transport only HCl and a couple other chemicals), the manufacturers of these railcars lease these railcars solely on a long-term basis, typically for ten years.

So, under the Commercial Agreement, PVS was obliged to purchase a particular percentage quantity of USMAG's HCl output (50% of output, estimated to be 57,000 tons per year), and to obtain a sufficient number of railcars to ship that quantity of HCl. But PVS would receive monies under the Commercial Agreement only if USMAG had HCl to sell—which, of course, was going to happen only if USMAG was actually making HCl.

## III.    The First Pivotal Point: USMAG Has Plant Delays and the HCl Market Falls

As will be shown at trial, when PVS and USMAG entered into the Commercial Agreement on June 19, 2013, USMAG issued a press release announcing the construction of its HCl plant, and stating that it planned for its HCl to be available for sale in "the first quarter of 2014." Again,

under the Commercial Agreement, PVS was obliged to buy 50% of the HCl USMAG produced, and PVS had to obtain railcars to ship that HCl. So, as will be demonstrated at trial, in preparation for the start of HCl production, which USMAG said would happen in the beginning of 2014, PVS began leasing railcars promptly after signing the Commercial Agreement in June of 2013, and continued to do so through the beginning of 2014, until it had obtained 60 railcars—the number of railcars that the parties estimated would be necessary to ship the anticipated quantities of HCl. However, USMAG's plant did not start producing marketable HCl in the first quarter of 2014 as USMAG had stated when PVS and USMAG entered into their Commercial Agreement. Nor did USMAG's plant start producing in the second, third, or fourth quarters of that year. Indeed, as will be shown at trial, it wasn't until *April 8, 2015* that USMAG informed PVS that its plant was truly up and running, and suggested that the parties consider March 1, 2015 "as the official 'Commencement Date' for agreement purposes."

So, for all of 2014, and at least the first three months of 2015, PVS was required to make lease payments for the railcars it obtained to ship USMAG's HCl (as required by the Commercial Agreement), but PVS was not being compensated for those lease payments because USMAG, despite its announced start date, did not make any HCl for PVS to sell during those 15 months. By the time USMAG's plant was up and running, PVS was in the hole well over $1M in railcar costs alone. What's more, the market for HCl, which was up for much of 2014, came crashing down in the first and second quarters of 2015, and so, starting in 2015, PVS's prospects for finding buyers for 50% of USMAG's HCl output, at a price that would make PVS any money, were dismal.

It was in that context that the first pivotal point arose. Certainly, PVS could have sued USMAG for the damages it had caused PVS arising out of USMAG's unexcused failure to timely

5

commence its HCl production. But instead, PVS approached USMAG in early 2015, shortly after USMAG's HCl facility finally became operational, about reworking their contractual relationship. PVS informed USMAG of the amounts that PVS had lost to date under their Commercial Agreement (due, in large part, to the expenses that PVS incurred acquiring railcars that PVS could not use). PVS also informed USMAG that, based upon the losses that PVS had already incurred and the then-dismal HCl market conditions, PVS did not wish to remain in the parties' then-existing revenue-share arrangement with PVS bearing the full burden of the cost of leasing railcars to transport USMAG's HCl.

For its part, as will be shown at trial, USMAG had, by that time, determined that it no longer needed PVS to market USMAG's HCl for USMAG; USMAG wanted to continue to have the option, and freedom, to sell its HCl to whomever it wished. While USMAG determined it no longer needed PVS to sell USMAG's HCl, USMAG did need something critical from PVS— USMAG needed the fleet of specialized HCl railcars that PVS had acquired to transport USMAG's HCl. So, the parties agreed to replace their existing revenue-share arrangement with two new arrangements: They would, in USMAG's own words, "[p]ull[] the cars out of the arrangement" and have PVS sublease its 60 HCl railcars to USMAG, which would help PVS so that it wasn't "paying for cars while [USMAG wasn't] running," and USMAG would have the benefit of "controlling the cars and controlling the freight rate on shipments." In addition, instead of having USMAG sell HCl to PVS under a revenue-share arrangement, USMAG would start selling its HCl to PVS under a sales agreement.

6

1780769.1

### IV.   The Railcar Subleases and the Sales Agreement

In May 2015, the parties began negotiating the terms of the new proposed railcar-sublease arrangement and the new proposed sales agreement. In and before June 2015, pursuant to those negotiations, PVS began shipping the railcars that USMAG wished to sublease from PVS to USMAG's Rowley, Utah facility, and USMAG began using the subleased railcars at least as early as June 19, 2015. Also in June 2015, PVS began buying HCl from USMAG not on a revenue-share basis but on a straight sales arrangement.

