Richard D. Burbidge (0492)
rburbidge@burbidgemitchell.com
Carolyn LeDuc (14240)
cleduc@burbidgemitchell.com
Clancey S. Henderson (17066)
chenderson@burbidgemitchell.com
BURBIDGE | MITCHELL
215 South State Street, Suite 920
Salt Lake City, Utah 84111
Telephone: 801-355-6677
Facsimile:  801-355-2341

*Attorneys for Plaintiff/Counterclaim Defendant US Magnesium, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| US MAGNESIUM, LLC, <br><br> Plaintiff and Counterclaim Defendant, <br><br> vs. <br><br> PVS CHLORALKALI, INC. <br><br> Defendant and Counterclaimant. | **PLAINTIFF US MAGNESIUM, LLC'S AMENDED TRIAL BRIEF** <br><br> Case No. 2:16-cv-01021-JNP-DBP <br><br> Judge Jill N. Parrish <br><br> Magistrate Judge Dustin B. Pead |

Plaintiff US Magnesium, LLC ("US Mag"), by and through counsel, hereby submits this

Trial Brief in anticipation of the bench trial scheduled for February 15-17, 2022.

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................... 1

II.  ELEMENTS FOR US MAG'S BREACH OF CONTRACT CLAIM AND ACTION FOR DECLARATORY JUDGMENT ................................................................... 4

  A.  FIRST ELEMENT - CONTRACT ......................................................................... 4

  B.  SECOND ELEMENT - PERFORMANCE BY US MAG ................................... 5

  C.  THIRD ELEMENT - BREACH BY PVS ............................................................. 5

  D.  FOURTH ELEMENT - DAMAGES ..................................................................... 6

III.  ELEMENTS FOR US MAG'S AFFIMATIVE DEFENSES .................................... 7

IV.  ANTICIPATED TRIAL WITNESSES ................................................................... 8

  A.  [US MAG] Garret Jones, Senior Sales Engineer, US Mag ................................... 8

  B.  [US MAG] Cameron Tissington, Former VP Sales, US Mag ............................... 8

  C.  [US MAG] Susan Slade, VP Marketing, US Mag ................................................ 8

  D.  [US MAG] Richard Hoffman, US Mag Damages Expert ..................................... 9

  E.  [PVS] Scott Trussell – Former President, PVS ChlorAlkali ................................. 9

  F.  [PVS] Jeffery Stein, President, PVS ChlorAlkali ................................................. 9

V.  SUMMARY OF KEY EVENTS ........................................................................... 10

  A.  With PVS's Encouragement and Assistance, US Mag Built a New Hydrochloric Acid Plant and Entered the High-Grade HCl Market. ........................................ 10

  B.  When the Market for Hydrochloric Acid Declined, PVS Sought Relief From Its Obligations Under the Commercial Agreement, and the Parties Executed a New Agreement. .......................................................................................................... 12

  C.  Material Terms of the Sales Agreement ............................................................... 15

  D.  PVS Failed to Purchase US Mag's Offered Volumes, Causing US Mag to Justifiably Claim Breach and Cease Payments Under the Railcar Subleases in 2016 ..................................................................................................................... 20

VI.  KEY LEGAL DISPUTES AND AUTHORITIES .................................................. 23

  A.  US Mag's Performance and PVS's Breaches. ...................................................... 23

ii

1.    The One-Year CWT Commitment Was a Binding and Enforceable Obligation Under the Sales Agreement, and PVS Breached That Obligation. .................. 23

2.    As to Remaining Quantities Under the Sales Agreement, US Mag Performed Its Promises, But PVS Breached. ...................................................... 27

B.  US Mag Is Entitled to a Declaratory Judgment That After PVS's Material Breaches, It Had No Further Obligations Under the Sales Agreement and the Integrated Railcar Subleases. ................................................................. 31

C.  As to Monetary Damages, US Mag Seeks to Recover $350,741 in Lost Profits.  35

1.    Lost Profits for CWT Sales ................................................................. 36

2.    Non-CWT Lost Profits ....................................................................... 37

3.    Avoided Railcar Sublease Expenses ................................................. 39

4.    No Avoided Cost for Producing HCl – and Incidental (Additional) Cost to Neutralize Unused Chlorine ............................................................. 39

5.    Summary of US Mag's Damages ....................................................... 41

VII.   CONCLUSION ............................................................................................ 42

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Brown*, 646 P.2d 692 (Utah 1982) ........................................................... 35

*Atlas Corp. v. Clovis Nat'l Bank*, 737 P.2d 225 (Utah 1987) ...................................... 32

*Bazak Intern. Corp. v. Tarrant Apparel Grp*, 378 F.Supp.2d 377 (S.D.N.Y. 2005) .................... 23

*Bonneville Distr. Co. v. Green River Dvlpmnt Assoc., Inc.*, 2007 UT App 175,164 P.3d 433 .... 32

*Calumet Refining Co. v. Star Lubricating Co.*, 230 P. 1028 (Utah 1924) .............................. 24, 26

*Campbell v. Staple Cotton Co-op. Ass'n*, 334 So.2d 378 (Miss. 1976) ........................................ 30

*Cannon v. Stevens Sch. of Bus.*, 560 P.2d 1383 (Utah 1977) ........................................................... 31

*Dunning v. Chemical Waste Management, Inc.*, No. 91 C 2502, 1997 WL 222891, (N.D. Ill. Apr. 24, 1997) ................................................................. 33

*Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 22, 94 P.3d 193 ................................................ 27

*Holland-Cook Mfg. Co. v. Consolidated Wagon & Machine Co.*, 161 P. 922 (Utah 1916)......... 35

*Huegel v. Mifflin Const. Co., Inc.*, 796 A.2d 350 (Pa. Super. Ct. 2002)...................................... 33

*Lefavi v. Bertoch*, 2000 UT App 5, ¶ 16, 994 P.2d 817 ................................................................. 36

*Lone Mountain Prod. Co. v. Natural Gas Pipeline Co.*, 984 F.2d 1551 (10th Cir.1992)............. 36

*Macris v. Sevea Intern., Inc.*, 2013 UT App 176, ¶ 44, 307 P.3d 625 .......................................... 36

*Naimie v. Cytozyme Laboratories, Inc.,* 174 F.3d 1104 (10th Cir. 1999).................................... 36

*Orlob v. Wasatch Med. Mngmnt*, 2005 UT App 430, 124 P.3d 269.............................................. 32

*Pennsy Supply Inc. v. American Ash Recycling Corp.,* 895 P.2d 595 (Penn. Super. Ct. 2006).... 40

*Polyglycoat Corp. v. Holcomb*, 591 P.2d 449 (Utah 1979) ........................................................... 27

*Republic Bank, Inc. v. West Penn Allegheny Hlth Sys., Inc.*, 475 Fed.Appx. 692 (10th Cir. 2012)............................................................................... 23, 24

*Sacramento Baseball Club, Inc. v. Great Northern Baseball Co.*, 748 P.2d 1058 (Utah 1987) .. 33

*Sparrow v. Tayco Const. Co.*, 846 P.2d 1323 (Utah Ct. App. 1993).......................................... 32

*Upstate Shredding, LLC v. Northeastern Ferrous, Inc.*, No. 3:12–CV–1015 (LEK/DEP), 2014 WL 4883024 (N.D.N.Y. Sep. 30, 2014) .......................................................... 30

*Winsness v. M. J. Conoco Distributors, Inc.*, 593 P.2d 1303 (Utah 1979) ............................ 35, 36

**Rules**

MUJI 2d CV 2116.......................................................................................................... 27

Restatement (Second) of Contracts § 245...................................................................... 31

Utah Code § 70a-2–201(2).............................................................................................. 24

Utah Code § 70A-2-204 .................................................................................................. 23

Utah Code § 70A-2-206 .................................................................................................. 23

Utah Code § 70A-2-610 .................................................................................................. 32

## I.   INTRODUCTION

As the Court will recall, this action involves breach of an agreement for the purchase of hydrochloric acid.  The facts are straightforward and the breach was clear.

US Mag is an American manufacturer of magnesium.  PVS is a broker/seller of hydrochloric acid (sometimes "HCl").  In the process of manufacturing magnesium, US Mag produces chlorine, a significant portion of which it must sell or neutralize at considerable expense.

In 2013, the president of PVS, Scott Trussell, proposed that US Mag construct an HCl plant to convert its excess chlorine to high-grade hydrochloric acid, which PVS would then market and sell as US Mag's broker.[1]  Mr. Trussell proposed that PVS would benefit from this arrangement by obtaining additional HCl to sell, while US Mag would benefit by avoiding the cost of neutralizing excess chlorine byproduct and profiting from the sales.  The parties entered into a Commercial Agreement whereby PVS agreed to sell and transport at least 50% and up to 100% of US Mag's output of high-grade HCl.  Under the Commercial Agreement, the parties agreed to split net revenues, with 77½% of the net revenue to US Mag and 22½% to PVS.  At the time, the HCl market was strong, with demand outpacing supply.  And the future prospects for the market looked bright.  Therefore, with PVS's encouragement and assistance, US Mag built its new HCl plant.

The plant was fully constructed and began its operations in early 2015, triggering the "effective date" of the Commercial Agreement.  However, within a few months of the effective date, the market for HCl declined.  There was a "hardship" clause in the Commercial Agreement, but PVS did not want to have to comply with that clause, as that would have required at least 12

---

[1] US Mag had considered building an HCl plant prior to speaking with PVS.  However, PVS encouraged the idea, promising to provide substantial assistance with (among other things) marketing, distribution, and sales.

additional months of unabated performance.  Therefore, PVS asked US Mag if it could simply be relieved of its contractual obligations.

US Mag had the right, of course, to reject this request.  And since the Commercial Agreement effectively guaranteed a market for up to 100% of its HCl output, such that US Mag could avoid neutralization costs, the agreement was beneficial to US Mag even in a downturned market.  Nevertheless, in order to preserve the business relationship, US Mag accommodated PVS's request for relief.  The parties entered into an alternative "Sales Agreement," with three distinct features: (1) US Mag had the option to sell at least 600 tons of HCl to PVS per week; (2) of that 600 tons per week, 258 tons (3 railcars of volume) would be guaranteed for sale at $90/ton to be delivered to a PVS affiliate, California Water Technologies ("CWT") for the first year of the contract period; and (3) to enable transportation of the 600 tons per week anticipated under the Sales Agreement, US Mag would sublease 60 railcars from PVS, thus assuming PVS's obligations for the lease of those railcars from third parties.

