# EXHIBIT A

## HYDROCHLORIC ACID SALES AGREEMENT

This Hydrochloric Acid Sales Agreement ("Sales Agreement") is made and effective this 1st day of June, 2015, by and between PVS CHLORALKALI, INC., a Michigan Corporation located at 10900 Harper Avenue, Detroit, Michigan 48213 ("PVS"); and US MAGNESIUM LLC, a Delaware Limited Liability Company located at 238 N 2200 West, Salt Lake City, UT 84116 ("USMAG"). The term "Parties" shall refer to PVS Chloralkali, Inc. and US Magnesium LLC. This Sales Agreement supersedes the Commercial Agreement made between PVS and USMAG effective June 13, 2013 (the "Existing Agreement").

### RECITALS

**WHEREAS**, PVS notified USMAG that the Existing Agreement between the Parties created financial hardship for PVS,

**WHEREAS**, effective June 1, 2015, the Parties mutually agreed to terminate the Existing Agreement and replace it with this Sales Agreement and separate Railcar Subleases (defined below), to be executed simultaneously with this Sales Agreement, and

**WHEREAS**, this Sales Agreement provides USMAG with an option to sell Product to PVS and to compensate PVS on a sales commission basis.

NOW THEREFORE, PVS and USMAG agree as follows:

1.  **AGREEMENT TERM:** The Commencement Date of this Sales Agreement shall be June 1, 2015. The initial term ("Term") of this Sales Agreement shall be the period from the Commencement Date through December 31, 2017. At the expiration of the initial Term and any subsequent Term, this Sales Agreement will automatically extend for an additional period of one year unless cancelled by either Party with ninety (90) days notice prior to the end of the then-current Term, in which case, this Sales Agreement will end upon the expiration of the then-current Term.

2.  **PRODUCT:** The term "Product" shall mean hydrochloric acid (HCl) that USMAG produces at its Rowley, Utah facility ("Facility"), which conforms to the specifications set forth in the attached Schedule 1.

3.  **VOLUME:** USMAG shall, at its sole discretion, offer a volume of Product each week ("Offered Volume") to PVS. The initial Offered Volume is a target of 600 Tons of Product per week (for purposes of this Sales Agreement, the term "Ton" means a net ton of 2,000 pounds, otherwise commonly known as a "short ton" or a "US short ton"). PVS shall be obligated to purchase the Offered Volume provided that:

    a.  USMAG provides a written report to PVS, as far in advance as possible, of the quantities of Product that USMAG expects to offer for sale;

    b.  USMAG uses its best efforts to make Product available to PVS in relatively equal quantities and on a regular basis;

    c.  USMAG provides a minimum of two weeks' notice on firm volume available for sale and shipment during any shipment week. For example, Product available for shipment during the week of June 15, 2015 will be communicated no later than the end of business on June 1, 2015;

EXHIBIT
**057**

Exhibit  2
Wit: Stein
Date: 6-20-18

H.F. Benhart, CSR-2614

    d.    Unless mutually agreed, PVS is not obligated to purchase more than 600 Tons per week;

    e.    PVS is not obligated to purchase more Product over a given period of time than it resells during the same period of time; and

    f.    The Parties mutually agree upon a Price for the Offered Volume in accordance with Section 6 of this Sales Agreement.

4.    **PLACES OF DELIVERY AND MEANS OF SHIPMENT:** All Product sold to PVS pursuant to this Sales Agreement shall be INCOTERMS 2010 CPT destination and shall be shipped via railcars or trucks depending upon the destination(s) for the Product shipped. USMAG is responsible for all transportation and related expenses in connection with each shipment of Product—including, without limitation, all Railcar Sublease expenses pursuant to Section 5 of this Sales Agreement and all other lease and sublease costs and other expenses related to the railcars and trucks used to ship the Product from the Facility to the Product's destination(s)—and USMAG shall provide, at its sole expense: (a) all shipping documents required by the shipper; and (b) certificates of analysis regarding the compliance of the shipped Product with the specifications contained in the attached **Schedule 1**.

5.    **RAILCAR SUBLEASES:** The Parties acknowledge that PVS currently leases from American Railcar Leasing LLC, GATX Corporation and Union Tank Car Company (collectively, the "Railcar Lessors") the 60 railcars listed in the attached **Schedule 2** and which the Parties now wish to transfer from PVS to USMAG (collectively, the "Transferred Railcars"). Simultaneously with the Parties' execution of this Sales Agreement, and effective as of the Commencement Date, PVS and USMAG shall enter into three separate railcar sublease agreements (collectively, "Railcar Subleases" and each a "Railcar Sublease") in substantially the same form as the attached **Schedule 3**, with one Railcar Sublease for each Railcar Lessor (covering the Transferred Railcars respectively provided by that Railcar Lessor), pursuant to which, USMAG shall sublease the Transferred Railcars. The Parties acknowledge that the Railcar Lessors have previously consented to the Railcar Subleases.