On July 17, 2015, Cam Tissington (on behalf of USMAG) met with Dave Nicholson and Scott Trussell (on behalf of PVS) to discuss completing the paperwork for their ongoing railcar-sublease arrangement and for their sales agreement that had already replaced the parties' revenue-share arrangement. Later that same month, the parties signed the Railcar Subleases and the Sales Agreement.

The parties' new railcar-sublease arrangement was relatively straightforward: USMAG agreed to pay PVS $1,050 per month for each railcar PVS provided, which resulted in a total monthly rent (for 60 railcars) equal to $63,000. The term of the new sublease arrangement was to be three years (June 1, 2015 through May 31, 2018). And USMAG agreed to be subject to the terms of the Principal Leases—i.e., PVS's leases with the owners of the railcars (collectively, the "Principal Lessors"). Finally, because the 60 Subleased Railcars were leased by PVS from three Principal Lessors (American Railcar Leasing ("ARL"), GATX Corporation ("GATX") and Union Tank Car Company ("UTLX"))—each having an entirely unique Principal Lease and each requiring the separate consent of each Principal Lessor for any proposed sublease of that Lessor's

7

1780769.1

railcars—PVS and USMAG were required to enter into three separate Railcar Subleases (one for each Principal Lessor).

The parties' new Sales Agreement differed from the Commercial Agreement in several ways. First, there would be no sharing of the net revenue. PVS would simply pay USMAG a price to be mutually agreed-upon by the parties for any HCl PVS purchased, without regard to PVS's pricing of that HCl to its customers. Second, PVS's purchasing obligations were much different. Again, under the Commercial Agreement, PVS was required to purchase a precise percentage quantity of HCl from USMAG—50% of USMAG's output for the term of the agreement. Under the Sales Agreement, however, USMAG was to offer, "at its sole discretion," "a volume of [HCl] each week." The initial offered volume was to be "a target" of 600 tons, but the quantity offered could be less (even zero), subject to USMAG's "sole discretion." When and if USMAG made a weekly offer to sell a specific volume of HCl to PVS, PVS would be obligated to purchase that offered volume only if several conditions were first satisfied:

First, the offered volume could not exceed 600 tons: "PVS is not obligated to purchase more than 600 Tons per week." Sales Agreement at § 3(d). Second, PVS was obligated to purchase the offered volume from USMAG only if PVS had already identified a customer to whom PVS could resell the offered volume: "PVS is not obligated to purchase more [HCl] over a given period of time than it resells during the same period of time." *Id.* at § 3(e). Third, and most significantly, PVS was obligated to purchase HCl *only if the parties "mutually agree[d] upon a Price." Id.* at § 3(f) (emphasis added). The failure to satisfy any of these conditions meant that there would be no sale.

1780769.1

## V.    The Second Pivotal Point: USMAG Has More Production Problems and the HCl Market Falls—Again

Similar to the production problems that plagued USMAG under the parties' first agreement when it built its HCl plant (which delayed production from the announced start-up date of Q1 2014 until the actual start-up at the end of Q1 2015), USMAG began having production problems shortly after the parties signed their new agreement: On September 15, 2015, PVS attempted to purchase HCl from USMAG for immediate delivery to PVS's customers, but USMAG informed PVS that it "had premature failure in one of the main units of our HCL synthesis unit. . . . The rebuild time is estimated at three weeks. . . . [W]e will be unable to accept PVS orders until the unit is back on [line]. . . ." Then, on October 6, 2015, USMAG's Cam Tissington informed PVS that USMAG was "finishing up the unplanned maintenance on the boiler element of the HCl synthesis plant. Unfortunately, the repairs took longer than my 'padded' estimate and normal shipments will be delayed until after Friday October 16." Then, on November 3, 2015, Mr. Tissington informed PVS that "The burner is finally up and running after the unplanned outage. . . . We are in a position where we can accept orders from customers again." Unfortunately, shortly after USMAG finally solved its production problems, the HCl market developed problems of its own when the market once again crashed and prices for HCl once again dropped dramatically.

As the evidence at trial will show, during the term of the Sales Agreement, PVS located buyers and approached USMAG about buying HCl from USMAG for resale to those buyers. But, as the evidence at trial will show, PVS and USMAG often couldn't agree on a price—the prices that PVS was willing to pay (driven by then-existing market conditions) were just too low for USMAG to make a profit, especially with freight costs. But the thing that was really hurting

9

USMAG was the same thing that was hurting PVS when USMAG struggled to get its plant up and running: the railcars. USMAG, however, reacted differently than PVS did when it was in a similar situation.