The new Sales Agreement, executed in late July 2015, had a retroactive effective date of June 1, 2015.  However, PVS started breaching the Sales Agreement even while the ink was still drying.  Thus, although US Mag notified PVS of HCl availability at 600 tons per week (thereby exercising its option), PVS failed and refused to provide a price on, much less take, the HCl that US Mag offered.  And, PVS failed to purchase the agreed 3 railcars per week for CWT, upon which the parties had agreed to a fixed price of $90/ton.  By July 2016, PVS had defaulted on 5,717 tons of the fixed-price CWT commitment (42.6% default), and had defaulted on 17,349 tons of non-CWT product (92.1% default).  Moreover, for the preceding six months, PVS had been delinquent on the majority of US Mag's invoices, sometimes seriously delinquent; and its payables department had been evasive and sometimes dishonest with US Mag's staff.

2

On July 6, 2016, following months of PVS's defaulting performance, US Mag gave formal notice to PVS that it was in breach.  Until that time, while the Sales Agreement had been in effect, US Mag had dutifully paid the sublease payments on all 60 railcars—though not all had been delivered to US Mag; and the railcars, by reason of PVS's default in its HCl purchase obligations, had been only partially employed.  PVS had failed to purchase its HCl commitment, had failed to make payments for the HCl purchased, and had charged US Mag for undelivered, and only partially utilized, railcars. US Mag stated that it intended to suspend and discontinue payments on the Railcar Subleases if PVS's breaches were not cured.  PVS did not cure its breaches to purchase HCl commensurate with its contractual obligation, and US Mag therefore discontinued lease payments for the railcars.

In its breach of contract claim, US Mag seeks damages against PVS under a "benefit of the bargain" theory.  The damages for the breach of the purchase obligation are $350,741 constituting three elements: (1) the contract profit that US Mag lost by reason of the PVS breaches, and (2) the cost of neutralizing the HCl that should have been but was not purchased by PVS (the "shortfall"); less (3) US Mag's avoided costs under the Railcar Subleases.  The damages are summarized below:

| Total Lost Profits from Unsold Hydrochloric Acid | |
|---|---|
| Profit Loss from Unsold Hydrochloric Acid (Non-CWT) | $1,084,125 |
| Plus: Profit Loss from Unsold Hydrochloric Acid (CWT) | $264,358 |
| Plus: Chlorine Neutralization Costs | $542,607 |
| Less: Additional Railcar Lease Payments | ($1,540,350) |
| **Total Lost Profits** | **$350,741** |

3

There is no dispute that the Sales Agreement, including the incorporated Railcar Subleases, is valid and enforceable.  Also not in dispute is the amount of HCl purchased by PVS during the first year of the Sales Agreement (2015-2016).  Further, the fact that US Mag discontinued payments under the Railcar Subleases in August 2016 (following PVS's breach) is not in dispute.  Therefore, the issues to be resolved by the factfinder will be few and specific.  US Mag will show, from the language of the contract, as modified by the parties, PVS incurred a purchase obligation under the Sales Agreement, and that the Railcar Subleases were integrated with, and made part of, the Sales Agreement.  US Mag will also demonstrate that it incurred damages by reason of the PVS breaches.

In the alternative, by reason of the breach, US Mag seeks a declaratory judgment that after PVS's breach, declared in July 2016, it had no further obligation under the Sales Agreement or integrated Railcar Subleases.

## II.  ELEMENTS FOR US MAG'S BREACH OF CONTRACT CLAIM AND ACTION FOR DECLARATORY JUDGMENT

A claim for breach of contract requires: (1) a contract, (2) performance by the party seeking recovery, (3) breach by the other party, and (4) damages. *Bair v. Axiom Design, LLC*, 2001 UT 20, ¶ 14, 20 P.3d 388.  For US Mag's declaratory judgment claim, of course, no proof of damages is necessary.  Below is a summary of the evidence supporting each element.

### A.  FIRST ELEMENT - CONTRACT

- US Mag and PVS entered into the Hydrochloric Acid Sales Agreement, which referenced, incorporated, and required that the parties enter into, all of the Railcar Subleases, made effective June 1, 2015. (Stip. Ex. 57, attached hereto as Exhibit A.)  The Sales Agreement was for the period from June 1, 2015 to December 31, 2017.
- On August 4, 2015, about a week after the parties executed the Sales Agreement, the parties agreed in writing to modify and simplify their protocol for each sale—such that (1) US Mag would inform PVS of available volumes; (2) PVS, as broker, would inform

4

US Mag of one or more of its pending sales for such volume (price, location); and (3) US Mag would accept PVS's price or pass on the transaction. (Stip. Ex. 65 (attached as Exhibit C hereto).)

- As a fixed component of the Agreement, PVS promised to take 3 railcars (258 tons) per week for resale to its customer/affiliate CWT, at a fixed price of $90/ton, for a one-year period. (Stip. Exs. 53, 54.)

- Pursuant to paragraphs 4 and 5 of the Sales Agreement, US Mag agreed to assume PVS's obligations for the lease of 60 railcars, which would enable US Mag to fulfill the sales that PVS would arrange for US Mag. (Stip. Ex. 57 (Ex. A hereto).)  With or without the execution of the Railcar Subleases, by the terms of the Sales Agreement alone, US Mag was obligated to pay PVS for the leased railcars.  A form sublease agreement was attached to the Sales Agreement as Schedule 3, and each of the executed Railcar Subleases followed that form precisely. Each of the Railcar Subleases had a term of June 1, 2015 through May 31, 2018.  Pursuant to these Railcar Subleases, PVS was obligated to deliver a total of 60 railcars to US Mag.  For each delivered railcar, US Mag was to pay $1,050 /month.

## B.    SECOND ELEMENT - PERFORMANCE BY US MAG

- US Mag fulfilled its obligation to offer HCl to PVS, typically offering the "target" 600 tons of HCl per week.  Such offers were made in writing and/or, pursuant to the simplified protocol mentioned above, by telephone.  (Stip. Exs. 65 (Ex. C hereto), 69.)

- For a short period in the fall of 2015, US Mag's HCl plant was down for maintenance. At all times during this plant maintenance, US Mag kept sufficient quantities of reserve HCl to fulfill the 3 railcar/week commitment for CWT.  Then, as soon as the HCl plant was operating again at full capacity, US Mag informed PVS that it was once again able to supply volumes to non-CWT customers, up to a total of 600 tons/week.

- During the contract period, when PVS informed US Mag of a pending sale and quoted the subject price and location, US Mag typically agreed on the price and the sale closed.

- The Court will hear evidence that US Mag fulfilled its obligation to pay for the delivered subleased railcars until July 2016, by which time PVS had failed to cure its material breach of the Agreement.

## C.    THIRD ELEMENT - BREACH BY PVS

- There is no dispute PVS did not take the required 3 railcars (258 tons) per week at $90/ton for resale to its customer/affiliate CWT.  (Stip. Exs. 104-105,138; Pl. Exs. 203-204.)

- As to non-CWT transactions, there is no dispute that throughout the term of the Sales Agreement, PVS brokered large volumes of HCl to its various customers, but PVS's sales were almost entirely brokered via HCl suppliers *other than US Mag*.  (Stip. Ex. 145, 146.)  For the overwhelming majority of its customer transactions, PVS failed to notify US Mag of the transaction and failed to quote US Mag a price/location for the business.

5

After November, 2015, PVS brokered not a single sale for US Mag's non-CWT product. At the date US Mag declared breach, PVS had defaulted on over 40% of its CWT purchase obligations, and over 90% of its non-CWT purchase obligations.

- PVS failed to timely pay for even the small quantities of HCl that it did broker for US Mag. (Stip. Exs. 99-100, 102.)

- The above facts show that US Mag is entitled to a declaratory judgment that after 2016, it had no further obligations under the Sales Agreement and the integrated Railcar Subleases.

### D.    FOURTH ELEMENT - DAMAGES

- As to money damages, US Mag will seek the "benefit of its bargain" – that is, expected revenues minus any saved costs, plus incidental damages.

- **Lost Profits – CWT Volumes**.  The first component of US Mag's lost profits arises from unsold HCl for PVS's customer/affiliate CWT.  PVS failed to take HCl at the agreed rate of 3 railcars (258 tons) per week at the fixed price of $90/ton.  During this yearlong commitment period, PVS fell short by 5,717 tons (42.6%).  Taking into account costs for freight[2] and PVS's "commissions"[3] under the Sales Agreement, US Mag lost CWT profits amounting to $264,358. (Pl. Ex. 215.)

- **Lost Profits – Non-CWT Volumes**.  The second component of US Mag's lost profits arises from unsold HCl for PVS's _non_-CWT customers.  US Mag was damaged by PVS's failure to notify US Mag of available transactions (prices and locations) for the non-CWT volume made available by US Mag.  Through the date of breach, the default for non-CWT purchases was 17,349 tons, a default of 92.1%.  Through the end of the contract term, PVS fell short by 62,788 tons.  Again taking into account costs for freight and commissions, US Mag lost non-CWT profits amounting to $1,084,125. (Pl. Ex. 213.)

- **Railcar Sublease Payments**.  Due to PVS's breach, US Mag's sublease of the railcars was rendered a waste.  However, for purposes of computing "benefit of the bargain" damages, a hypothetical calculation was made assuming the ongoing lease of the railcars that would have been needed if PVS had performed; and therefore the lost profits calculated by US Mag assume the railcar expenses were paid, amounting to additional expense of $1,540,350.  Parenthetically, PVS is claiming US Mag should pay the sum of $1.2 million for additional railcar payments, despite PVS's breach that rendered the railcars of no use to US Mag.  As referenced above, under US Mag's declaratory relief

---

[2] As US Mag's witness Garrett Jones will explain at trial, railroad companies like Union Pacific charge a freight cost, analogous to postage for the US Mail, based on the mileage traveled.  Such freight costs are paid exclusively to a railroad line, and are thus over and above any cost incurred for lease of the railcar(s) in which goods are shipped.

[3] The Sales Agreement provided that PVS would take a "commission" on each HCl transaction, based on the price of the HCl in that transaction.  Thus, for example, an HCl transaction at less than $125/ton would yield PVS a commission of $1.00 per ton.

claim, US Mag should be relieved of any obligation to pay the subleases subsequent to PVS's breach of Sales Agreement.  (Stip. Ex. 150; Pl. Ex. 219.)

- **Incidental Damages – Cost of Neutralizing Chlorine**.  Under Utah law, a party can recover incidental damages if it can show "the damages (1) were incurred because of the breach, and (2) were reasonable."  *Ohline Corp. v. Granite Mill*, 849 P.2d 602, 605 (Utah Ct. App. 1993) (citation omitted); *see also* Utah Code § 70A-2-710 (incidental damages include costs incurred to store or dispose of unsold goods).  Here, PVS's breaches caused US Mag to incur the cost of neutralizing the hazardous chlorine in the HCl that was not purchased.  As the Court will hear at trial, avoidance of neutralization costs was one of US Mag's primary incentives in constructing the HCl plant and entering into sales/brokerage agreements with PVS.  US Mag's neutralization cost for the chlorine from the unsold HCl was $542,607.  (Pl. Ex. 205.)