6.    **SALES PRICE AND PVS COMMISSION:** The Parties shall determine the price per Ton ("Price") to be paid by PVS for each shipment of Product on a shipment-by-shipment basis. PVS shall be paid a sales commission by USMAG based upon that agreed-upon Price, as follows:

    a.    If the Price to PVS is:

        (1)    Less than $125.00, the sales commission shall be one dollar ($1.00) per Ton;

        (2)    Equal to or greater than $125.00 but less than $150.00, the sales commission shall be three dollars ($3.00) per Ton;

        (3)    Equal to or greater than $150.00 but less than $175.00, the sales commission shall be six dollars ($6.00) per Ton;

        (4)    Equal to or greater than $175.00 but less than $200, the sales commission shall be nine dollars ($9.00) per Ton; and

        (5)    Equal to or greater than $200.00, the sales commission shall be twelve dollars ($12.00) per Ton.

b.  **Illustrations**

(1)  If the Parties agree that the Price for particular Offered Volume will be $95, PVS shall pay a net amount of $95 (Price) – $1 (sales commission) = $94 for each Ton of that Offered Volume.

(2)  If the Parties agree that the Price for particular Offered Volume will be $130, PVS shall pay a net amount of $130 (Price) – $3 (sales commission) = $127 for each Ton of that Offered Volume.

(3)  If the Parties agree that the Price for particular Offered Volume will be $160, PVS shall pay a net amount of $160 (Price) – $6 (sales commission) = $154 for each Ton of that Offered Volume.

(4)  If the Parties agree that the Price for particular Offered Volume will be $180, PVS shall pay a net amount of $180 (Price) – $9 (sales commission) = $171 for each Ton of that Offered Volume.

(5)  If the Parties agree that the Price for particular Offered Volume will be $300, PVS shall pay a net amount of $300 (Price) – $12 (sales commission) = $288 for each Ton of that Offered Volume.

The Parties acknowledge and agree that nothing in this Sales Agreement shall restrict or otherwise affect PVS's ability to determine the prices for which PVS resells Product purchased from USMAG under this Sales Agreement and that such resale prices shall be determined by PVS in its sole discretion based upon its negotiations with its customers.

7.  **DETERMINATION OF QUANTITY:** USMAG shall determine the quantity of each shipment of Product by: (a) weighing, on certified scales, tank cars or trucks both before and after the Product is loaded into the cars or trucks; or (b) some other mutually agreeable method of measurement. USMAG's weight shall govern unless established to be inaccurate.

8.  **INVOICE AND PAYMENT TERMS:** USMAG will invoice PVS for each shipment at time of shipment, payable net 30 days from the date of invoice. USMAG reserves the right, among other remedies, to suspend further shipments in the event PVS fails to pay for any invoice when payment becomes due, absent any bona fide dispute relating to the payment, delay in receiving paperwork, or other normal reasons for delay in payment.

9.  **NO WAIVER:** No delay or failure by either Party to insist upon the strict performance of any covenant, duty, term, or condition of this Sales Agreement, or to exercise any rights or remedies following a breach hereof, shall constitute a waiver of any subsequent breach.

10.  **WARRANTY PROVISION:**

a.  **Title and Quality.** USMAG warrants that PVS shall receive good and marketable title to all Product purchased by PVS under this Sales Agreement free and clear of all liens, security interests and encumbrances of any kind. USMAG warrants that neither the Product nor the process by which USMAG produces Product infringes any U.S. Patent. USMAG further warrants that the Product shall conform to the specifications set forth in the attached Schedule 1 (the "Specifications"). Beyond the foregoing warranties, there are no other warranties or guarantees regarding the Product or its use, whether express or implied, including, without

limitation, any implied warranties of merchantability or fitness for a particular purpose even if that purpose is known by USMAG.

b.   **Off-Specification Product.** If any hydrochloric acid delivered to PVS fails to conform with the Specifications and if, as a practical matter, PVS could not reasonably be expected to be able to sell the Product, PVS is not obligated to purchase the non-conforming Product from USMAG.

c.   **Non-Conformity.** In the event of non-conformity of delivered goods to the Specifications, PVS's exclusive remedy shall be rejection and return of non-conforming goods and credit for any transportation charges and Price paid by PVS with respect to the non-conforming goods. No action of PVS arising out of any non-conformity shall be commenced later than sixty (60) days after the cause of action has occurred.

11.   **INDEMNIFICATION:**

a.   **USMAG's Duty to Indemnify PVS.** Before the delivery of Product to PVS, USMAG assumes full responsibility for and liability arising out of: (1) loading, discharge, storage, handling, use and disposal of such Product, including the use of such Product alone or in combination with other substances; and (2) compliance or noncompliance with any laws or regulations relating to the Product. USMAG shall defend, indemnify and hold harmless PVS, its representatives and employees, from and against all losses, liabilities, damages and expenses (including reasonable attorneys' fees) made against or incurred by PVS and its representatives and employees arising out of any claim, suit or proceeding by any governmental agency or any third Parties (including, without limitation, any employee of USMAG or member of such employee's family) which claim, suit or proceeding alleges death, personal or economic injury or damages to any private or public property or resources caused or contributed by the Product, if such death, injury or damage occurred before delivery of the Product by USMAG to PVS.

b.   **PVS's Duty to Indemnity USMAG.** After delivery to PVS of Product, PVS shall assume full responsibility for and liability arising out of: (1) unloading, discharge, storage, handling, use and disposal of such Product, including the use of such Product alone or in combination with other substances; and (2) compliance or noncompliance with any laws or regulations relating to the Product. PVS shall defend, indemnify and hold harmless USMAG, its representatives and employees, from and against all losses, liabilities, damages and expenses (including reasonable attorneys' fees) made against or incurred by USMAG and its representatives and employees arising out of any claim, suit or proceeding by any governmental agency or any third Parties (including, without limitation, any employee of PVS or member of such employee's family), which claim, suit or proceeding alleges death, personal or economic injury or damages to any private or public property or resources caused or contributed by Product, if such death, injury or damage occurred subsequent to delivery of the Product to PVS by USMAG under this Sales Agreement, except to the extent that any such loss, liability, damage or expense resulted directly from the failure of such Product to have conformed to the Specifications set forth in **Schedule 1** when delivered to PVS.