Compare:

- Under the parties' Commercial Agreement, USMAG's 1+ year delay in commencing HCl production caused PVS to incur $1+ million in railcar lease expenses for railcars that PVS could not use because USMAG had no HCl to sell PVS. In addition to those substantial railcar expenses, PVS was faced with the dismal HCl market conditions that existed when USMAG's facility finally became capable of producing HCl at the end of Q1 2015. Faced with both of these circumstances (neither of which were in any way attributable to PVS), PVS could have sought to recoup its railcar losses from USMAG. Instead, PVS approached USMAG and suggested the parties go back to the proverbial drawing board, in terms of their business arrangement.

- Under the parties' Sales Agreement, when USMAG's HCl business soured due to poor market conditions, USMAG accused PVS of breach of contract, refused to make any more railcar-rent payments, and then filed suit.

### THE PARTIES' CLAIMS

In this case, USMAG accuses PVS of breaching the Sales Agreement, and of breaching an alleged oral agreement, which it refers to as the "CWT Agreement." USMAG contends that PVS's alleged breaches of the Sales Agreement and CWT Agreement somehow excuse USMAG of its obligation to perform under the completely separate Railcar Subleases. USMAG also contends that it has been damaged in the amount of $350,741 in lost profits.

10

1780769.1

PVS, on its part, simply seeks redress under the Railcar Subleases. The Railcar Subleases required USMAG to pay rent at the monthly rate of $1,050 for each Subleased Railcar that PVS delivered to USMAG. Although the three Railcar Subleases each required USMAG to pay that rent through May 2018, the evidence at trial will show that, in an effort to mitigate its damages, PVS agreed in October 2017 (during the pendency of this case) to allow USMAG to return the railcars early, and PVS now seeks only the rental payments from the date each railcar was delivered to USMAG, to the date each car was returned to PVS. The total rent payable under the Railcar Subleases for the Subleased Railcars during the time USMAG possessed those Subleased Railcars equals $1,822,355.48. Under terms of the Railcar Subleases, after deducting the total rent that USMAG actually paid for the Subleased Railcars during that period ($606,900), USMAG still owes a balance of:

$$\$1,822,355.48 - \$606,900.00 = \$1,215,455.48$$

In addition to recovering this unpaid rent for the Subleased Railcars, the Railcar Subleases further entitle PVS to recover its actual attorneys' fees incurred in this action:

> **Indemnification**. USMAG shall indemnify and hold PVS harmless from and against all losses, liabilities, claims, damages and expenses (*including, without limitation, reasonable attorneys' fees*) made against PVS or which PVS may incur arising out of USMAG's failure to comply with the terms and conditions of this Sublease. All indemnities contained in this Sublease shall survive the termination of this Sublease, regardless of the cause of the termination.

Railcar Subleases ¶ 18 (emphasis added).

USMAG does not (and cannot) point to any provision of the Railcar Subleases that excuses its performance under those agreements. Instead, USMAG points to the Sales Agreement and the alleged oral "CWT Agreement" and claims that PVS did not buy enough HCl from USMAG, so

11

USMAG shouldn't have to pay for the railcars. USMAG's claim is fatally flawed for two reasons: First, the evidence will show that PVS never breached the Sales Agreement and that the alleged CWT agreement never existed (and that, even if there had been such an agreement, it would have been unenforceable as a matter of law). Second, there is no provision within the Sales Agreement—nor in the Railcar Subleases—that can be credibly construed to state that any breach by PVS under the Sales Agreement (or the alleged CWT Agreement) excuses USMAG's performance under the Railcar Subleases.

## TRIAL ISSUES

This is a breach of contract case. Indeed, as stated above, both parties are alleging that the other breached one (or more) of the parties' agreements. So, both parties will need to show that the other breached an enforceable contract, which resulted in damages to the non-breaching party. While the contracts at issue—the Railcar Subleases and the Sales Agreement—are separate agreements, the facts surrounding them are inarguably intertwined. Thus, so too are the parties' claims and affirmative defenses. Accordingly, PVS has determined that, instead of laying out the simple claim elements, it might be more helpful to the Court for the facts of this case and the evidence that will be offered at trial to be discussed through the lens of the primary *issues* that will confront the Court at trial. A discussion of these issues follows.