- **No Saved Costs for Producing HCl**.  In some cases, a buyer's breach may cause the seller to avoid production costs.  In this case, that did not occur.  As just discussed, US Mag had to neutralize its unused chlorine into order to make the chlorine safe for disposal.  The first step in this neutralization process was converting the chlorine to low-grade HCl.  US Mag witness Garrett Jones will explain that this step in the neutralization process costs approximately the same amount as the cost of converting chlorine to high-grade HCl.  The neutralization costs included in US Mag's damages analysis were incurred over and above any cost to convert the chlorine to low-grade HCl.

- **Total Lost Profits**.  Taking into account (a) US Mag's lost profits from CWT sales; (b) US Mag's lost profits from non-CWT sales; (c) hypothetical railcar lease expenses; and (d) incidental costs incurred to neutralize the chlorine, US Mag's total lost net profits from PVS's breach is $350,741.

## III.    ELEMENTS FOR US MAG'S AFFIMATIVE DEFENSES

- PVS seeks damages arising from US Mag's discontinuance of payments under the Railcar Subleases. US Mag's affirmative defense to this claim rests on the "first to breach" rule. "Under the first-to-breach rule, a party first guilty of a substantial or material breach of contract cannot complain if the other party thereafter refuses to perform.  He can neither insist on performance by the other party nor maintain an action against the other party for a subsequent failure to perform." *Cross v. Olsen*, 2013 UT App 135, ¶ 25, 303 P.3d 1030 (cleaned up).

- As shown above, PVS materially breached the Sales Agreement by failing to fulfill its CWT and non-CWT obligations and failing to pay or timely pay US Mag for purchased HCl, negating any further duty of performance for US Mag.  PVS should recover nothing on its counterclaim.

7

## IV.    ANTICIPATED TRIAL WITNESSES

### A.    [US MAG] Garret Jones, Senior Sales Engineer, US Mag

Mr. Jones will testify regarding the negotiation and execution of the Sales Agreement. He will testify that the Sales Agreement obligated US Mag to assume PVS's duties under the referenced and simultaneously-executed Railcar Subleases; that PVS agreed to take 3 railcars per week for CWT, at $90/ton for one year; that US Mag consistently offered volumes of HCl to PVS; that PVS defaulted on over 90% of its obligations to buy US Mag's non-CWT HCl by failing to quote any price/location for US Mag's product; that PVS defaulted on over 40% of its obligation to purchase HCl for CWT at fixed price and volume; that PVS was informed of, and failed to cure, its breaches; that US Mag ceased payments on the Railcar Subleases only after PVS's breach; and that US Mag was damaged by PVS's breach.

### B.    [US MAG] Cameron Tissington, Former VP Sales, US Mag

Mr. Tissington will be unavailable for trial (out of the country) and will thus testify by deposition.  Mr. Tissington will testify that PVS encouraged US Mag to construct an HCl plant and enter into the HCl business; that PVS promised it would market and sell US Mag's product; and that PVS claimed "hardship" under the parties' original "Commercial Agreement." Mr. Tissington will testify that the Sales Agreement and Railcar Subleases were integrated and part of the same whole. Mr. Tissington will testify about PVS's documented agreement with respect to CWT, and the parties' agreement to a revised protocol for non-CWT transactions.

### C.    [US MAG] Susan Slade, VP Marketing, US Mag

Ms. Slade may testify regarding the market conditions during the contractual period, US Mag's negotiation and execution of the Agreement, and PVS's breach of the Agreement.

**D.      [US MAG] Richard Hoffman, US Mag Damages Expert**

Mr. Hoffman has performed a forensic accounting analysis of US Mag's damages.  Mr. Hoffman will testify that US Mag lost net profits of $350,741 as a result of PVS purchasing less than the fixed purchase obligations of HCl for CWT and the weekly offered volume of non-CWT hydrochloric acid from US Magnesium between June 1, 2015 and December 31, 2017.

**E.      [PVS] Scott Trussell – Former President, PVS ChlorAlkali**

Mr. Trussell was the president of PVS at all relevant times before his departure from the company at the end of July, 2015 (around the same time the parties signed the Sales Agreement). While Mr. Trussell's successor president, Jeffrey Stein, signed the Sales Agreement on PVS's behalf, Mr. Trussell was the PVS representative involved in all pre-execution discussions and negotiations.  Mr. Trussell will testify about PVS's role in bringing US Mag into the high-grade HCl market and decision to construct an HCl plant.  Mr. Trussell is expected to testify that after US Mag's HCl plant became operational, PVS claimed hardship and sought to renegotiate the Commercial Agreement.  Mr. Trussell is expected to affirm that the parties replaced the Commercial Agreement with the Sales Agreement and Railcar Subleases, and that the Railcar Subleases were an essential part of the Sales Agreement. He is expected to affirm the documented agreement that, under the Sales Agreement, PVS promised to take 3 railcars per week at $90/ton, for one year, for its customer/affiliate CWT.

**F.      [PVS] Jeffery Stein, President, PVS ChlorAlkali**

As just mentioned, Mr. Stein became the president of PVS just as Scott Trussell was leaving at the end of July, 2015.  US Mag expects Mr. Stein will have to acknowledge his own emails confirming the CWT commitment.  He is expected to testify that market prices declined—although he will have to admit that PVS continued to transact HCl business with other

9

HCl suppliers (not US Mag), and PVS almost never proposed transactions for US Mag's consideration or approval, as was its obligation.

## V.    SUMMARY OF KEY EVENTS

Following is a timeline of key facts and events underlying the parties' dispute, many of which are uncontested.

### A.    With PVS's Encouragement and Assistance, US Mag Built a New Hydrochloric Acid Plant and Entered the High-Grade HCl Market.

1.    US Mag operates a magnesium production plant in Rowley, Utah.  To make its magnesium, US Mag precipitates magnesium chloride from the Great Salt Lake, and then separates the magnesium chloride into magnesium and chlorine. The chlorine, in turn, can be sold, converted into other chemicals (such as hydrochloric acid or ferric chloride), or neutralized and discarded through specialized disposal services.

2.    At all relevant times, PVS has been an established broker of high-grade hydrochloric acid (HCl).

3.    In or about 2013, US Mag considered entering into the high-grade HCl market. Scott Trussell, then-president of PVS, contacted Cameron Tissington, US Mag's Vice President of Marketing and Sales, to gauge US Mag's wherewithal to enter into the high-grade HCl market.

4.    US Mag did have the interest to add high-quality HCl to its product offerings. PVS learned that although US Mag currently lacked the facilities necessary to produce, load, and transport HCl, US Mag had abundant chlorine that could be converted to high-quality HCl.  US Mag also had an interest in avoiding the cost of neutralizing and disposing of excess chlorine.

5.    PVS represented that it could assist US Mag during its designing and constructing of a high-grade hydrochloric acid plant.  PVS represented, moreover, that it had market

10

knowledge, customers, and an existing infrastructure by which US Mag could distribute its new product.

6.      After several discussions, US Mag decided to move forward with construction of a new HCl plant.  Even without a formal agreement yet in place, Mr. Trussell provided insight about the HCl market and photographs of other plants' configurations, and he identified manufacturers that could supply components necessary for US Mag's new plant.  Mr. Trussell testified that "[W]e, I, was going to help them successfully get this project off the ground and bring the maximum value and consistency this project, absolutely."  (Trussell Dep. 35:9-24.)

7.      In the meantime, Mr. Tissington and Mr. Trussell negotiated the terms of what would be known as the "Commercial Agreement."  On June 13, 2013, before US Mag had begun construction on its HCl plant, US Mag and PVS executed the Commercial Agreement.  (Stip. Ex. 13.)

8.      Under the Commercial Agreement, US Mag would produce high-grade HCl, which PVS would sell to U.S. consumers at prices PVS negotiated.  PVS agreed to broker at least 40,000 tons/yr., which constituted half of US Mag's minimum projected annual output.  At US Mag's discretion and on 60-days' notice, PVS could have also been obligated to take US Mag's entire output.  (*See* Stip. Ex. 13, ¶ 3(a)(ii).)  PVS's duty to purchase HCl would be triggered when US Mag began producing 104 tons of HCl per day over a 10-day period.

9.      Because the market price of HCl could be variable, US Mag and PVS did not agree on a set purchase price.  Instead, the parties agreed to "revenue share":  US Mag would receive 77.5% of the net revenue and PVS would receive the remainder.  (Stip. Ex. 13 ¶ 8(c).)

10.     On June 19, 2013, US Mag issued a press release announcing the future construction of its new HCl plant.  (Stip. Ex. 14.)  Mr. Trussell will testify that he (PVS) helped

11

draft the press release.  Both PVS and US Mag knew, of course, that construction of the plant could involve setbacks and could take years.  But they agreed to issue the press release now, so as to discourage other potential newcomers to the market and try to avoid a glut of supply.

11.      In anticipation of its obligations under the Commercial Agreement, PVS leased new railcars.  US Mag also entered into its own lease agreements for railcars.  Because it would take approximately 18 months from the date of execution of a railcar lease agreement for a lessee to receive HCl railcars from a lessor, the parties had to enter into their respective railcar lease agreements well before US Mag completed construction of its HCl plant.

12.      By early 2015, US Mag's new HCl plant was complete and operational.  US Mag and PVS each agreed that they would consider March 1, 2015 to be the official "Commencement Date" under the Commercial Agreement.  (Stip. Ex. 20.)  For two months, PVS purchased HCl from US Mag, then sold the material to its customers and split the revenue with US Mag according to the terms of the Commercial Agreement.  Then problems arose.

**B.      When the Market for Hydrochloric Acid Declined, PVS Sought Relief From Its Obligations Under the Commercial Agreement, and the Parties Executed a New Agreement.**

13.      Late in the spring of 2015, the HCl market began to decline, and the price of HCl dropped.  Because the Commercial Agreement was not commercially advantageous for PVS in such a market, Mr. Trussell (PVS) called Mr. Tissington (US Mag) to seek relief.  PVS wanted to be released from its contractual obligations.

14.      The terms of the Commercial Agreement, as then constituted, were beneficial to US Mag.  However, US Mag valued its relationship with PVS, and hoped PVS would continue to market and sell its HCl.  As PVS was aware, US Mag also had an interest in avoiding the cost

12

of neutralizing excess chlorine byproduct.  Thus, US Mag agreed to release PVS from the Commercial Agreement and to instead negotiate a new agreement.