12.   **FORCE MAJEURE AND EXCUSE OF PERFORMANCE:** Performance of any obligation under this Sales Agreement may be suspended by either Party, without either Party incurring liability or being deemed to be in default under this Sales Agreement, to the extent that such performance becomes restricted or limited by an act of God; war; riot; fire; storm; explosion; accident; flood; sabotage; inability to obtain fuel, power, raw materials or equipment; governmental

laws, regulations or orders; or any other cause beyond the reasonable control of such Party (whether or not of the same kind or nature as the causes or contingencies listed above); or by labor trouble, strike, lockout or injunction (whether or not such labor event is within the reasonable control of such Party) (collectively, "Force Majeure"). The affected Party shall invoke this provision by promptly giving written notice to the other Party of the nature of the Force Majeure involved and the estimated duration of the suspension period. At the option of the Party receiving such notice: (i) the Term of this Sales Agreement then in effect shall be extended by the period of any such suspension, and quantities of Product not delivered during the suspension period because of such suspension shall be delivered later on during the period for which the Term of this Sales Agreement is extended; or (ii) the total quantities of Product otherwise deliverable under this Sales Agreement shall be reduced by the quantity not delivered during the suspension period because of such suspension and, in either event, this Sales Agreement shall otherwise remain unaffected.

13. **INSPECTION AND ACCEPTANCE:** Buyer shall inspect all Product delivered hereunder immediately upon delivery. Buyer's failure to give USMAG written notice of any claim within ninety (90) days from date of delivery shall constitute an unqualified acceptance of such Product and shall constitute a waiver by Buyer of all claims with respect thereto. PVS shall be entitled to rely, without inspection, upon the certificates of analysis given to PVS by USMAG with respect to the quality of the Product.

14. **SEPARATE CONTRACTS:** Each sale or delivery made by USMAG pursuant to this Sales Agreement shall stand as a separate contract, and the failure of any delivery to conform to PVS's requirements shall not be deemed a breach of contract as to others, or a breach of this Sales Agreement as a whole.

15. **COMPLIANCE WITH LABOR LAWS:** In producing Product for sale to PVS, USMAG shall comply with all applicable requirements of Sections 6, 7 and 12 of the Fair Labor Standards Act of 1938, as amended ("FLSA"), and with the applicable regulations and orders of the United States Department of Labor issued under Section 14 of FLSA, and agrees to so certify on its invoice if so directed by PVS.

16. **ASSIGNMENT:** Neither Party's rights nor obligations under this Sales Agreement may be assigned without the other Party's prior written consent, unless the assignment is to a subsidiary or parent corporation of the assigning Party, in which case, the consent of the non-assigning Party shall not be required. Any assignment permitted under this Sales Agreement shall not relieve the assignor of its obligations under this Sales Agreement. Any attempted assignment not in compliance with this Section 16 shall be void. If either Party requests the other to consent to an assignment pursuant to this Section, such consent shall not be unreasonably withheld or delayed. Subject to the foregoing, this Sales Agreement shall bind the respective successors and assigns of the Parties to this Sales Agreement.

17. **DISPUTE RESOLUTION:** Any dispute, difference, controversy or claim between the Parties arising out of or in connection with this Sales Agreement or as to rights or obligations hereunder may be referred by either Party to the respective executive officers of the Parties for resolution to the satisfaction of the Parties, if possible. Such executive officers may, if they so desire, consult outside experts for assistance in arriving at a resolution. Such executive officers will make a bona fide attempt to settle any such dispute, difference, controversy or claim amicably through negotiations within fifteen (15) days of its submission to them. If the dispute, difference, controversy, or claim has not been settled within fifteen (15) days or within such other period as the Parties may agree in writing, the Parties will submit such dispute, difference, controversy or claim

to settlement proceedings pursuant to non-binding mediation administered by the American Arbitration Association.

18. **GOVERNING LAW, VENUE, ARBITRATION:** If any dispute, controversy, or claim has not been resolved within sixty (60) days of its submission to mediation pursuant to Section 17, either Party may submit such dispute, controversy, or claim to litigation. The Parties agree that for purposes of personal jurisdiction and venue, all lawsuits related to or arising out of this Sales Agreement will be brought only in the state or federal courts located in the State of Utah, USA.

19. **WAIVER:** In order to be effective, a waiver of any particular breach or default of this Sales Agreement shall be in writing signed by the Party against which the enforcement of the waiver is sought, and, except to the extent provided in such signed written instrument, no waiver shall constitute a continuing waiver or a waiver of any other breach or default, and acceptance by USMAG of any payments (or acceptance by PVS of any deliveries) with knowledge of any breach or default shall not constitute such waiver. Any payments to be made or obligations to be performed before, upon or after the termination of this Sales Agreement shall survive termination of this Sales Agreement if not already made or performed at the date of termination.