### I.    Integration

As the Court is aware, on November 12, 2018, PVS filed its Motion for Partial Summary Judgment (Doc. 47). In that motion, PVS asked the Court to enter judgment on its counterclaim—i.e., that USMAG had breached the Railcar Subleases by failing to make the requisite sublease payments—leaving any issues related to breach of the Sales Agreement for trial. USMAG opposed

12

1780769.1

that motion, arguing that the Railcar Subleases and the Sales Agreement were "one agreement" between the parties, and that USMAG's obligations under the Railcar Subleases were excused by PVS's alleged breach of the Sales Agreement. In its Memorandum Decision and Order (Doc. 60), the Court decided that the language of the agreements did not "make clear the parties' intentions regarding how the agreements relate to each other." *Id.* at 6. The Court then held that, "[v]iewed in the light most favorable to USMAG, the evidence does not establish that the parties intended for each agreement to operate as a standalone obligation."

At trial, the Court will need to decide this issue of integration—not just under the summary judgment standard, but in light of all of the extrinsic evidence. In considering whether multiple contracts should be construed as a single agreement, courts, of course, look within the four corners of the parties' agreements. Here, the Sales Agreement provides that the "terms and conditions of this Sales Agreement constitute the entire understanding between the Parties relating to the subject matter of th[e] Sales Agreement," and that the Sales Agreement "supersedes all prior and contemporaneous agreements . . . , understanding, negotiations and discussions" related to the Sales Agreement's subject matter. Sales Agreement, § 25. Similarly, the Railcar Subleases provide that the subleases, and the "documents that are to be delivered pursuant to th[e] Sublease[s]"—i.e., the Principal Leases and the lessors' consents—"constitute the entire agreement between the parties pertaining to the subject matter of th[e] Sublease[s]" and that the subleases "supersede all prior and contemporaneous agreements, understandings and negotiations." Subleases, § 20(d).

When resort must be had to extrinsic evidence (e.g., when the parties' intent cannot be discerned from the agreements' express language), courts analyze whether or not: (1) the contracts achieve a single purpose; (2) each contract is separately supported by consideration; and (3)

13

construing the contracts together would result in a forfeiture. *See Bess v. Jensen*, 782 P.2d 542, 543–45 (Utah Ct. App. 1989). When the court has heard the evidence of the context in which the Sales Agreement and the Railcar Subleases were negotiated and signed, it will be clear that any alleged breach by PVS of the Sales Agreement did not relieve USMAG of its Railcar Sublease obligations.

## II.     Breach

Even if the Court determines at trial that the parties intended the Railcar Subleases and the Sales Agreement to be construed as a single agreement, USMAG would be excused of its performance only if it can prove that PVS breached the parties' "single agreement" and did so in a material way. Given the terms of the Sales Agreement, USMAG will not be able to meet that burden.

Unlike the Railcar Subleases, which are fairly run-of-the-mill contracts, the Sales Agreement is unusual. The Court will note that the Sales Agreement does not in fact require PVS to purchase 600 tons of HCl per week from USMAG. Indeed, the Sales Agreement does not require PVS to purchase any HCl at all, unless certain preconditions are met. Specifically, PVS had to buy HCl only if:

    a.  USMAG provides a written report to PVS, as far in advance as possible, of the quantities of Product that USMAG expects to offer for sale;

    b.  USMAG uses its best efforts to make Product available to PVS in relatively equal quantities and on a regular basis;

    c.  USMAG provides a minimum of two weeks' notice on firm volume available for sale and shipment during any shipments week. For example, Product available for shipment during the week of June 15, 2015 will be communicated no later than the end of business on June 1, 2015;

    d.  Unless mutually agreed, PVS is not obligated to purchase more than 600 Tons per week;

> e.  PVS is not obligated to purchase more Product over a given period of time than it resells during the same period of time; and
>
> f.  The Parties mutually agree upon a Price for the Offered Volume in accordance with Section 6 of this Sales Agreement.

Sales Agreement, § 3(a)–(e).

To prevail on its breach of contract claim, USMAG must show that *each and every one* of these presale conditions was met for *each and every one* of the purchases PVS allegedly failed to make—which is a burden USMAG simply cannot meet. At trial, USMAG will undoubtedly offer emails where USMAG declared that it expected to have 600 tons of HCl per week available "for the foreseeable future." Although the Sales Agreement does not authorize USMAG to issue any such blanket declaration of availability, such a blanket declaration, even if allowed, would at most satisfy presale conditions "a" and "b," but it certainly doesn't meet USMAG's obligation to provide biweekly, firm-volume notifications under precondition "c."