15.  Negotiations ensued in the summer of 2015.  US Mag agreed to supply PVS with a target of 600 tons of HCl per week—well below the volume PVS had been required to purchase under the Commercial Agreement.[4]  PVS agreed to purchase this volume at prices to be declared weekly, based on the transactions that PVS was negotiating with end customers.  PVS further agreed that for one year, it would satisfy part of its 600 ton/week obligation by purchasing a firm 258 tons (3 railcars) at a fixed $90/ton, for delivery to its affiliate CWT.

16.  US Mag agreed to assume responsibility for the delivery of its HCl to PVS's customers.  Therefore, as part of the new agreement, US Mag agreed to assume PVS's obligations for the lease of 60 railcars.

17.  By mid-July 2015, the parties had worked out terms and were finalizing their written documents.  For the CWT commitment (fixed price and volume), PVS needed the approval of its parent company, PVS Chemicals, since PVS Chemicals had the primary relationship with CWT.  Therefore, on July 17, 2015, Mr. Tissington (US Mag) met with Mr. Trussell (PVS) and David Nicholson, the president of PVS Chemicals (the "July 17 Meeting").  During the July 17 Meeting, Mr. Tissington and Mr. Trussell explained to Mr. Nicholson the new terms to which they had agreed.  On behalf of PVS Chemicals, Mr. Nicholson approved the CWT portion of the agreement.  Mr. Nicholson instructed PVS to issue a purchase order to US

---

[4] Under the Commercial Agreement, PVS had agreed to take between 40,000 tons and 57,000 tons of HCl per year—or, in other words, between 769 and 1096 tons per week.  (*See* Stip. Ex. 13, ¶ 3.)

Mag reflecting the same.  The testimony concerning this meeting and the confirming emails are undisputed.

18.    A few days later, on July 22, 2015, Mr. Trussell sent Mr. Tissington a final draft of the new Sales Agreement; a final draft of the Railcar Subleases, which were a part of the Sales Agreement; and an assurance that PVS was working on a formal CWT purchase order to fulfill a portion of PVS's obligations under the terms of the new Sales Agreement.

19.    On July 24th, US Mag signed and returned the Sales Agreement and the incorporated Railcar Sublease Agreements. (Stip. Exs. 49, 50.)  At the same time, Mr. Tissington delivered an email stating that his execution of these documents was made conditional on PVS's honoring the CWT commitment.  Mr. Tissington stated:

> I've signed the attached agreement in 2 places.  You'll need to the same and send me an electronic version of the signed and executed agreement.  …
>
> **As we discussed, I am signing this agreement with the understanding that US MAG will receive a one year purchase order from PVS for 3 cars of HCl per week, delivered to CWT in California, at $90/ton.**  The reason this is so important to me is that **it firms up the volume that US MAG can count on, at a known price,** for a portion of the period represented by the agreement.

(Stip. Ex. 49 (emphasis added).)

20.    The same day Mr. Tissington executed the Sales Agreement and the incorporated Railcar Subleases, Mr. Trussell amicably resigned from PVS, leaving the final act of signing the new agreements to his successor, Jeffrey Stein.

21.    Mr. Stein had not been involved in any of the negotiations between US Mag and PVS, and had not been present for the July 17 Meeting with PVS's parent company.  However, Mr. Nicholson (of PVS's parent company) ordered Mr. Stein to issue the CWT purchase order,

14

pursuant to the terms on which the parties had previously agreed.  In fact, Mr. Stein testified that he understood this instruction as his "marching orders."  (Stein Dep. 94:4-9.)  In multiple emails exchanged with US Mag, Mr. Stein affirmed the CWT part of the Sales Agreement, assuring Mr. Tissington that PVS would shortly be sending a formal purchase order for that volume.  (Stip. Exs. 54, 67, and 72.)  By way of example, in a July 28, 2015 email to Mr. Tissington (and copying Mr. Nicholson), Mr. Stein stated:

> I spoke to Dave [Nicholson].  We are all set, sorry for the confusion.  I will be sending you executed documents later today. ***We will also be sending you the PO for 3 cars per week at $90 DEL to CWT.***

(Stip. Ex. 54 (emphasis added).)

22.    One week later in a follow-up email, Mr. Tissington stated, "[W]e haven't seen the PV[S]-CWT orders.  Do you have a planned start date for the purchases."  Mr. Stein answered:

> Yes, lets [sic] plan for the morning of the 19th and ***per my earlier email the 3 r/c's [railcars] per week will commence shortly***.

(*See*  Stip. Ex. 67 (emphasis added).)

23.    Again, at the end of August, Mr. Stein reiterated:

> ***Thanks, Cam, we will make sure we are shipping the 3 cars per week to CWT …***

(*See* Stip. Ex. 72 (emphasis added).)

C.    **Material Terms of the Sales Agreement**

24.    Under Paragraph 3 of the Sales Agreement, US Mag had the option to sell, and PVS was "obligated" to purchase, up to 600 tons of HCl per week, arranged on a shipment-by-shipment basis for PVS's customer base. US Mag's option could be exercised as follows:

15

US MAG shall, at is sole discretion, offer a volume of Product each week ("Offered Volume") to PVS. ***The initial Offered Volume is a target of 600 Tons of Product per week*** (for purposes of this Sales Agreement, the term "Ton" means a net ton of 2,000 pounds, otherwise commonly known as a "short ton" or "US short ton"). ***PVS shall be obligated to purchase the Offered Volume*** provided that:

a.      US MAG provides a written report to PVS, as far in advance as possible, of the quantities of Product that US MAG expects to offer;

b.      US MAG uses its best efforts to make Product available to PVS in relatively equal quantities and on a regular basis;

c.      US MAG provides a minimum two weeks' notice on final volume available for sale and shipment during any shipment week. For example, Product available for shipment during the week of June 15, 2015 will be communicated no later than the end of business on June 1, 2015;

d.      Unless mutually agreed, PVS is not obligated to purchase more than 600 tons per week;

e.      PVS is not obligated to purchase more Product over a given period of time than it resells during the same period of time; and

f.      The Parties mutually agree upon a Price for the Offered Volume in accordance with Section 6 of this Sales Agreement.

(*See* Stip. Ex. 57 (Ex. A hereto), ¶ 3 (emphasis added).)

25.      Just days after executing the Sales Agreement, the parties confirmed in writing that in respect of the above requirements of Section 3, they would follow a simpler protocol, with three required steps. Specifically, (1) US Mag would tell PVS that it had product to sell; (2) PVS would inform US Mag of the price and location needed; and (3) US Mag could then agree with the price or pass on the business. (Stip. Ex. 65 (Ex. C hereto).) Remember that PVS was not just a buyer, but a *broker* of HCl. Thus, throughout the term of the Sales Agreement, PVS would

16

have existing customers and would be transacting specific sales with these customers at definite prices and locations each week.  PVS had the obligation, then, to present US Mag with prices and locations based on these third-party sales—at which time US Mag would have the option to accept the business or pass.

26.    This modified protocol was memorialized in an August 4, 2015 email ("Aug. 4, 2015 Email") from Mr. Tissington to Michael Wawrzyniak and Jeff Stein of PVS and Brian Alford, US Mag's logistics manager.  (*Id.*)  Mr. Tissington wrote:

> Michael & Brian,
>
> ***Jeff and I have changed the protocol for new business (out with the Scott—in with the new) going forward.***  It should make life a little simpler.
>
> **1. *USMag will inform PVS that we have product to sell.***
> **2. *PVS will inform US Mag of the location and price needed.***
> **3. *USMag will look at the price and freight rate and agree with the price or pass on the business.***
>
> At the present time and the foreseeable future (next six months) USMag has 600 tons per week of product available to sell to PVS. We are working under the assumption that 3 cars each week (86 tons/each) will move to PVS/CWT leaving 3 cars for other ship to locations such as Sweetwater Texas.

To the above email, Mr. Stein (PVS) replied, ***"Yes, this is my understanding and we will be getting the CWT orders on the books (3 R/Cs per week) shortly.  Thanks…"***  (*Id.* (emphasis added); *see also* Stein Dep. 104:14-105:1.)

27.    In his deposition, Mr. Stein commented on the portion of the above email dealing with the CWT obligation.  He did not deny that the parties had reached certain terms; he only purported to have been confused about when the one-year obligation would begin.  He stated: "***We were working off the assumption that there was a PO for one year from June, July,*** whatever the – keeps changing."  (Stein Dep. 104:14-107:16.)

17

28.     Because the Sales Agreement was framed as an "option" contract, US Mag did not need to accept PVS's stated prices and locations, but if it did, PVS would be obligated to conclude the transaction.

29.     Based on the shipment-by-shipment pricing that PVS committed to pay US Mag, US Mag agreed to pay PVS a sliding-scale "commission" (Stip. Ex. 57 (Ex. A hereto), ¶ 6(a)). PVS had the discretion to charge end customers more or less than it paid US Mag for each HCl transaction. (*Id.*, ¶ 6(b)). Mr. Hoffman, US Mag's damages expert, has determined that PVS's typical mark-up (over and above the "commissions" set forth in paragraph 6(a) of the Sales Agreement) was approximately 0.6%. (Pl. Ex. 216 [Hoffman Sch. 5].)

30.     The parties understood and agreed that over the life of the Sales Agreement, at 600 tons per week for 135 weeks, US Mag would sell a total of approximately 81,000 tons (160,000,000 pounds) of hydrochloric acid to PVS or to PVS's customers.

31.     Under the Sales Agreement, US Mag assumed the obligation to transport its HCl to PVS's end customers.  Paragraph 4 of the Sales Agreement stated, in pertinent part:

> USMAG is responsible for all transportation and related expenses in connection with each shipment of Product including, without limitation, all Railcar Sublease expenses pursuant to Section 5 of this Sales Agreement and all other lease and sublease costs and other expenses related to the railcars and trucks used to ship the Product from the Facility to the Product's destination(s)…

32.     To facilitate such transportation, US Mag agreed, in the Sales Agreement, to sublease certain railcars from PVS.  (Stip. Ex. 57 (Ex. A hereto) ¶¶ 4-5 & Sch. 2-3).  This transfer of the railcar obligations was so central to the Sales Agreement that it was mentioned prominently in the recitals to the Sales Agreement, which stated, in pertinent part:

> ***Whereas, effective June 1, 2015, the Parties mutually agreed to terminate the Existing Agreement and replace it with this Sales***

18

> ***Agreement <u>and separate Railcar Subleases</u>** (defined below)**, to be executed simultaneously with this Sales Agreement…"***

(Stip. Ex. 57, attached hereto as Exhibit A (emphasis added).)