20. **INVALID PROVISIONS:** If any provision of this Sales Agreement is or becomes invalid or illegal in whole or in part, such provision shall be deemed amended, as is nearly possible, to be consistent with the intent expressed in this Sales Agreement, and if such is impossible, that provision shall fail by itself without invalidating any of the remaining provisions not otherwise invalid or illegal, provided that this provision shall not preclude a court of competent jurisdiction from refusing to sever any provision, if severance would be inequitable to either Party, and this Sales Agreement shall be enforced to the fullest extent permitted by law.

21. **BANKRUPTCY; DEFAULT:** Upon the default of either Party in the performance of that Party's obligations under this Sales Agreement, the non-defaulting Party may give notice in writing to the defaulting Party, specifying the nature of the default. If the specified default is not then cured within 10 days after such notice is given or if either Party shall make an assignment for the benefit of creditors, or in the event of a commencement of proceedings by or against either Party involving bankruptcy, insolvency, reorganization or arrangement the non-defaulting Party, without further demand or notice of any kind and without prejudice to any other remedy of the non-defaulting Party, may cancel this Sales Agreement (the defaulting Party remaining liable for damages) or the non-defaulting Party may defer its further performance under this Sales Agreement until the default is remedied (in which event, if the non-defaulting Party elects, the Term of this Sales Agreement then in effect shall be deemed extended for a period of time equal to that during which performance is so deferred).

22. **CONFIDENTIALITY:** The provisions, terms and conditions of this Sales Agreement are proprietary business information of both Parties and shall be considered confidential. Unless expressly agreed to in writing, neither Party shall disclose any information contained in this Sales Agreement to any third party except as may be required by law, except that USMAG may disclose price and quantity information set forth in this Sales Agreement in negotiating with a competitor of PVS. Each Party will use the same degree of care in protecting business information contained in this Sales Agreement as it would with its own proprietary business information.

23. **NOTICES:** All notices, consents, approvals, requests and other communications (collectively, "Notices") required or permitted under this Sales Agreement shall be given in writing and shall be delivered by one of the following methods of delivery (a) hand delivery; (b) certified or registered mail (postage prepaid, return receipt requested); (c) Federal Express or another nationally

recognized overnight courier; or (d) telefax (receipt of which shall be confirmed by telephone) addressed as follows:

| | |
|---|---|
| If to Seller: | US Magnesium LLC |
| | Attn: VP Sales |
| | 238 North 2200 West |
| | Salt Lake City, UT 84116 |
| | Telefax:  (801) 534-14070 |
| | |
| If to Buyer: | PVS Chloralkali, Inc. |
| | Attn: David Nicholson, Vice President |
| | 10900 Harper Avenue |
| | Detroit, Michigan 48213 |
| | Telefax:  (313) 571-2225 |

A Notice sent by one of the foregoing methods shall be deemed effective upon its receipt by the Party being notified or, if sooner, upon the lapse of three business days after such Notice has been deposited in the U.S. mail, postage prepaid and properly addressed to the Party to be notified. Either Party may change its address for Notice purposes at any time by giving Notice of such address change to the other Party in accordance with the foregoing.

24.    **SCHEDULES:** If a document or matter is disclosed in any Schedule to this Sales Agreement, it shall be deemed to be disclosed for all purposes of this Sales Agreement without the necessity of specific repetition or cross-reference. Unless expressly provided otherwise, all capitalized terms used in any Schedule to this Sales Agreement shall have the definitions specified in this Sales Agreement.

25.    **ENTIRE AGREEMENT:** The terms and conditions of this Sales Agreement constitute the entire understanding between the Parties relating to the subject matter of this Sales Agreement, and this Sales Agreement supersedes all prior and contemporaneous agreements (including, without limitation, the Existing Agreement), understandings, negotiations and discussions of the Parties, whether oral or written, and there are no representations or other agreements between the Parties with respect to the subject matter of this Sales Agreement, except as specifically set forth in this Sales Agreement. This Sales Agreement is expressly limited to the terms and conditions contained in this Sales Agreement, and neither Party's terms and conditions in acknowledging or accepting this Sales Agreement or in issuing purchase orders, releases or shipping instructions under this Sales Agreement or other documents shall alter in any way the provisions of this Sales Agreement, unless signed by a duly authorized representative of the other Party. Neither Party shall be bound by any change in, addition to or waiver of any of the provisions of this Sales Agreement unless approved in writing by its authorized representative.

*(signed on immediately following page; remainder of page intentionally left blank)*

IN WITNESS OF THIS AGREEMENT, the Parties have signed below by their duly authorized representatives, effective as of the date first written above in this Sales Agreement.

PVS CHLORALKALI, INC.                                     US MAGNESIUM LLC


By: W. Scott Trussell                                     By:    Cam Tissington
Title: President                                          Title:  Vice President, Sales

Date: July 28, 2015                                       Date: JULY 2A, 2015

Schedule 1—Product Specifications

[See Immediately Following Page]



**Hydrochloric Acid, 22 Baume, Technical Grade**

**Sales Specification**

US Magnesium's Technical Grade Hydrochloric Acid is an aqueous solution of hydrogen chloride gas at a concentration of 22 Baume. It is slightly yellow in appearance.

| Technical Grade HCl | weight % | 35.21 min |
|---|---|---|
| Specific Gravity | at 60°F | 1.179 min |
| Baume | Degrees | 22 min |
| Color | APHA | 40 max |
| Iron | ppm | 5 max |
| Non-volatile Residue | % | 0.5 max |

**Certification**

US Magnesium produces 22 Baume hydrochloric acid conforming to ASTM E1146-08 specification.

**Shipping Containers**

Bulk tank truck and tank car.