What's more, USMAG will not be able to show that preconditions "e" and "f" were simultaneously met for any particular order—i.e., that (1) PVS refused to purchase HCl from USMAG that PVS could have resold (*i.e.*, that, during x-period of time, PVS turned down the opportunity to buy HCl from USMAG that PVS could have resold to available customer(s)); and, more importantly, (2) PVS and USMAG had mutually agreed upon a price for the HCl that PVS refused to purchase.

## III.     The Sales Agreement Is Not a Requirements Contract

At first glance, the Sales Agreement appears to be a form of requirements contract. But it lacks the hallmarks of such an arrangement: "A 'requirements contract,' in order to be valid, must (1) obligate the buyer to buy goods, (2) to buy the goods *exclusively* from the seller, and (3)

obligate the buyer to buy all goods of a particular kind from the seller." Requirements Contracts, White, Summers, & Hillman, Uniform Commercial Code § 4:20 (6th ed.) (emphasis added); *see also Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451, 461 (9th Cir. 1979) (cleaned up) ("It is elementary that a requirements contract is one in which the buyer expressly or implicitly promises he will obtain his goods or services from the (seller) [e]xclusively."). As the Court will note, nowhere in the Sales Agreement did PVS agree to buy HCl *exclusively* from USMAG. And USMAG will not be able to adduce any evidence at trial to support the inclusion of such a term. Indeed, the evidence at trial will show that USMAG always intended, and in fact, did, sell HCl to others, and that USMAG was fully aware of, and took no issue with, PVS's existing relationships with other HCl suppliers.

The evidence at trial will show that PVS purchased HCl from other suppliers when it wasn't purchasing HCl from USMAG. However, the evidence will *not* show that, in those situations, PVS's purchase of HCl breached the parties' Sales Agreement, nor will it demonstrate bad faith on the part of PVS. Instead, it will show that the parties never intended to have an exclusive relationship, and that PVS was merely satisfying its contractual obligations to third parties. Thus, the Court will see that PVS did not breach the parties' agreement by doing business with other suppliers.

## IV.     Purchase Quantities

Again, formation of a contract requires an offer, an acceptance, and consideration, and "[f]or an offer to be one that would create a valid and binding contract, its terms must be definite and unambiguous." *Soundvision Techs., LLC v. Templeton Grp. Ltd.*, 929 F. Supp. 2d 1174, 1187 (D. Utah 2013) (cleaned up). This issue of definiteness comes up frequently in the quasi-

1780769.1

requirements-contracts arena. "[A]n indefinite quantities contract, a contract where the buyer agrees to purchase and the seller agrees to supply whatever quantity of goods the buyer chooses to purchase from seller, is unenforceable because the buyer's promise from seller is considered illusory." *Mason v. U.S.*, 615 F.2d 1343, 1346 n. 5 (1980).

As the Court will note, when read carefully, the Sales Agreement does not specify the amount of HCl PVS is obligated to purchase from USMAG. True, the Sales Agreement identifies the "initial Offered Volume" of 600 tons per week, but nothing in the Sales Agreement says PVS was actually required to *purchase* that amount of HCl every week. Nothing in the parties' agreement, and nothing that will be adduced at trial, will show that PVS was obliged to purchase any specific amount of HCl that it did not purchase.[2]

## V.   Separate Contracts Clause

Even when a breach of one agreement in fact constitutes a breach of another, the non-breaching party is not necessarily excused of its performance under the second agreement. The Court will need to review the contracts as a whole to determine what the parties intended in such a circumstance—i.e., that particular type of breach. The evidence will show that the parties intended each sales transaction to operate independently of all others, such that a breach of one left the remainder of the contract—including the parties' various obligations—intact. In particular, the Sales Agreement provides that "[e]ach sale or delivery made by USMAG pursuant to this Sales

---

[2] It could be argued that, for these reasons, the Sales Agreement doesn't even constitute a binding contract. *See Harvey*, 589 F.2d at 461; *Soundvision Techs.*, 929 F. Supp. 2d at 1187; *Mason*, 615 F.2d at 1346 n. 5 (1980). There is no such concern about the Railcar Subleases. In the subleases, USMAG clearly agreed to pay for railcars that PVS leased and delivered to USMAG. There is no dispute here that railcars—which were not paid for—were leased and delivered.

17

Agreement shall stand as a separate contract" and a breach of a single sale or delivery "shall not be deemed a breach of contract as to others, or a breach of this Sales Agreement as a whole." Sales Agreement, § 14. Thus, even if PVS breached the Sales Agreement by failing to purchase a certain amount of HCl, that failure would not excuse USMAG's failure to make all requisite payments under the Railcar Subleases.