33. As to these railcar obligations, paragraph 5 of the Sales Agreement stated, in pertinent part:

> The Parties acknowledge that PVS currently leases … the 60 railcars listed in the attached Schedule 2 and which the Parties now wish to transfer from PVS to US Mag… ***Simultaneously with the Parties' execution of this Sales Agreement, and effective as of the Commencement Date, PVS and USMAG shall enter into three separate railcar sublease agreements … in substantially the same form as the attached Schedule 3, with one Railcar Sublease for each Railcar Lessor …, pursuant to which, USMAG shall sublease the Transferred Railcars.***

34. In accordance with this paragraph 5, US Mag and PVS executed three Railcar Subleases (a different sublease for each of the three original lessors, or 60 railcars in total), at or about the same time they executed the Sales Agreement.

35. Schedule 2 to the Sales Agreement, entitled "Railcars to be Subleased to US MAG," specifically identified each railcar that would be subject to the Railcar Subleases. Schedule 3, then, was a template "Railcar Sublease Agreement," identical in form to the Railcar Subleases that were ultimately executed by the parties, with modifications only to reflect the different original lessors. Relatedly, paragraph 24 of the Sales Agreement, entitled "SCHEDULES," states as follows:

> If a document or matter is disclosed in any Schedule to this Sales Agreement, it shall be deemed to be disclosed for all purposes of this Sales Agreement without the necessity of a specific repetition or cross-reference.

(Stip. Ex. 57 (Ex. A hereto), ¶ 25.)

36. The Recitals in each of the Railcar Subleases state:

> Effective as of the Effective Date of this Sublease, the Parties are entering into a Hydrochloric Acid Sales Contract dated as of June 1, 2015 (the "Sales Agreement") pursuant to which US MAG has agreed to sell Product (as defined in the Sales Agreement to PVS.) ***The Parties are entering into this Sublease pursuant to the Sales Agreement.***

(Stip. Exs. 58, 60, 62 (emphasis added.)

**D.   PVS Failed to Purchase US Mag's Offered Volumes, Causing US Mag to Justifiably Claim Breach and Cease Payments Under the Railcar Subleases in 2016.**

37.   Even before the Sales Agreement was formally executed, US Mag informed PVS that it would have 600 tons of HCl per week to sell.  The evidence will also show that after the agreement was signed, US Mag told PVS many times – in writing, and thereafter repeatedly and regularly by phone – that it had 600 tons/week of HCl to sell, and would have the same quantity available every week for the foreseeable future.

38.   By way of example, on August 19, 2015, US Mag delivered a letter to PVS, stating (in pertinent part):

> Please accept this letter as written notification that US Magnesium offers PVS Chemicals Inc. for purchase, under the terms of our June 1, 2015 Sales Agreement, ***600 tons of Hydrochloric Acid per week for the balance of calendar year 2015.*** In the event that PVS is interested in purchasing more than 600 tons per week, US Magnesium has the ability to increase production to provide additional material.

(Stip. Ex. 69.)

39.   Throughout the first year of the contract term, US Mag maintained a consistent 600 tons per week of available volume, except for a brief period in the fall of 2015, when US Mag's HCl plant experienced a temporary shut-down for maintenance.  Even during that brief maintenance period, US Mag had sufficient quantities on hand to fulfill the 3 railcars per week for CWT.  And when the temporary shut-down abated, and at all times thereafter, US Mag informed PVS of consistently available quantities of HCl.

20

40.    However, PVS failed to meet its reciprocal obligations.

41.    For CWT material, as shown on Plaintiff's Exhibit 226 (attached hereto as Exhibit B), PVS sometimes purchased the required 258 tons/week, but more often did not.   By the end of the one-year CWT commitment period, PVS was deficient in CWT purchases by 5,717 tons, or 42.6% of its obligation.

42.    For US Mag's remaining available hydrochloric acid, PVS typically failed and refused to provide price and location for its transactions, as it had agreed and was obligated to do.  Instead, as US Mag later learned, PVS opted to broker HCl largely from other suppliers, in frank disregard of its obligations to US Mag.  As shown on Plaintiff's Exhibit 226 (attached hereto as Exhibit B), this failure to purchase US Mag's offered quantities of HCl continued through July 6, 2016, until US Mag finally declared PVS to be in breach.

43.    The breach at the time of notice was a default in non-CWT purchases by 17,349 tons, or 92.1% of its obligation to that date.

44.    By May, 2016, PVS was at least $77,000 past due, with payments overdue by as many as 121 days.  (Stip. Ex. 101.)  In response to US Mag's requests for payment, however, PVS's billing department often failed to respond, obfuscated, or supplied misinformation. Paragraph 8 of the Sales Agreement provides, "USMAG reserves the right, among other remedies, to suspend further shipments in the event PVS fails to pay for any invoice when payment becomes due…"

//

//

21

45.     On July 6, 2016, US Mag informed PVS that it considered PVS to be in breach. (*See* Stip. Ex. 104.)  On August 12, 2016, Mr. Tissington further informed Mr. Stein that PVS's 30-day payment terms had been withdrawn.  (Stip. Ex. 113.)

46.     A few weeks later, US Mag sought permission from PVS to sub-sublease 30 railcars to a third party, in order to mitigate losses from the breach.  (Stip. Ex. 123.)  PVS ignored the request.  On August 28, 2017, US Mag again attempted to mitigate loss and notified PVS that it intended to immediately return the railcars.  (Stip. Ex. 124.)  While there ensued some discussion among the parties' attorneys, PVS never authorized return or sub-sublease of the railcars.

47.     On October 19, 2017, yet again, US Mag sought permission from PVS to sub-sublease all 60 railcars to a third party in order to mitigate loss.  This time, although PVS apparently informed its counsel that it would accept return of the sublease railcars, PVS's counsel failed to relay that information to US Mag. (Stip. Ex. 127.)

48.     In response to PVS's material breaches, US Mag discontinued payment on the Railcar Subleases.  Thereafter, and as soon as it was logistically practicable, US Mag parked the empty railcars—to await return to PVS as soon as PVS accepted the same.  To do so, US Mag had to first offload some of the railcars, which were filled with HCl in anticipation of PVS's purchases.  Other subleased railcars were, at that time, being used to deliver HCl.  Those cars were returned to US Mag and likewise parked.

//

//

22

## VI.    KEY LEGAL DISPUTES AND AUTHORITIES

### A.    US Mag's Performance and PVS's Breaches.

The parties to this case do not dispute that the Sales Agreement is authentic, binding, and enforceable; and, as set forth above, the requirements under the Sales Agreement provided simple terms for PVS to buy or broker US Mag's hydrochloric acid.

The parties' respective performances under the Sales Agreement can best be analyzed under two distinct legal rubrics – one for certain dedicated volumes to PVS's affiliate, CWT; and the other for all remaining volumes, whether for CWT or other PVS customers.

### 1.    The One-Year CWT Commitment Was a Binding and Enforceable Obligation Under the Sales Agreement, and PVS Breached That Obligation.

Under the Uniform Commercial Code, "a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Utah Code § 70A-2-204. For commercial transactions, moreover, "an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." *See* Utah Code § 70A-2-206.

It is well established that under the above code provisions, both an "offer" and an "acceptance" can be communicated via simple emails. *See, e.g., Republic Bank, Inc. v. West Penn Allegheny Hlth Sys., Inc.*, 475 Fed.Appx. 692, 698 (10th Cir. 2012) (applying Utah law, finding that certain emailed communications constituted offer and acceptance under UCC) (citing UCC § 2–204(1)); *Bazak Intern. Corp. v. Tarrant Apparel Grp*, 378 F.Supp.2d 377, 389–90 (S.D.N.Y. 2005) (applying UCC, observing that "confirmatory" e-mail sent by party to be charged was sufficient to create triable jury issue on existence and terms of agreement).

Also, the fact that the parties may have contemplated a more formal writing, such as a purchase order, is immaterial to whether a binding agreement was formed.  *See Calumet Refining Co. v. Star Lubricating Co.*, 230 P. 1028 (Utah 1924) (finding exchanged telegrams sufficient to constitute binding commercial agreement, although the confirming telegram stated, "Mailing Contract," and the later-delivered formal contract was never executed, but the parties partially performed).  In *Calumet*, the Utah Supreme Court declared: "[W]here parties have assented to all the terms of the contract, and they are fully understood in the same way by each of them, the mere reference in conjunction therewith of a future contract in writing will not negative the existence of a present contract."  *Id.* at 1029.[5]

Here, as an inducement for US Mag to modify the parties' Commercial Agreement and assume PVS's railcar obligations, US Mag offered and PVS accepted that for the first year under the Sales Agreement, nearly half of the agreed-upon 600 ton/week volume (approximately 258 tons/week, or 3 railcars) would be pre-committed at fixed pricing.  That is, US Mag would deliver 3 railcars per week to PVS's affiliate, CWT, at a firm price of $90/ton.  Over the course

---

[5] The "statute of frauds" section of the UCC underscores the permissible informality of commercial transactions.  While transactions for the sale of goods worth $500 or more must be committed to writing, that writing can be sufficient even if it omits or incorrectly states one of the agreed terms, and even if "written in lead pencil on a scratch pad." Utah Code 70A-2-201 & cmt. 1.  The only term that must appear in the written confirmation is the quantity term.  *See, e.g., Republic Bank*, 475 Fed.Appx. at 698 (citing Utah Code § 70a-2–201 cmt. 1).  Thus, "the price, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted."  *Id.* (cleaned up).

What is more, as between merchants, if written confirmation of a transaction is received and not protested within 10 days, the statute of frauds is deemed satisfied:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know of its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within 10 days after it is received.

Utah Code § 70a-2–201(2).

of that first year, PVS thus committed to fixed terms for approximately 13,416 tons (26,832,000 pounds) of material.

The evidence of PVS's CWT commitment is substantial and undisputed. The Court will see that starting in June of 2015 (about a month before the parties executed the Sales Agreement) and continuing until a few weeks post-execution, the parties exchanged many written communications reflecting negotiations over, *and finally conclusion and affirmation of*, the CWT deal. Just a few of these communications include the following:

- On July 24, 2015, when Mr. Tissington (US Mag) signed the Sales Agreement, he wrote, ***"As we discussed, I am signing this agreement with the understanding that US Mag will receive a one-year purchase order from PVS for 3 cars of HCl per week, delivered to CWT in California, at $90/ton. The reason that this is so important to me is that it firms up a volume that US Mag can count on, at a known price, for a portion of the period represented by the agreement."*** (Stip. Ex. 53 (emphasis added).)