US Magnesium LLC provides this information in good faith and makes no representations to its accuracy or comprehensiveness. This document is intended only as a guide to the appropriate precautionary handling of the material by a properly trained person using the product. Individuals receiving the information must exercise their independent judgment in determining its appropriateness for a particular purpose. US Magnesium LLC makes no representations or warranties, either expressed or implied, including without limitation any warranties of merchantability for a particular purpose with respect to the information set forth herein or the product to which the information refers. User accepts full responsibility for compliance with all applicable Federal, state and local laws and regulations.

US Magnesium LLC
238 North 2200 West, Salt Lake City, UT 84116-2921
(801) 532-2043    FAX (801) 534-1407
www.usmagnesium.com

Schedule 2—Railcars to be Subleased to USMAG

A.    AMERICAN RAILCAR LEASING LLC RAILCARS
1.    SHPX 213690
2.    SHPX 213702
3.    SHPX 213703
4.    SHPX 213704
5.    SHPX 213728
6.    SHPX 213729
7.    SHPX 213731
8.    SHPX 213732
9.    SHPX 213759
10.   SHPX 213762
11.   SHPX 213765
12.   SHPX 213769
13.   SHPX 213773
14.   SHPX 213775
15.   SHPX 213786
16.   SHPX 213788
17.   SHPX 213795
18.   SHPX 213799

B.    GATX CORPORATION RAILCARS
1.    GATX 213025
2.    GATX 213026
3.    GATX 213035
4.    GATX 213043
5.    GATX 213046
6.    GATX 213057
7.    GATX 217108
8.    GATX 217109
9.    GATX 217111
10.   GATX 217115
11.   GATX 217119
12.   GATX 217121
13.   GATX 217126
14.   GATX 217132
15.   GATX 217139
16.   GATX 217140
17.   GATX 217142

C.    UNION TANK CAR COMPANY

1.    UTLX 130573
2.    UTLX 130575
3.    UTLX 130578
4.    UTLX 130580
5.    UTLX 130581
6.    UTLX 130582
7.    UTLX 130583

Case 2:16-cv-01021-JNP-DBP   Document 7-4   Filed 11/15/16   Page 13 of 23

8.  UTLX 130584
9.  UTLX 130586
10. UTLX 130589
11. UTLX 130592
12. UTLX 130600
13. UTLX 130605
14. UTLX 130608
15. UTLX 130610
16. UTLX 130616
17. UTLX 130617
18. UTLX 130619
19. UTLX 130626
20. UTLX 130628
21. UTLX 130629
22. UTLX 130631
23. UTLX 130633
24. UTLX 130636
25. UTLX 130641

## Schedule 3—Railcar Sublease Agreement

THIS RAILCAR SUBLEASE AGREEMENT ("Sublease") is entered into as of June 1, 2015 (the "Effective Date"), by PVS CHLORALKALI, INC., a Michigan corporation having its principal office at 10900 Harper Avenue, Detroit, Michigan 48213 ("PVS"); and US MAGNESIUM LLC, a Delaware Limited Liability Company located at 238 N 2200 West, Salt Lake City, UT 84116 ("USMAG"). The term "Parties" shall refer to PVS Chloralkali, Inc. and US Magnesium LLC.

### RECITALS

A.    Separate Sales Agreement. Effective as of the Effective Date of this Sublease, the Parties are entering into a Hydrochloric Acid Sales Contract dated as of June 1, 2015 (the "Sales Agreement") pursuant to which USMAG has agreed to sell Product (as defined in the Sales Agreement to PVS. The Parties are entering into this Sublease pursuant to the Sales Agreement.

B.    Principal Lease. PVS is currently leasing the railroad cars listed in **Attachment 1** (collectively, the "Railcars" and each a "Railcar") from _____ ("Railcar Lessor"). A copy of the lease (as amended, the "Principal Lease") pursuant to which PVS is leasing the Railcars from Lessor is attached to this Sublease as **Attachment 2**.

C.    Sublease. USMAG wishes to sublease the Railcars from PVS pursuant to this Sublease.

### AGREEMENT

THEREFORE, PVS and USMAG agree as follows:

1.    Sublease of Railcars. PVS agrees to sublease to USMAG, and USMAG agrees to sublease from PVS, upon the terms and conditions set forth in this Sublease, the Railcars.

2.    Delivery and Acceptance of Railcars. Effective immediately upon the Effective Date of this Sublease, each Railcar shall be deemed to be delivered to USMAG on the first day of the month subsequent to its arrival in Rowley Utah, and rental will commence. USMAG shall inspect each Railcar after its arrival at the Facility: failure of USMAG to promptly report to PVS any defect in the Railcar shall constitute acceptance of such Railcar by USMAG and shall be conclusive evidence that the Railcar is fit for its intended purpose under this Agreement.

3.    Inspections and Tests of Railcars; Responsibility for Damage

    a.    Inspections and Tests

        (1)    General. Before each loading of each Railcar, USMAG shall: (a) visually inspect the Railcar to determine whether it is suitable for receiving, transporting and discharging the commodity to be loaded into the Railcar; and (b) test the integrity of the lining of the Railcar based upon the electrical conductivity of the commodity or the electrical resistance of the lining. Following USMAG's first loading of each Railcar, USMAG shall send to PVS copies of: (i) the results of USMAG's first pre- and post-load inspection of the Railcar; and (ii) the Railcar Condition Feedback form completed for the Railcar.