## VI.    Severability

Even if the Court determines that the Railcar Subleases and the Sublease Agreement constitute a single agreement, that does not mean each obligation thereunder should rise and fall with all of the remaining provisions. Whether a contract is divisible—i.e., whether its various terms are severable—depends on "the intent of the parties at the time they entered the contract." *Est. Landscape & Snow Removal Specialists, Inc. v. Mountain States Tel. & Tel. Co.*, 844 P.2d 322, 328 (Utah 1992). Discerning this intent "poses a question of law." *Id.* "A court divining the intent of parties to a contract should look first within the four corners of the instrument itself." *Id.*

The evidence at trial will show that, not only does the Sales Agreement provide that each purchase/sale of HCl should be treated as a separate contract (*see* Sales Agreement § 14), but it also states that if any of its provisions is found to be irreparably invalid, that provision should "fail by itself without invalidating any of the remaining provisions not otherwise invalid or illegal." *Id.* at § 20. The Railcar Subleases have a similar provision:

> If any provision of this Sublease . . . is held invalid or unenforceable, the remainder of this Sublease, or the application of such provision under other circumstances, shall not be affected by such invalidity or unenforceability, and each provision of this Sublease shall be enforced to the fullest extent permitted by law.

Railcar Subleases, § 20(f).

18

## VII. Material Breach

Even when a breach related to a single order, or a series of orders, constitutes a breach of the entire agreement, that does not necessarily mean that such a breach (or series of breaches) will relieve the non-breaching party of its performance under the agreement. "Only a *material* breach will excuse further performance by the non-breaching party." *McArthur v. State Farm Mut. Auto. Ins. Co.*, 2012 UT 22, ¶ 28 n. 7, 274 P.3d 981 (emphasis added). Therefore, "[n]ot every minor failure justifies nonperformance and rescission of the contract." *Saunders v. Sharp*, 840 P.2d 796, 806 (Utah Ct. App. 1992). "'It must be something so substantial that it could be reasonably deemed to vindicate the other's refusal to perform.'" *Id.* (quoting *Zion's Props., Inc. v. Holt*, 538 P.2d 1319, 1321 (Utah 1975)).

"A material breach includes a failure of performance which defeats the very object of the contract or is of such prime importance that the contract would not have been made if default in that particular had been contemplated." *Polyglycoat Corp. v. Holcomb*, 591 P.2d 449, 451 (Utah 1979) (cleaned up). "[W]hether a breach is material is a question of degree" and "turns on a number of factors: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." *Cross v. Olsen*, 2013 UT App 135, ¶¶ 28–29, 303 P.3d 1030 (cleaned up).

19

The evidence at trial will show that PVS did not breach the Sales Agreement at all, but even if it did, any alleged breach of that contract did not constitute a *material* breach of the parties' Railcar Subleases, because it is undisputed that PVS fully performed its obligations to USMAG under those Subleases by delivering the Subleased Railcars to USMAG and allowing USMAG to possess and use those Railcars as it saw fit during the term of the Subleases. Because there was no breach at all of PVS's obligations under the Subleases (much less a material breach), USMAG was required to continue meeting its obligations thereunder—including its obligation to continue making all sublease payments.

USMAG claims to have been damaged in the amount of $350,741 for lost profits. In this case, as in any case, the fact of lost profits and their calculation depends on many assumptions, which may or may not be proven at trial. PVS, on the other hand, is not seeking to recover lost profits from USMAG's breach: PVS seeks only to recover the sublease payments that USMAG promised to pay for the Subleased Railcars—which would merely reimburse PVS for *only a portion* of the amounts that PVS promised to pay (and did pay) its Principal Lessors for the Subleased Railcars during the entire period that USMAG possessed the Subleased Railcars (the evidence at trial will show that the Railcar Subleases obligated USMAG to pay $63,000/month for the 60 Subleased Railcars which PVS itself was continuing to lease from its Principal Lessors at a cost of $77,625/month). The shortfall between the amounts that USMAG agreed to pay PVS for the Subleased Railcars and the amounts that USMAG actually paid to PVS totaled $1,215,455.48

In addition, as stated above, each HCl order was to be treated as a separate contract, so a failure to complete a particular order could not have gone to the "very object of the contract." *Polyglycoat Corp.*, 591 P.2d at 451. Thus, even if PVS did breach the parties' agreement (which

20

it didn't), that breach (or those breaches) did not relieve USMAG of its obligations under the parties' agreements—especially the Railcar Subleases.