- On July 28, 2015, by which time PVS had not yet executed and returned the Sales Agreement, Mr. Stein (PVS) wrote to Mr. Tissington (US Mag), "… ***We are all set, sorry for the confusion. I will be sending you the executed documents later today. We will also be sending you the PO for 3 cars per week at $90 DEL to CWT.*** I look forward to working with you…" (Stip. Ex. 54 (emphasis added).)

- On August 4, 2015, Mr. Tissington (US Mag) wrote to Stein (PVS), "[W]e haven't seen the PV[S]-CWT purchase orders. Do you have a planned start date for the purchases." He later added, ***"We are working under the assumption that 3 cars each week (86 tons each) will move to PVS-CWT leaving 3 cars for other ship to locations such as Sweetwater Texas."*** (Stip. Exs. 66, 67 (emphasis added).) Mr. Stein responded, ***"Yes, this is my understanding and we will be getting the CWT orders on the books (3 R/C per week) shortly."*** (Stip. Ex. 66 (emphasis added).)

- On August 19, Mr. Tissington (US Mag) wrote to Mr. Stein (PVS), ***"The Sales Agreement was signed on July 29 and we have received orders for only two cars per week for the past three weeks. [US Mag] expects PVS to order the previously agreed upon quantity and to make up the shortfall."*** PVS did not object

25

- to this characterization of its CWT commitment.  (Stip. Ex. 69 (emphasis added).)

- The following week, in the context of an email exchange regarding additional volumes of material, Mr. Stein wrote, "***In addition to the 2-3 per week to CWT*** plus an additional 3 per week to the oil patch in TX … can we place another 2-3 per week on you to the oil patch…?***"*** *Mr. Tissington quickly corrected Mr. Stein's mis-statement of the agreement, stating (in pertinent part),* ***"And [I] am looking for 3 cars per week (not 2) at the CWT $90/ton."*** Mr. Stein answered, "***Thanks, Cam, we will make sure we are shipping the 3 cars per week to CWT*** and will be placing 3 additional orders per week…"  (Stip. Ex. 72 (emphasis added).)

PVS's current president, Jeffrey Stein, unequivocally affirmed the CWT obligation in his deposition.  Commenting on Mr. Tissington's [US Mag] August 4, 2015 email, in which Mr. Tissington lays out the CWT terms, Mr. Stein observed, "***We were working off the assumption that there was a PO for one year from June, July***…"  (Stein Dep. 104:14-107:16.)  The Court will see that while Mr. Stein purported to be confused about when the CWT obligation was to begin (a dubious position, given written communications post-dating August 4th), Stein cannot and did not dispute that there was, in fact, a one-year commitment for CWT on the terms specified by Mr. Tissington.  The many emails set forth above include firm quantity (three railcars per week, totaling approximately 258 tons), firm price ($90/ton), and a set term (one year); and they show that obligation was supposed to begin *immediately*.  Under Utah law, this was more than sufficient to constitute a binding agreement.

Of note, nothing in the Supply Agreement required transactions to be documented in purchase orders; and Mr. Stein, PVS's president, confirmed in his deposition that the parties frequently arranged transactions orally. (Stein Dep. 100:8-16.)[6]

---

[6] Further demonstrating that PVS knew of and agreed to the CWT transactions is the fact that, just as in the *Calumet* case, PVS partially performed its promises.  Plaintiff's Exhibit 226 (Ex. B hereto) summarizes the volumes of HCl that PVS actually brokered each week for the

26

Under Utah law, a breach is material "if a party fails to perform an obligation that was important to fulfilling the purpose of the contract." *See* MUJI 2d CV 2116; *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 22, 94 P.3d 193; *Polyglycoat Corp. v. Holcomb*, 591 P.2d 449, 451 (Utah 1979).

Here, as shown on Plaintiff's Exhibit 226 (attached hereto as Exhibit B), PVS's orders for CWT remained spotty and in breach all through the promised one-year commitment period.  By June 1, 2016, which concluded that first year, PVS's shortfalls for CWT alone (to say nothing of other shortfalls) totaled 5,717 tons (11,434,000 pounds), which was 42.6% of the CWT obligation.  PVS's breach of its CWT obligations was material.

**2.**      **As to Remaining Quantities Under the Sales Agreement, US Mag Performed Its Promises, But PVS Breached.**

The Sales Agreement stated from the outset that US Mag's "Initial Offered Volume" was 600 tons per week.  Therefore, over and above the CWT volumes (3 railcars = 258 tons/week), the parties anticipated and agreed that for the first year, PVS would be brokering about 342 tons (600 – 258 = 342) each week.  After that first year, a full 600 tons per week would be available for any PVS customer, until the end of the contract term, December 2017.

As mentioned in Section V, ¶ 24 above, the Sales Agreement stated PVS would be "obligated" to purchase US Mag's volume, provided that: (a) US Mag provided advance written

---

duration of the contract term.   As shown in the column labeled "Purchased CWT," PVS ordered the requisite amounts (258+ tons) of hydrochloric acid for CWT for many weeks—as, for example, for the weeks staring 8/31, 9/7, 9/21, 9/28, 10/12, and 10/26.  The Court will see evidence that for each shipment to CWT, whether or not the shipment satisfied the 258-ton quantity, PVS paid the agreed $90/ton—even when prices for other (non-CWT) customers were substantially below that unit price.  The Court will see, too, that when PVS's quantities fell short in certain weeks—for example, 8/10, 8/17, 8/24—US Mag called attention to this delinquency and declared in writing that it expected PVS to make up the shortfalls.  (Stip. Ex. 69.)  Tellingly, in response to these communications, PVS never denied that an agreement respecting CWT orders had been concluded.

notice of available volumes; (b) US Mag used best efforts to provide consistent quantities; (c) US Mag provided minimum 2-weeks' notice of available supplies; (d) unless mutually agreed, PVS was not obligated to purchase more than 600 tons per week; (e) PVS was not obligated to purchase more HCl than it resold during the same period; and (f) the parties had to agree on pricing.  (*See* Stip. Ex. 57 (Ex. A hereto), ¶ 3.)

About a week after the parties executed the Sales Agreement, the parties made critical modifications to their protocol for closing weekly transactions.  Specifically:

> 1. *USMag will inform PVS that we have product to sell.*
> 2. *PVS will inform US Mag of the location and price needed.*
> 3. *USMag will look at the price and freight rate and agree with the price or pass on the business.*

(Stip. Ex. 65 (Ex. C hereto) (emphasis added).)  Mr. Stein, PVS's current president, unequivocally affirmed in his deposition that this was the protocol that the parties agreed would govern all future non-CWT transactions.

The Court will hear testimony that in the world of brokering HCl and other commodities, transactions are often informal and are done minute by minute.  The parties in this case anticipated those kinds of transactions and thus set forth in the Sales Agreement the broad range of terms that would apply when a price and location had been quoted and accepted.  For example, US Mag would deliver the goods, US Mag would pay for the railcar sublease and expense, US Mag would perform the chemical analyses, and so forth.  Thus, with the above expedited protocol in place, the parties could transact business quickly, with a clear understanding of who would handle necessary attendant duties.  If US Mag exercised its option to say there was available product, PVS had the obligation ["PVS *will*"] to give US Mag the price and location for that week's transactions.

28

Under step (1) of the revised protocol, there is no question US Mag informed PVS of available volumes. The Court will review documents and hear testimony showing that available volumes were communicated, both in writing and verbally. (*E.g.*, Stip. Exs. 65 (Ex. C hereto) and 69.) In fact, the parties were communicating by phone at least once a week, often more.[7]

The failure occurred with PVS's obligations under step (2)—i.e., PVS did not "inform US Mag of the location and price needed."

PVS is expected to emphasize subsection 3(d) of the Sales Agreement, which states that PVS was "not obligated to purchase more Product over a given period of time than it resells during the same period of time." PVS is expected to argue it was somehow excused from taking any additional HCl quantities because it ostensibly did not have end customers for such sales. The Court will see evidence, however, that throughout the term of the Sales Agreement, PVS typically "resold" a volume of HCl far in excess of 600 tons/week; PVS was just diverting its business to other HCl suppliers. (Stip. Exs. 145, 146.) And, the Court will hear testimony that PVS resold the HCl of these other suppliers at prices/locations US Mag would have accepted.[8] Note, there is no provision of the Sales Agreement that permits PVS to prefer other suppliers, nor to take product from US Mag only in the event that it can sell a volume over and above what it can obtain from other suppliers.

---

[7] As mentioned above, the only time US Mag deviated from the 600 ton/week quantity was a brief period in the fall of 2015, when US Mag had to temporarily suspend new production to perform maintenance. US Mag made PVS aware of this minor interruption, and reserved a sufficient supply to meet the CWT sales each week at $90/ton. When US Mag's burners were restored to full operations, US Mag also promptly advised PVS of the same.

[8] Over the term of the Sales Agreement, there were just a few weeks in which US Mag declined a price quoted by PVS. US Mag does not seek damages for these weeks.

Ignoring the parties' agreed-upon "protocol," PVS may also emphasize subsection 3(f) of the Sales Agreement to try to escape its obligations, which section states that the parties must "agree" on pricing.  PVS is expected to take the position that it had no enforceable obligation since the parties "never agreed" on price.  PVS has further asserted that "the US market prices for HCl made transactions with US Mag 'cost prohibitive.'" (*See* Dkt. 45, Stein Disclosure, p. 2).  These arguments, again, should also be rejected.

Keep in mind, PVS was a commodities broker.  Thus, as set forth plainly in the revised "protocol," the parties would not be "negotiating" pricing in the traditional sense.  It was understood and agreed that PVS would have transactions already in the works each time PVS responded to US Mag's offered volumes of HCl.  (Hence PVS's duty to state both a price for the goods and a shipment location.)  PVS had a definite, objective, and certain obligation to quote US Mag a price and location for that week's HCl customer(s).  The Court can see, objectively, that PVS did not do what it promised to do.

The Court will hear testimony that PVS's price quotes were critical for US Mag, since US Mag was relying on PVS (its broker) to market US Mag's HCl through PVS's established customer relationships, and US Mag could not guess the prices at which PVS was transacting business with end customers.[9]

---

[9] *See, e.g., Upstate Shredding, LLC v. Northeastern Ferrous, Inc.*, No. 3:12–CV–1015 (LEK/DEP), 2014 WL 4883024, at *1 (N.D.N.Y. Sep. 30, 2014) (under scrap metal marketing relationship, "Plaintiffs [end customers] would quote a price per ton of scrap and send that quoted price to Finn [broker]. … Finn [as broker] would relay the quoted price to Northeastern [supplier], who would then arrange for a shipping company to haul materials to Plaintiffs' New York facility if the quoted price was agreeable."); *Campbell v. Staple Cotton Co-op. Ass'n*, 334 So.2d 378, 380 (Miss. 1976) (under cotton commodities marketing agreement, one marketing method involved "the association [broker] display[ing] a member's cotton to prospective buyers and report[ing] the price offered by the buyer to the member [supplier] who accept[ed] or reject[ed] the price offered").