        (2)    Results of Conductivity Tests. USMAG shall send to PVS copies of the results of all conductivity tests that USMAG performs on each Railcar pursuant to this Agreement.

(3)  **PVS Inspections.** PVS may, at its own expense, inspect the Railcars at any time during the Term (defined in Paragraph 6 below).

b.    **Responsibility for Damage.** USMAG shall be liable for all damage to any Railcar (including, without limitation, its tank, fittings, appurtenances and interior lining) which (i) is caused by the negligence or misconduct of USMAG or its agents or customers; (ii) is caused by any commodity other than 22 baumé hydrochloric acid loaded into the Railcar; or (iii) otherwise occurs while such Railcar is located on the premises of USMAG, its agents or customers, regardless of the cause of the damage.

4.    **Lining Ownership.** The rubber lining contained in each of the Railcars leased under this Sublease is the property of PVS and shall be maintained by PVS. PVS shall pay the cost of the interior lining of any Railcar and shall, at its sole cost and expense, maintain and renew all Railcar linings (both new and currently existing) whenever necessary during the Term of this Sublease, including when necessitated by repair to other portions of the Railcar; and PVS is responsible for removing the lining (if necessary) from each Railcar prior to its return to the Railcar Lessor at the expiration or termination of this Sublease with respect to such Railcar. For clarity in the event that any of the Railcars shall require a new lining during the Term hereof, PVS shall, at its sole discretion, have the option of replacing such lining or terminating this Sublease with respect to such Railcar effective upon notification by PVS to USMAG.

5.    **Rental.** The monthly lease rate shall be $1,050 for each Railcar (equal to a total monthly rent for all Railcars, after the arrival of all cars in Rowley, Utah, in the amount of $63,000). After each calendar month during the Term, PVS shall submit to USMAG an invoice for all rental and all charges assessed for excess mileage or other railroad tariffs incurred under this Sublease during the preceding month. Furthermore PVS shall provide upon request empty mileage equalization statements provided by the Railcar Lessor for the Railcars. Should it be found that any empty mileage discrepancies exist, USMAG has the power to contest payment for such charges. USMAG shall pay the net amount of each invoice within 30 days of the invoice date.

6.    **Term of Sublease; Renewals.** All Railcars are being leased for an initial lease period ("Term") of approximately thirty-six (36) months, commencing on the month after their arrival in Rowley Utah and ending on May 31, 2018. Upon the expiration of the initial Term, the Sublease Term may be extended by the Parties' mutual consent for up to three additional one-year renewal Terms.

7.    **Product.** USMAG shall be authorized to use the Railcars to transport or store hydrochloric acid that meets or exceeds the specifications contained in **Attachment 3**. USMAG shall not use the Railcars to transport or store any other product without PVS's prior written consent.

8.    **Location.** USMAG shall use the Railcars solely within the continental U.S.A. In the event any Railcar is used outside of this area for any reason whatsoever, USMAG shall assume full responsibility for all costs, taxes, duties or other charges incidental to such use, including, without limitation, all costs incurred in returning the Railcar.

9.    **Shipping Documents.** USMAG shall prepare all shipping documents—including, without limitation, all bills of lading and manifests—that are required for each shipment of product in each Railcar.

10.    **No Tamper Evident Bags.** USMAG shall not use tamper evident bags in connection with any Railcar.

-2-

11.    **Compliance with Laws.** USMAG shall at all times use the Railcars in conformity with: (i) all American Association of Railways (AAR) Interchange Rules; and (ii) all U.S. Department of Transportation (DOT) regulations.

12.    **Acknowledgment of Sublease.** USMAG acknowledges that PVS derives its interest in the Railcars under the Principal Lease and that this Sublease is a sublease of a portion of the railcars leased to PVS under the Principal Lease. USMAG further acknowledges that the effectiveness and enforceability of this Sublease is expressly contingent upon the receipt of the consent of the Railcar Lessor under the Principal Lease with respect to this Sublease, which the Parties acknowledge has been received on or before the Effective Date of this Sublease. USMAG further acknowledges that this Sublease is subject to and governed by the terms of the Principal Lease and that USMAG shall not take (or omit to take) any action so as to constitute a default under the Principal Lease. USMAG shall hold harmless and indemnify PVS from any damages or other expenses arising from any breach of the Principal Lease by USMAG, including, but not limited to, actual reasonable costs and attorneys' fees caused by such breach, and shall insure and indemnify the Indemnified Party against all claims and causes of action to the same extent and according to the same terms as if the relevant provisions of the Principal Lease were inserted into this Sublease word for word.

13.    **Taxes.** USMAG shall pay, or cause to be paid to, or shall reimburse PVS for, all taxes including, but not limited to, sales, use, leasing, operation and excise taxes, together with any penalties, fines or interest on such taxes and all duties, imports, taxes and similar charges arising out of the use of the Railcars; *provided, however*, that USMAG shall not be liable for taxes payable with respect to PVS's net income.

14.    **Lettering and Numbering of Railcars.** USMAG shall place no lettering or marking of any kind upon the Railcars without the prior written consent of PVS except that USMAG shall be permitted to placard the Railcars in accordance with all applicable laws and regulations. USMAG shall not change or permit to be changed or alter the present lettering or numbering on any Railcar without the prior written consent of PVS.