## VIII.   Statute of Frauds

USMAG alleges that the parties entered into a side deal referred to as the "CWT Agreement." USMAG contends that, at the July 17, 2015 meeting between USMAG and PVS, PVS orally agreed to purchase three railcars of HCl per week, at $90/ton, for a full year. PVS denies that any such agreement was ever reached.

But regardless of where the Court comes down on this dispute, Utah law provides that, between merchants, and subject to discrete exceptions, "a contract for the sale of goods for the price $500 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." Utah Code Ann. § 70A-2-201. In addition, "*every agreement* that by its terms is not to be performed within one year from the making of the agreement" is "void unless the agreement, or some note or memorandum of the agreement, is in writing, signed by the party to be charged with the agreement." Utah Code § 25-5-4(1)(a) (emphasis added). In other words, if an agreement calls for the sale of goods for more than $500, or if an agreement cannot, by its terms, be performed within one year (i.e., before a year has elapsed), it is subject to Utah's Statute of Frauds. And if the agreement is subject to the Statute of Frauds, it must be in writing and be signed

1780769.1

by the party to be charged. Otherwise, the agreement is unenforceable.[3] There is no such writing in this case.

## IX.    Mitigation of Damages

As discussed above, many of PVS's defenses against USMAG's breach-of-contract claims support PVS's counterclaim—that USMAG's claim that PVS breached the Sales Agreement fails for numerous reasons, and thus, regardless of how the Court rules on the integration issue, USMAG was not relieved of its payment obligations under the Railcar Subleases. Another one of PVS's defenses in this matter is failure to mitigate. "Under the doctrine of avoidable consequences the nonbreaching party has an active duty to mitigate his damages, and [] may not, either by action or inaction, aggravate the injury occasioned by the breach." *Pack v. Case*, 2001 UT App 232, ¶ 27, 30 P.3d 436 (cleaned up).

The evidence at trial will show that USMAG always *intended* to sell HCl directly to customers and to other resellers. The evidence will show that USMAG always had the *ability* to do so—using the railcars provided by PVS. Indeed, the evidence will show that USMAG *did in fact sell* HCl directly to customers and other resellers. The evidence at trial will also show that USMAG sold other products made from its byproduct chlorine. PVS believes that the Court will conclude that USMAG failed to adequately mitigate its damages by failing to make appropriate efforts to sell any HCl it believed PVS was obligated to purchase, and/or convert its chlorine, or

---

[3] Even if the alleged oral agreement could somehow satisfy the Statute of Frauds (which it can't), it would still be subject to the integration clauses identified in section I above. Again, those clauses supersede and eliminate any and all oral agreements or understandings that allegedly existed prior to, or contemporaneously with, the Sales Agreement and the Railcar Subleases about the subject matter of those agreements—including the alleged CWT Agreement.

its already produced HCl, into another product to be sold on the open market. Accordingly, PVS believes that any damages that USMAG might otherwise be entitled to recover if the facts in this case supported USMAG's claims (which they don't), the Court will nonetheless hold that USMAG's damages must be reduced by its failure to properly mitigate its alleged damages.

## WITNESSES

PVS intends to call the following witnesses in support of its claims and defenses:

### 1. Jeffrey Stein

It is anticipated that Mr. Stein will attend trial in this matter. As President of PVS, Mr. Stein executed the Sales Agreement and Railcar Subleases on behalf of PVS and managed the company's performance under those contracts. PVS anticipates that Mr. Stein will testify regarding: the HCl market during the time periods relevant to this dispute; the similarities and differences between revenue-share arrangements and sales agreements and the different iterations of each type that PVS has entered into with various HCl sellers; PVS's understanding of the terms of the Sales Agreement at the time PVS executed it; PVS's conveyance of railcars to USMAG under the Railcar Subleases; PVS's purchase of HCl from USMAG under the Sales Agreement; PVS's purchase of HCl for CWT; PVS's purchase of HCl from other sellers; PVS's communications with USMAG in negotiating HCl prices; PVS's HCl customers during the relevant time period; PVS's communications with USMAG relating to USMAG's return of the railcars to PVS; PVS's communications with USMAG relating to USMAG's allegations of PVS's breach of the Railcar Subleases; and USMAG's refusal to continue to make railcar-sublease payments.