US Mag's reliance on PVS was all the more critical since US Mag had taken on the duty of subleasing 60 railcars in the Sales Agreement. Remember, these 60 railcars were precisely the number of cars necessary for US Mag to deliver the target 600 tons of HCl anticipated to be sold through PVS.

Importantly, the Sales Agreement had no provision allowing PVS to escape its obligations if it unilaterally decided that transactions with US Mag were "cost prohibitive." Instead, PVS, as broker, had the obligation to quote US Mag the price/location for its customer transactions and let *US Mag alone* determine whether such price was acceptable or not. That was the nature of US Mag's "option." PVS's failure to state its price was another breach of its own obligations. In sum, PVS cannot now rely on its own failures to somehow excuse its obligations. *See Cannon v. Stevens Sch. of Bus.*, 560 P.2d 1383 (Utah 1977) ("[N]o one can avail himself of the nonperformance of a condition precedent, who has himself occasioned its non-performance."); Restatement (Second) of Contracts § 245.

As with volumes for CWT, PVS's failure to purchase non-CWT volumes was a material breach. As shown on Exhibit B hereto, by the end of the first contract year alone (before US Mag declared breach), PVS incurred a deficiency of 17,349 tons of HCl (92.1% of its obligation) for non-CWT sales.

**B.    US Mag Is Entitled to a Declaratory Judgment That After PVS's Material Breaches, It Had No Further Obligations Under the Sales Agreement and the Integrated Railcar Subleases.**

US Mag seeks a declaratory judgment that its obligations under the Sales Agreement and integrated Railcar Subleases came to an end following PVS's breach.

Under the "first breach" rule in Utah, "a party first guilty of a substantial or material breach of contract cannot complain if the other party thereafter refuses to perform. He can

31

neither insist on performance by the other party nor maintain an action against the other party for a subsequent failure to perform." *Bonneville Distr. Co. v. Green River Dvlpmnt Assoc., Inc.*, 2007 UT App 175, ¶ 32, 164 P.3d 433 (cleaned up); *Orlob v. Wasatch Med. Mngmnt,* 2005 UT App 430, ¶ 26, 124 P.3d 269; *see also* Utah Code § 70A-2-610 (aggrieved party entitled to cease performance following other party's repudiation).

Under the above law, PVS's material breach and repudiation of the Sales Agreement negated any further duty of performance on the part of US Mag. That meant US Mag had no further duty to supply HCl to or through PVS. Further, because the Railcar Subleases were a part of, and integrated with, the Sales Agreement, US Mag's obligation to continue lease payments on the railcars was also negated by PVS's breach.

As the Court has seen, PVS argues that the Railcar Subleases were somehow independent of either party's obligations under the Sales Agreement—suggesting that even a catastrophic breach of the Sales Agreement would leave the Railcar Subleases unaffected. However, as explained in US Mag's Memorandum in Opposition to PVS's Motion for Summary Judgment (Dkt. 49), PVS's arguments on this issue do not comport with Utah law.

In Utah, where documents are "executed substantially contemporaneously and are clearly interrelated, they must be construed as whole and harmonized, if possible." *See Atlas Corp. v. Clovis Nat'l Bank*, 737 P.2d 225, 229 (Utah 1987) (finding sale agreement, operating agreement, and mining deed to be part of the same agreement, although mining deed was executed two months after other agreements); *Sparrow v. Tayco Const. Co.*, 846 P.2d 1323, 1326 (Utah Ct. App. 1993). In *Sacramento Baseball Club, Inc. v. Great Northern Baseball Co.*, 748 P.2d 1058

32

(Utah 1987), the Utah Supreme Court observed that "[i]f the parties intended to create one

contract, the number of documents that memorialize the agreement is irrelevant." *Id.* at 1060.[10]

Here, the Sales Agreement and Railcar Subleases involved the same parties as the Sales

Agreement; they were negotiated contemporaneously with the Sales Agreement; and they shared

with the Sales Agreement a single overarching purpose, namely, to relieve PVS of certain

claimed "hardships" under the parties' prior Commercial Agreement.  This is made plain in the

recitals to the Sales Agreement, which state (in pertinent part):

> Whereas, effective June 1, 2015, the Parties mutually agreed to
> terminate the Existing Agreement [Commercial Agreement] <u>and</u>
> ***<u>replace it with this Sales Agreement and separate Railcar</u>***
> ***<u>Subleases (defined below) to be executed simultaneously with this</u>***
> ***<u>Sales Agreement</u>***…

(Stip. Ex. 57 (Ex. A hereto) (emphasis added).)[11]

Paragraph 4 of the Sales Agreement required US Mag to assume "all railcar sublease

expenses" from PVS.  Paragraph 5 of the Sales Agreement not only acknowledged PVS's current

railcar leases, but again <u>required,</u> US Mag to sublease the cars, providing specific details about

the number of cars (60), the names of the railcar lessors, and the form of the anticipated

subleases.  Schedule 2 to the Sales Agreement is a list identifying, by serial number, each of the

---

[10] *See also Huegel v. Mifflin Const. Co., Inc.*, 796 A.2d 350, 356–57 (Pa. Super. Ct. 2002) (despite integration clause in one agreement, finding another agreement incorporated therein, due to numerous cross-references); *Dunning v. Chemical Waste Management, Inc.*, No. 91 C 2502, 1997 WL 222891, at *8–9 (N.D. Ill. Apr. 24, 1997) (finding two instruments to constitute a single agreement where one instrument identified and attached the other).

[11] There was a simple reason why the parties chose to use three "separate" instruments, rather than a single instrument, to effect US Mag's sublease of these cars.  US Mag had agreed to sublease 60 railcars, but the 60 railcars happened to be owned by three different original lessors. As PVS's President Scott Trussell explained in an email sent the same day US Mag signed the Sales Agreement, "There are 3 sublease agreements; all the same but as I understand we have to do separate ones because of the different leasing companies involved."  (Stip. Ex. 44.)

railcars to be subleased; and Schedule 3 the Sales Agreement is a form sublease agreement, virtually identical to each of the Railcar Subleases actually executed by the parties.[12]

By the above provisions, the Railcar Subleases were just as central to the Sales Agreement as a trust deed is to a mortgage loan document.  The instruments are inextricably connected.  Thus, if US Mag had signed the Sales Agreement but had for some reason refused to sign the Railcar Subleases, PVS could have sued US Mag for breach of the Sales Agreement and prevailed.

Making the parties' intent all the more plain, each of the Railcar Subleases begins by reciting, in pertinent part, that "the Parties are entering into a Hydrochloric Acid Sales Contract dated as of June 1, 2015" and ***"[t]he Parties are entering into this Sublease pursuant to the Sales Agreement."*** (Emphasis added.)

In sum, the Railcar Subleases were attached to and expressly made part of the Sales Agreement.  Accordingly, PVS's material breach of the Sales Agreement not only negated US Mag's obligation to sell HCl through PVS, but also negated all of US Mag's further obligations under the Railcar Subleases.  US Mag is entitled to a declaratory judgment that *all* contract obligations ended as of July 2016, the date US Mag declared PVS to be in material breach.  Relatedly, PVS's counterclaim, by which it seeks "damages" for US Mag's "failure" to make railcar sublease payments, should be dismissed and PVS should recover nothing.

In respect of the claim for declaratory judgment, even if the Court were to find (and it should not) that the non-CWT part of the Sales Agreement was somehow unenforceable, PVS's

---

[12] Notably, the Sales Agreement stated that all matters disclosed in any such "schedule" are "deemed to be disclosed for all purposes of this Sales Agreement."  (Stip. Ex. 57 (Ex. A hereto), ¶ 24.)

material breach of the CWT portion, in which the parties agreed on pricing, location and quantity, is sufficiently material to defeat PVS's counterclaim under the Railcar Subleases.

This outcome is eminently just; it should not escape the Court's attention that in 2015 and the first half of 2016 alone (even before the date US Mag declared "breach"), US Mag paid hundreds of thousands of dollars for railcars that could not be used by reason of PVS's breach.

**C.**     **As to Monetary Damages, US Mag Seeks to Recover $350,741 in Lost Profits.**

Under Utah law, US Mag is entitled to recover the benefit of its bargain.  *See Alexander v. Brown*, 646 P.2d 692, 695 (Utah 1982) ("Damages are properly measured by the amount necessary to place the nonbreaching party in as good a position as if the contract had been performed.").  While section 70a-2-708(1) of the UCC provides that damages are sometimes measured as the difference between contract price and market price, the Code also states that if measuring damages in this manner is not sufficient to make the non-breaching party whole, then:

> *[T]he measure of damages is the profit (including reasonable overhead)* <u>*which the seller would have made from full performance by the buyer*</u>*,* together with any incidental damages provided in this chapter (Section 70A-2-710), *due allowance for costs reasonably incurred and due credit for payments or proceeds of resale*.

Utah Code § 70a-2-708(2) (emphasis added); *see also Holland-Cook Mfg. Co. v. Consolidated Wagon & Machine Co.*, 161 P. 922, 924 (Utah 1916) (discussing benefit-of-bargain damages for goods yet to be manufactured).

Under Utah law, the measure of damages need not be established with precision.  In *Winsness v. M. J. Conoco Distributors, Inc.*, 593 P.2d 1303 (Utah 1979), the Utah Supreme Court acknowledged that "some degree of uncertainty" in damages calculations is often "inevitable."  *Id.* at 1305–06.  Thus, "where there is strong evidence of the fact of damage, a defendant should not escape liability because the amount of damage cannot be proved with

35

precision." *Id.* Utah courts require only that a damages award have a "reasonable basis" in the evidence presented at trial. *See Macris v. Sevea Intern., Inc.*, 2013 UT App 176, ¶ 44, 307 P.3d 625 ("As to the amount of the damages awarded, this court "will not overturn the trial court's decision unless there was no reasonable basis for the decision.""); *Lefavi v. Bertoch*, 2000 UT App 5, ¶ 16, 994 P.2d 817 ("When a reasonable basis exists for the trial court's award of damages, this court will affirm the damage award on appeal.")[13]

In this case, US Mag's damages expert, Mr. Hoffman, had to determine damages in several stages. As shown on his schedules, which US Mag will introduce as trial exhibits, Mr. Hoffman separately analyzed anticipated profits for CWT and non-CWT volumes. He then totaled these anticipated profits, reduced these profits by the additional amount US Mag would have needed to spend in the but-for world under the Railcar Subleases, and added amounts US Mag incurred to neutralize the chlorine not used in HCl for PVS transactions.