15.    **Maintenance and Repair.** USMAG shall maintain each of the Railcars in good condition and repair in accordance with all applicable laws and regulations at PVS's expense, *provided* that, before proceeding with each repair and maintenance activity, USMAG must obtain PVS's prior authorization. No alteration to any Railcar shall be made or authorized by USMAG without the prior written authority of PVS, except that USMAG may, at its expense, replace or repair any service equipment (dome covers, outlet caps, valves, etc.) if lost or broken with like kind of at least equal quality. If any Railcar should require cleaning, in the reasonable opinion of PVS, due to any commodity placed into the Railcar by USMAG, such cleaning costs shall be borne by USMAG. PVS shall maintain the lining in accordance with Paragraph 4.

16.    **Return of Railcars**

   a.    **General Condition.** At the end of the final Term, USMAG shall return each Railcar to PVS in the same condition—and complete with all parts, equipment and accessories- ·as when initially delivered to USMAG, reasonable wear and tear excepted. Each Railcar shall be free from all charges and liens which may result from any act or default of USMAG.

   b.    **Cleaning.** USMAG shall arrange, before returning any Railcar to PVS and at USMAG's sole expense, to clean the Railcar if any residue exists in the Railcar other than hydrochloric acid which meets or exceeds the specifications contained in **Attachment 3.** USMAG shall arrange, before returning any Railcar to PVS and at USMAG's sole expense, to: (a) clean graffiti and stains from the exterior of the

-3-

Railcar and (b) repair any corroded areas in the Railcar. If any Railcar is returned to PVS without the removal of such residue, graffiti or stains (or without the repair of the corroded areas), USMAG shall reimburse PVS for all expenses that PVS incurs in completing such items.

c.    **Return Destination.** USMAG shall arrange, at its sole expense, to return each Railcar to such return destination that PVS reasonably designates, in the western USA, to USMAG before the return date. To the extent that PVS incurs any freight charge in connection with the return of any Railcar to PVS, USMAG shall promptly reimburse PVS for the full amount of that charge.

d.    **Inspection.** PVS shall inspect each Railcar after receipt at its return destination, and PVS shall report to USMAG any defect or other nonconformity that PVS discovers in the Railcar during that inspection.

17.    **Remedies.** If, during the Term: (a) USMAG fails to perform any of its obligations under this Sublease; (b) a liquidator, receiver or trustee is appointed for any of USMAG's property; (c) USMAG is adjudicated a bankrupt, or a winding-up order is with respect to USMAG; (d) an application for the reorganization under a bankruptcy act is filed by or against USMAG which shall not be dismissed within 30 days of its filing date; (e) USMAG becomes insolvent or makes an assignment for the benefit of creditors, or takes or attempts to take benefit of any insolvency statute; (f) an execution is issued pursuant to a judgment rendered against USMAG; (g) USMAG is unable or refuses to make payment to PVS in accordance with any of its obligations under this Sublease—PVS may, at its election, terminate this Sublease, repossess the Railcars, or any of them, and remove such Railcars from USMAG's use, and PVS shall, effective immediately, be relieved of any further obligation to USMAG with respect to each removed Railcar.

18.    **Indemnification.** USMAG shall indemnify and hold PVS harmless from and against all losses, liabilities, claims, damages and expenses (including, without limitation, reasonable attorneys' fees) made against PVS or which PVS may incur arising out of USMAG's failure to comply with the terms and conditions of this Sublease. All indemnities contained in this Sublease shall survive the termination of this Sublease, regardless of the cause of the termination.

19.    **Environmental, Health and Safety Compliance.** USMAG shall comply with all applicable laws, rules, regulations and industry standards governing the loading, storage or transport of the products to be transported by USMAG in the Railcars, including, without limitation, all hazardous materials and dangerous goods legislation and codes, all environmental legislation and regulations and all workplace hazardous materials legislation and regulations governing the safety, handling, labeling, transport and use of hazardous materials.

20.    **General**

a.    **Assignment.** This Sublease shall not be assigned by either party without the prior written consent of the other party, which consent shall not be unreasonably denied or delayed. Subject to the foregoing, this Sublease shall inure to the benefit of, and be binding upon, the parties and their respective successors and assigns.

b.    **Notices.** All notices, consents, approvals, requests and other communications (collectively, "Notices" and each a "Notice") required or permitted by this Sublease shall be given in writing and shall be delivered by one of the following methods of delivery—(1) hand delivery; (2) certified or registered mail (postage prepaid, return receipt requested); (3) Federal Express or another nationally recognized overnight courier; (4) fax; or (5) e-mail—addressed to the parties at their respective addresses given at the beginning of this Sublease or, if sent by fax or e-mail, as follows:

| If to PVS: | *Fax*: | (313) 921-1378 |
|---|---|---|
| | *E-Mail*: | mdunn@pvschemicals.com |
| If to USMAG: | *Fax*: | (801) 534-1407 |
| | *E-Mail*: | ctissington@usmagnesium.com |

A Notice sent by one of the foregoing methods shall be deemed effective (i) if delivered by hand or overnight courier, at the time of delivery; (ii) if sent by fax or e-mail, at the time of transmission; or (iii) if sent by mail, 48 hours after the date of mailing. Either party may change its address for Notice purposes at any time by giving Notice of such address change in accordance with the foregoing.

c.    **Governing Law; Venue.** The Parties agree that for purposes of personal jurisdiction and venue, all lawsuits related to or arising out of this Sales Agreement will be brought only in the state or federal courts located in the State of Utah, USA, and this Sublease shall be governed by and interpreted in accordance with the laws of Utah.