## 2. David Nicholson

It is anticipated that Mr. Nicholson will attend trial in this matter. Mr. Nicholson is the President and CEO of PVS's parent company, and he oversaw PVS's negotiation of, and performance under, the Commercial Agreement, Sales Agreement, and Railcar Subleases. PVS anticipates that Mr. Nicholson will testify regarding: the HCl market during the time periods relevant to this dispute; the similarities and differences between revenue-share arrangements and sales agreements and the different iterations of each type that PVS has entered into with various HCl sellers; PVS's understanding of the terms of the Sales Agreement at the time PVS executed it; PVS's communications with USMAG (and the lack thereof) relating to HCl for CWT; PVS's acquisition of railcars pursuant to the Commercial Agreement; PVS's acquisition of the railcars identified in the Sublease Agreements; PVS's conveyance of railcars to USMAG under the Railcar Subleases; USMAG's return of the railcars to PVS; PVS's purchase of HCl from USMAG under the Sales Agreement; PVS's purchase of HCl for CWT; PVS's purchase of HCl from other sellers; PVS's HCl customers during the relevant time period; PVS damages from USMAG's breach of the Railcar Subleases; the profitability of USMAG's HCl business.

## 3. Mike Dunn

PVS might call Mr. Dunn as a witness in this matter. As PVS's Vice President of Materials & Logistics, Mr. Dunn supervised and controlled PVS's leasing and subleasing of railcars. PVS anticipates that, if called, Mr. Dunn will testify regarding: PVS's acquisition of railcars, pursuant to the Commercial Agreement; PVS's acquisition of the railcars identified in the Sublease Agreements; PVS's conveyance of railcars to USMAG under the Railcars Subleases to USMAG; USMAG's return of the railcars to PVS.

### 4. William Scott Trussell

It is anticipated that Mr. Trussell will attend trial in this matter. Mr. Trussell was the President of PVS during the negotiation of, and the parties' performance under, the Commercial Agreement, as well as during the negotiation (but not the execution) of the Sales Agreement. PVS anticipates that Mr. Trussell will testify regarding: the HCl market during the time periods relevant to this dispute; the losses PVS experienced under the Commercial Agreement; the parties' intent in entering into the Sales Agreement; the parties' intent in entering into the Sublease Agreements; the similarities and differences between revenue-share arrangements and sales agreements and the different iterations of each type that PVS has entered into with various HCl sellers; PVS's understanding of the terms of the Sales Agreement at the time PVS executed it; PVS's acquisition of railcars, pursuant to the Commercial Agreement; PVS's acquisition of the railcars identified in the Sublease Agreements; his employment once he left PVS; his interactions with USMAG once he left PVS.

### 5. Cameron Tissington

It is anticipated that Mr. Tissington will not attend trial in this matter. Mr. Tissington was the Vice President of Sales for USMAG during the negotiation of, and the parties' performance under, the Commercial Agreement, the Railcar Subleases, and the Sales Agreement. PVS will offer some limited testimony from Mr. Tissington's recorded testimony—namely his deposition testimony—as designated by PVS pretrial. PVS anticipates that Mr. Tissington's testimony will relate to the following: the HCl market during the time periods relevant to this dispute; the losses PVS experienced under the Commercial Agreement; the parties' intent in entering into the Sales Agreement; the parties' intent in entering into the Sublease Agreements; PVS's conveyance of

railcars pursuant to the Railcar Subleases; the amount of HCl produced on a weekly basis during its operation; the amount of time USMAG's HCl plant was not producing HCl or was not producing HCl to the plant's full capacity; USMAG's efforts to sell HCl to third parties; USMAG's sales of chlorine-based products other than HCl; USMAG's struggles to get its HCl plant up and running; USMAG's return of the railcars to PVS and the parties' communications related to that return; the parties' attempts to negotiate HCl prices; the parties' communications related to PVS's purchase of HCl for CWT.

## 6. Reservation

In addition, PVS reserves the right to call any rebuttal witness not currently anticipated, based on testimony at trial, as allowed by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the Court.

DATED this 31st day of January, 2022.

JONES WALDO HOLBROOK & McDONOUGH, PC


By: /s/ *Paul R. Smith*
    Timothy C. Houpt
    Paul R. Smith
*Attorneys for Defendant and Counter Claimant PVS Chloralkali, Inc.*

26

1780769.1

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 31st day of January, 2022, I caused a true and correct copy of the foregoing DEFENDANT'S TRIAL BRIEF to be served, via electronic filing, on the following:

Richard D. Burbidge
rburbidge@burbidgemitchell.com
Carolyn LeDuc
cleduc@burbidgemitchell.com
Clancey S. Henderson
chenderson@burbidgemitchell.com
BURBIDGE | MITCHELL
215 South State Street, Suite 920
Salt Lake City, UT  84111


           */s/ Paul R. Smith*

1780769.1