### 1.    Lost Profits for CWT Sales

First, Mr. Hoffman determined the price that US Mag would have expected to receive from the HCl sales anticipated by the Sales Agreement in the but-for world. For CWT transactions, this was simple, because the parties had agreed on $90/ton.

Next, Mr. Hoffman determined the volume of product US Mag would have sold in the but-for world. Again, for CWT transactions this was easy. PVS had agreed to take 3 railcars, for a total volume of about 258 tons, each week, through the first year of the Agreement. Of the

---

[13] The Tenth Circuit applies the same rule. *See Naimie v. Cytozyme Laboratories, Inc.*, 174 F.3d 1104, 1113 (10th Cir. 1999) (damages award will not be disturbed on appeal "if it has a reasonable basis in the evidence" (citing *Lone Mountain Prod. Co. v. Natural Gas Pipeline Co.*, 984 F.2d 1551, 1558 (10th Cir.1992)).

13,416 tons (52 weeks x 258 tons) expected under the Sales Agreement for CWT, PVS purchased a mere 7,699 tons, leaving a deficiency of 5,717 tons. (Pl. Ex. 226 (Ex. B hereto).)

If PVS had fully performed, US Mag would have incurred freight costs—i.e., costs paid to the railroad companies for the privilege of using the railways.  As the Court will hear at trial, freight costs vary by mileage (destination).  For CWT transactions, these freight costs were consistent, because the destination was always the same.  (*See* Pl. Ex. 215 [Hoffman Sch. 4].)

Had PVS fully performed, US Mag would also have had to pay PVS certain sales commissions, based on a sliding-scale rubric set forth in paragraph 6 of the Sales Agreement. For CWT sales, these commissions would have been $1/ton.  (Ex. Pl. Ex. 215 [Hoffman Sch. 4].)

As will be explained at trial by Mr. Hoffman, for CWT sales, US Mag's lost profits were $264,358.  (Pl. Ex. 215 [Hoffman Sch. 4].)

### 2.     Non-CWT Lost Profits

For non-CWT transactions, this lost-profit analysis was slightly more complex.

As with CWT transactions, Mr. Hoffman first determined pricing for the but-for world.

When the parties to a contract with an open price term fail to set a price, the Court can determine what that reasonable price would have been.  *See* Utah Code Ann. § 70A-2-305 ("The parties if they so intend can conclude a contract for sale even though the price is not settled.  ***In such a case the price is a reasonable price at the time for delivery if .. … the price is left to be agreed by the parties and they fail to agree***…") (emphasis added).  In this case, the Court can determine a reasonable price by considering evidence of PVS's contemporaneous HCl transactions with other parties.

In this litigation, PVS did not produce evidence of the brokerage prices it paid to other HCl suppliers; it only produced evidence of the final prices it charged to *end customers*.

37

Remember, though, that in addition to the sales commissions PVS obtained on all HCl transactions with US Mag (*see* Sales Agreement ¶ 6), PVS could obtain additional profit by charging the end customers more than it paid to US Mag for the delivered HCl. (*Id.*) Mr. Hoffman, therefore, could not simply assume that the prices PVS charged to end customers were the same prices that PVS would have paid to US Mag. He had to first determine PVS's average mark-up. Thereafter, he could determine prices that US Mag would have received by simply deducting PVS's typical mark-up from end-customer pricing.

For this part of the analysis, Mr. Hoffman gathered data provided by PVS regarding each sale of HCl from June 1, 2015 through December 31, 2017, to determine the prices PVS charged to end customers. For transactions involving US Mag, Mr. Hoffman compared the price PVS paid to US Mag to the price PVS charged end customers, to determine that PVS's typical mark-up was .6%. Deducting such mark-up from end-customer pricing throughout the term of the contract, Mr. Hoffman determined average prices US Mag would have received absent breach. These prices are shown on Mr. Hoffman's Schedule 3, which is Plaintiff's Exhibit 214.

Next, Mr. Hoffman determined volume of lost non-CWT sales. For the first year of the Agreement, Mr. Hoffman simply subtracted the CWT volumes (258 tons/week) from the target volume under the Agreement (600 tons/week) to determine a deficiency of 342 tons/week. As shown on Plaintiff's Exhibit 226 (attached hereto as Exhibit B), the few exceptions were the weeks in which US Mag's HCl burner was down, during which time it was presumed that US Mag would have supplied only the volumes for CWT. For all transactions after the first year of the Agreement—i.e., after the period for the CWT commitment had concluded—Mr. Hoffman assumed volumes would have totaled the targeted 600 tons/week. If PVS did not resell at least 600 tons in any week, Mr. Hoffman reduced PVS's obligations to the amount that PVS did

38

resell. Mr. Hoffman determined that, overall, non-CWT lost volumes through the life of the Agreement totaled 63,493 tons.

Next, Mr. Hoffman considered hypothetical freight costs that would have been incurred had PVS performed. For non-CWT transactions, freight costs were analyzed on a shipment-by-shipment basis, using certain rail shipping tables, as shown in Schedule 3 to Mr. Hoffman's report.  (Pl. Ex. 214 [Hoffman Sch. 3].)

Last, Mr. Hoffman took into account PVS's "commissions."  Because the Sales Agreement set commissions based on each shipment's pricing, Mr. Hoffman had to conduct a separate analysis of commissions for each anticipated sale, as shown on Mr. Hoffman's Schedule 3.  (Pl. Ex. 214.)

In all, US Mag lost $1,084,125 in profits on non-CWT sales.  (Pl. Ex. 213 [Hoffman Sch. 2].)

### 3.      Avoided Railcar Sublease Expenses

In a but-for world in which PVS fully performed, US Mag would have had to cover the railcar sublease payments through the end of the contract term.  As shown on Mr. Hoffman's Schedules 1 and 8, after the date US Mag declared breach (when US Mag discontinued all sublease payments), but for the PVS breach, US Mag would have incurred $1,540,350 in expense, but would have enjoyed the profits.

### 4.      No Avoided Cost for Producing HCl – and Incidental (Additional) Cost to Neutralize Unused Chlorine

Often a seller will avoid production cost in a circumstance of anticipatory breach.  Due to the unique nature of hydrochloric acid and the neutralization process necessary for disposal of chlorine, however, that was not the case here.

Recall that US Mag has always manufactured chlorine as a byproduct of its magnesium production process.  Thus, as long as the magnesium plant is producing magnesium, chlorine is an unavoidable output.  Chlorine, however, is a hazardous chemical and, if it is not sold (in some form or other), it must be disposed of in ways that mitigate environmental harm. Such disposal involves the neutralization of the chlorine, a costly process. Avoidance of these disposal costs was part of the consideration that US Mag received when entering into the Commercial Agreement, and the Sales Agreement/Railcar Subleases—by which PVS would be selling off chlorine products and thus obviating the need for neutralization.[14]

Following PVS's breach, US Mag did not have facilities to store unused HCl, and therefore had to keep the inventory not purchased by PVS in whatever subleased railcars were available.  By reason of PVS's breach, US Mag simply had excess chlorine on hand.  US Mag was forced to neutralize the chlorine it would have otherwise used to create high-grade HCl.

As the Court will hear at trial, the first step in this neutralization process is converting the chlorine to low-grade HCl.  US Mag witness Garrett Jones will explain that this step in the neutralization process costs approximately the same amount as the cost of converting chlorine to high-grade HCl.  That is, both processes involve approximately the same utility costs, similar man-power costs, and similar materials costs.  There will also be testimony showing that PVS knew that chlorine products, if not sold, would need to be neutralized.  Former PVS president Scott Trussell testified:

---

[14] *See, e.g., Pennsy Supply Inc. v. American Ash Recycling Corp.,* 895 P.2d 595 (Penn. Super. Ct. 2006) (finding that paving contractor's agreement to take AggRite paving materials from recycling company and thus spare recycling company significant disposal costs could constitute "consideration" for an agreement, notwithstanding the fact that contractor did not pay money for the material).

40

> Q.  And did you understand that some of the chlorine that it's producing in its plant can't be sold as commercial chlorine, it's just not pure enough, not clean enough, whatever?
>
> A.  Yes.
>
> Q.  So if they don't sell it as hydrochloric acid, they –
>
> A.  As a neutralizer, they would have to do some type of --
>
> Q.  Neutralization.
>
> A.  Yeah, they would have to.

(Trussell Dep. 103:10-19.)

The UCC provides that a buyer can recover incidental damages consisting of any "commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach." *See* Utah Code § 70A-2-710.  Where goods are unfinished, the seller can take any reasonable step to avoid losses caused by the breach. *See* Utah Code Ann. § 70A-2-704(2) (stating that if goods are unfinished, aggrieved seller may avoid loss by ceasing manufacture and "resell[ing] for scrap or salvage value or proceed[ing] in any other reasonable manner"). As explained by the Utah Court of Appeals, "to recover incidental damages, a buyer must show the damages (1) were incurred because of the breach, and (2) were reasonable." *Ohline Corp. v. Granite Mill,* 849 P.2d 602, 605 (Utah Ct. App. 1993) (citation omitted).

In this case, over and above any cost to convert the chlorine to low-grade HCl, for the term of the Sales Agreement, US Mag's reasonable neutralization costs amounted to $542,607. (*See* Pl. Ex. 218 (Hoffman Rpt., Schedule 7).)

### 5.    Summary of US Mag's Damages

US Mag's damages are summarized below:

//

41

| Total Lost Profits from Unsold Hydrochloric Acid | |
|---|---:|
| Profit from Unsold Hydrochloric Acid (Non-CWT) | $1,084,125 |
| Plus: Profit from Unsold Hydrochloric Acid (CWT) | $264,358 |
| Plus: Chlorine Neutralization Costs | $542,607 |
| Less: Additional Railcar Lease Payments | ($1,540,350) |
| **Total Lost Profits** | **$350,741** |

## VII.    CONCLUSION

For the foregoing reasons, the Court should find the following:

(1) That PVS materially breached the Sales Agreement, and the CWT commitment that was a part thereof;

(2) That PVS's material breach of the Sales Agreement excused US Mag's further performance under the Sales Agreement and integrated Railcar Subleases;

(3) That US Mag suffered monetary damages in the amount of $350,741 and is entitled to recovery of the same; and

(4) US Mag is entitled to pre-judgment interest on its damages.

DATED this 31st day of January, 2022.

BURBIDGE | MITCHELL

/s/ Richard D. Burbidge
Richard D. Burbidge
Attorneys for Plaintiff US Magnesium, LLC