d.    **Entire Agreement; Amendments; Waivers.** This Sublease, the documents that are referred to in this Sublease and the documents that are to be delivered pursuant to this Sublease constitute the entire agreement between the parties pertaining to the subject matter of this Sublease, and supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions of the parties, whether oral or written, and there are no representations or other agreements among the parties in connection with the subject matter of this Sublease, except as specifically set forth in this Sublease. No amendment, supplement, modification, waiver or termination of this Sublease shall be binding unless executed in writing by the party to be bound by such amendment, supplement, modification, waiver or termination. No waiver of any of the provisions of this Sublease shall be deemed or shall constitute a waiver of any other provision of this Sublease, whether or not similar, nor shall such waiver constitute a continuing waiver unless otherwise expressly provided in writing by the waiving party.

e.    **Interpretation.** Unless the context requires otherwise, all words used in this Agreement in the singular number shall extend to and include the plural, all words in the plural number shall extend to and include the singular, and all words in any gender shall extend to and include all genders. The term "including" shall mean "including, but not limited to." The terms "all" and "each" will each be construed as meaning "all and each." The term "and/or" and the connectives "and" and "or" will be construed either disjunctively or conjunctively so that each term shall mean "and," "or" and "both 'and' and 'or.'" The term "document" means both a paper document and an electronically stored document. The term "person" means any natural person or any business, legal, or governmental entity or association.

f.    **Invalid Provisions.** If any provision of this Sublease, or the application of such provision under certain circumstances, is held invalid or unenforceable, the remainder of this Sublease, or the application of such provision under other circumstances, shall not be affected by such invalidity or unenforceability, and each provision of this Sublease shall be enforced to the fullest extent permitted by law.

g.    **Attachments.** If a document or matter is disclosed in any Attachment to this Sublease, it shall be deemed to be disclosed for all purposes of this Sublease without the necessity of specific repetition or cross-reference. Unless expressly provided otherwise, all capitalized terms used in any Attachment to this Sublease shall have the definitions specified in this Sublease.

h.    **Time.** Time shall be of the essence in the performance and actions undertaken under this Agreement.

i.      **Force Majeure.** Performance of any obligation under this Sublease may be suspended by either party, without either party incurring liability or being deemed to be in default under this Sublease, to the extent that such performance becomes restricted or limited by an act of God; war; riot; fire; storm; explosion; accident; flood; sabotage; inability to obtain fuel, power, raw materials or equipment; governmental laws, regulations or orders; or any other cause beyond the reasonable control of such party (whether or not of the same kind or nature as the causes or contingencies listed above); or by labor trouble, strike, lockout or injunction (whether or not such labor event is within the reasonable control of such party) (collectively, "Force Majeure"). The affected party shall invoke this provision by promptly giving written notice to the other party of the nature of the Force Majeure involved and the estimated duration of the suspension period.

j.      **Counterparts; Headings.** This Sublease may be executed in two or more counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same Sublease. The Paragraph and Subparagraph headings in this Sublease are inserted for convenience of reference only and shall not constitute a part of this Sublease.

k.      **Faxed or E-Mailed Signatures the Same as Originals.** Execution and delivery of this Sublease by electronically exchanging (via fax, e-mail or otherwise) facsimile or portable document format ("pdf") copies bearing the signature of a party to this Sublease shall constitute a valid and binding execution and delivery of this Sublease by such party. Such facsimile or pdf copies shall constitute enforceable original documents for all purposes.

IN WITNESS OF THIS SUBLEASE, the parties have executed this Sublease effective as of the Effective Date.

PVS CHLORALKALI, INC.                                    US MAGNESIUM LLC.

By _____ July 28, 2015              By _____ July 24, 2015
~~W. Scott Trussell~~  Jeffrey T. Stein                 Cam Tissington
Its President                                           Its Vice President—Sales

Attachment 1—Subleased Railcars

[List]

Attachment 2—Principal Lease Agreement

[See Immediately Following Pages]

Attachment 3—Product Specifications

[See Immediately Following Page]



### Hydrochloric Acid, 22 Baume Technical Grade

**Sales Specification**

US Magnesium's Technical Grade Hydrochloric Acid is an aqueous solution of hydrogen chloride gas at a concentration of 22 Baume. It is slightly yellow in appearance.

| Technical Grade HCl | weight % | 35.21 min |
| Specific Gravity | at 60°F | 1.179 min |
| Baume | Degrees | 22 min |
| Color | APHA | 40 max |
| Iron | ppm | 5 max |
| Non-volatile Residue | % | 0.5 max |

**Certification**

US Magnesium produces 22 Baume hydrochloric acid conforming to ASTM E1146-08 specification.

**Shipping Containers**

Bulk tank truck and tank car.

US Magnesium LLC provides this information in good faith and makes no representations to its accuracy or comprehensiveness. This document is intended only as a guide to the appropriate precautionary handling of the material by a properly trained person using the product. Individuals receiving the information must exercise their independent judgment in determining its appropriateness for a particular purpose. US Magnesium LLC makes no representations or warranties, either expressed or implied, including without limitation any warranties of merchantability for a particular purpose with respect to the information set forth herein or the product to which the information refers. User accepts full responsibility for compliance with all applicable Federal, state and local laws and regulations.

US Magnesium LLC
238 North 2200 West, Salt Lake City, UT 84116-2921
(801) 532-2043   FAX (801) 534-1407
www.usmagnesium.com