Richard D. Burbidge (0492)
rburbidge@burbidgemitchell.com
Carolyn LeDuc (14240)
cleduc@burbidgemitchell.com
Clancey S. Henderson (17066)
chenderson@burbidgemitchell.com
BURBIDGE | MITCHELL
215 South State Street, Suite 920
Salt Lake City, Utah 84111
Telephone: 801-355-6677
Facsimile:  801-355-2341


*Attorneys for Plaintiff/Counterclaim Defendant US Magnesium, LLC*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| US MAGNESIUM, LLC,<br><br>Plaintiff and Counterclaim Defendant,<br><br>vs.<br><br>PVS CHLORALKALI, INC.<br><br>Defendant and Counterclaimant. | **PLAINTIFF**<br>**US MAGNESIUM'S**<br>**POST-TRIAL BRIEF**<br>**AND SUMMARY OF EVIDENCE**<br><br>Case No. 2:16-cv-01021-JNP-DBP<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead |

Plaintiff US Magnesium, LLC ("US Mag"), by and through counsel, hereby submits this

Post-Trial Brief, following the bench trial that took place February 15-17, 2022.  For

convenience, US Mag will refer to Defendant PVS Chloralkali as "PVS."

## I.    INTRODUCTION

The evidence at trial proved US Mag's claim that PVS breached the parties' Sales

Agreement, which agreement includes the integrated Railcar Subleases and CWT commitment.

1

In contrast, the evidence at trial showed that PVS's counterclaim, premised on the argument that the Railcar Subleases are standalone agreements, is without merit.

Since the inception of this case, PVS has told the Court a story of how US Mag allegedly misrepresented the timeline for construction of its hydrochloric acid plant; how US Mag's "delay" caused PVS to incur more than a million dollars in wasted railcar costs; how US Mag purportedly "wanted" to abandon the parties' 2013 Commercial Agreement in order to sell acid independently; and how US Mag secretly yearned to obtain PVS's railcars for itself.[1]  That foundational narrative, apparently, was part of PVS's singular agenda to argue that the Railcar Subleases were standalone agreements, somehow independent of the 2015 Sales Agreement. PVS's counterclaim hinged on that argument. As the Court saw at trial, however, every part of PVS's founding narrative was false.  The story was negated by PVS's own past president, Scott Trussell[2]; and by PVS's stipulated documents.  The story was not supported by a single witness.

The Court heard undisputed testimony that, long before the US Mag plant was under construction, the parties *co-drafted* a press release announcing US Mag's plans to enter the HCl market.  The parties *jointly* announced a start date as early as 2014, because both parties wanted to dissuade others from coming into the market.  There was undisputed testimony that US Mag

---

[1] Pertinent to allegedly "wasted" railcar expenses, PVS's Trial Brief argues that "in preparation for the start of HCl production, ***which USMAG said would happen in the beginning of 2014***, ***PVS began leasing railcars promptly after signing the Commercial Agreement in June of 2013***, and continued to do so through the beginning of 2014, until it had obtained 60 railcars—the number of railcars that the parties estimated would be necessary to ship the anticipated quantities of HCl."  PVS continued, "***So, for all of 2014, and at least the first three months of 2015, PVS was required to make lease payments*** for the railcars it obtained to ship USMAG's HCl (as required by the Commercial Agreement), but PVS was not being compensated for those lease payments because USMAG, ***despite its announced start date, did not make any HCl for PVS to sell during those 15 months. By the time USMAG's plant was up and running, PVS was in the hole well over $1M in railcar costs alone***.  (Dkt. 103, at 5 (emphasis added).)

[2] It is undisputed that Scott Trussell left PVS on good terms.  (2/16/22, Stein 300:12-16.)

did not misrepresent anything about its plant construction schedule; and that it kept PVS apprised of developments all along.  There was undisputed testimony that PVS alone determined when to order its railcars.  There were undisputed documents showing that PVS ordered 60 cars for US Mag only after receiving word that US Mag expected its plant to become operational in May of 2015.  The plant was, in fact, operational by March of 2015.  And there were undisputed documents showing that the railcars did not even *begin* arriving into service (and thus did not even begin to cost PVS a dime) until January of 2015.  So, as Mr. Trussell put it at trial, "It appears the timing did work out, yes."

Mr. Trussell, Mr. Jones, and Mr. Tissington—all three of the witness who knew anything about the parties' relationship in the spring of 2015—testified that US Mag expressed no desire to abandon the Commercial Agreement.  To the contrary, as the Court heard at trial, US Mag would have much preferred to keep the Commercial Agreement in force, not only because PVS bore responsibility for railcar and freight expense, but also because US Mag could require PVS to take up to 100% of its HCl output.  The evidence was unequivocal that US Mag was willing to renegotiate terms only as a gesture of good will, and only to foster a long-term relationship with PVS, whom it deemed to be an essential partner in getting its HCl marketed and sold.

The parties' new Sales Agreement expressly required US Mag to take over responsibility for HCl transportation, and to execute the Railcar Subleases. The Sales Agreement attached a template Railcar Sublease, separately signed by the parties, and even attached a list of serial numbers of the specific railcars for which US Mag would assume responsibility.  What is more, each of the Railcar Subleases expressly stated that it was being executed "pursuant to the Sales Agreement."  These contract provisions alone are sufficient to show that the Railcar Subleases and Sales Agreement were closely related, fully integrated, and mutually dependent.  But if the

3

Court needed any additional assurance, that came from the mouth of PVS's own Scott Trussell (the primary PVS witness who negotiated the Sales Agreement), who testified plainly that he intended, as PVS's president, that US Mag would take on the sublease obligations "as part of that Sales Agreement." Mr. Trussell testified, in fact, that the "only" reason the Subleases were memorialized in separate documents is that there were three distinct original lessors.

PVS's effort to strip the Railcar Subleases of any connection to the Sales Agreement was, apparently, only an attempt to divert focus from its own material breach of the Sales Agreement. Indeed, PVS has never really contested its breach.

The CWT breach is plain. On July 24, 2015, US Mag's Cam Tissington explained, in writing, that he was signing the Sales Agreement in reliance on PVS's CWT commitment; and PVS responded, in writing, with an unequivocal confirmation. Multiple emails confirm the details of that promise – i.e., 12 months of purchases for CWT in Sante Fe Springs, California; 3 railcars a week, $90/ton. These confirmations include a specific commitment by PVS to put the purchase order "on the books."

Trial Exhibit 226 summarized the evidence of PVS's breach under the Sales Agreement. That exhibit shows that PVS purchased only a fraction of what it was obligated to take under the CWT commitment. At the conclusion of that first year, there was a default of 5,717 tons of CWT material, or 42.6 % of the obligation.

PVS's breach in respect of non-CWT volumes is also plain. The Sales Agreement had just a few procedural prerequisites for the closing of weekly transactions. US Mag had to give notice of volume, and the parties had to agree on price. But remember, this arrangement involved one supplier of hydrochloric acid, US Mag, and one broker, PVS. As an established broker, PVS was connected to purchasers all over the country; and PVS alone had access to the

needs of those customers, pricing demands, and locations.  At trial, the Court heard testimony from both Garrett Jones (for US Mag) and Jeffrey Stein (for PVS) that the only way the parties could "agree on price," as per the Sales Agreement, was if PVS identified the price and location needed.

The Court saw evidence that, about a week after the parties executed the Sales Agreement, Mr. Stein and Mr. Tissington agreed to a "new protocol," by which weekly HCl transactions would be closed informally.  An email from Mr. Tissington set out the particulars of the new protocol in detail:

> Michael and Brian,
>
> Jeff and I have changed the protocol for new business (out with the Scott – in with the new) going forward.  It should make life a little simper.
>
> 1.  US Mag _will_ inform PVS that we have product to sell.
> 2.  PVS _will_ inform US Mag of the location and price needed.
> 3.  US Mag _will_ look at the price and freight and agree with the price or pass on the business.

Mr. Stein replied in writing, "Yes, this is my understanding."  And at trial, Mr. Stein repeatedly confirmed that "understanding."  He testified, among other things, that this email was "sent to my director of the supply cha[in] named Brian Alford," and it was **_a way for them to understand the transactions and how it was going to be placed because they were the people that are going to be in charge of placing the orders._**  (2/16/22, Stein 316:11-18.)  Later, Mr. Stein added, **_"this is a protocol, a way for us to conduct business on a day-to-day basis."_**  (2/16/22, Stein 327:1-5.)  Stein further testified that unless PVS fulfilled its obligations under the "protocol," there was no way an HCl transaction could close between the parties.  He stated:

> Q:  … But my question was **_in order for US Mag to send a railcar to a customer that PVS has arranged, US Mag is going to need from PVS a location, correct?_**

> A: *That's correct.*
> Q: *And in order for US Mag to say yes or no to a price for that tonnage to that location, it's going to need a price from PVS, correct?*
> A: *Correct.*
> Q: All right. If you don't give them a price and location, they cannot give you a yes or no, can they?
> A: I'm sorry. Repeat that, please?
> Q: Sure. *It says, three, US Mag will look at the price and the freight rate and agree with the price or pass. They can't do number three until you give them the location and the price that you need. Fair?*
> A: *Fair.*

(2/16/22, Stein 316:19-317:11.)

US Mag's witnesses testified that under the revised protocol, they communicated available volumes informally; Mr. Stein himself admitted that the parties were in frequent communication by phone.  Putting aside the period in which the US Mag plant was down for maintenance, Mr. Stein did not testify that he was ***ever*** in doubt about the availability of volume from US Mag.  The parties' stipulated documents show that railcars of excess HCl were piling up at the US Mag facility.

The Court heard undisputed evidence that during the first year of the parties' Agreement, PVS rarely came to US Mag with price/location information.  Mr. Stein testified that he sometimes put out proverbial "feelers," to gauge US Mag's general interest, but without making any reciprocal commitments.  Thus, as the Court saw in the emails presented at trial, US Mag would sometimes agree to a price and location, only to later find that the deal never materialized.  If the Sales Agreement required any semblance of good faith, PVS did not remotely deliver.

Mr. Jones testified that if PVS had come with additional offers, US Mag would have accepted the same.  There was but one occasion during that first year when US Mag rejected an offer.  As Mr. Jones explained, that offer came at a time when PVS's performance under the

CWT commitment had been spotty and absolutely no offers had been placed for non-CWT volume in two months.  Had PVS consistently identified prices and locations, and consistently performed under the CWT commitment, US Mag would have accepted the transactions because the higher prices (including for CWT) would have balanced out the lower prices.

Demonstrative Exhibit 226 shows that during the first year, PVS defaulted on over 70% of the *non*-CWT portion of the Sales Agreement.

On July 6, 2016, Cam Tissington for US Mag gave notice to PVS of breach of the Sales Agreement, and notice that as a consequence US Mag would discontinue payments to PVS on the Railcar Subleases that were a part of the Sales Agreement.  PVS did not refute the breach of the Sales Agreement of which US Mag gave notice, but merely and erroneously tried to make a case that the sublease portion of the Sales Agreement was completely separate and stand-alone. PVS argued that US Mag therefore was obligated to continue the payments to PVS under the subleases, irrespective of its performance or lack of performance under the Sales Agreement.

It is stunning that the evidence in this case reflects no denials of breach of the Sales Agreement prior to initiation of suit.  This absence of denial of breach is particularly impactful when considering the material breach of the CWT portion of the Sales Agreement with respect to which the documents and the testimony reflect an agreement on price, volume, location and duration of that obligation of purchase by PVS.

Under Utah law, as set forth in US Mag's proposed Findings and Conclusions (submitted herewith), PVS's catastrophic breach of the Sales Agreement excused US Mag from any further performance under the Sales Agreement and the integrated Railcar Subleases.  PVS's counterclaim, by which it seeks millions in additional payments under the Subleases, should be

dismissed.  And, US Mag should be awarded damages for volumes not placed over the life of the contract.

As requested by the Court, US Mag has prepared proposed Findings and Conclusions, which include a summary of the relevant evidence, citations to the trial record, and relevant legal authorities.  In this Trial Brief, US Mag will not repeat the legal authorities in support of its position, since those materials are all part of the proposed Findings and Conclusions.  What follows below, instead, is an analysis of the evidence presented at trial, with record citations, with a focus on the all-important issue of credibility.  For the convenience of the Court, the evidence is broken out by subject matter.

## II.    ANALYSIS OF THE EVIDENCE PRESENTED AT TRIAL

### A.  US Mag Excess Chlorine

The evidence was undisputed that US Mag manufactured magnesium as its primary product, and that it had a byproduct stream of chlorine that had to be sold or neutralized at great expense.  US Mag was not a large player in the HCl or chlorine market, and therefore had limited customer relationships for the sale of excess chlorine or chlorine derivatives.  PVS, a company very familiar with hydrochloric acid, did not contest the need for neutralization or the substantial cost involved with the same.[3]  Pertinent evidence was as follows:

1. US Mag cannot manufacture magnesium, its principal product, without also producing chlorine as a "fatal byproduct."  (2/15/22, Trussell 15:16-21.)

2. For every ton of magnesium, US Mag produced 3 tons of chlorine. US Mag cannot simply release the chlorine, because it is a toxic gas, and an inhalation hazard.  (2/16/22, Jones 133:2-18.)

---

[3] It bears note that PVS is currently in litigation with another of its former suppliers, Hexion; and Hexion's counterclaim seeks damages for the substantial neutralization costs that Hexion says it had to bear when PVS failed to purchase HCl under their supply agreement.  *See PVS Chloralkali v. Hexion*, No. 2:18-CV-00362 (S.D. Ohio).

3. The only way to stop a stream of chlorine from coming out of the US Mag plant is to stop producing magnesium, which is "not an option." (2/16/22, Jones 133:15-18.)

4. In the chlorine market, US Mag was "very small." "So the marketplace has a lot of players. So we participated where we could, but we could not sell all of it. There wasn't a market for us to sell all of that product, so we had to neutralize it. (2/16/22, Jones 137:12-25.)

5. Mr. Jones testified that "there's an expense associated with that neutralization which [US Mag] can avoid" if it sells hydrochloric acid. (2/16/22, Jones 141:14-16.)

**B. PVS's Representations About Its Expertise and What It Could Offer to US Mag**

The evidence was undisputed that PVS is an established broker of HCl; that PVS induced US Mag to construct a high-grade HCl plant with promises about helping US Mag into the HCl business, via its substantial industry connections and know-how.

6. PVS was in the business of selling, marketing, and distributing HCl. Scott Trussell testified PVS was a "broker between those who produced and those who used." (2/15/2022, Trussell 11:14-23, 30:14-18.)

7. Trussell understood US Mag had a byproduct HCl stream. "And being in the distribution business, PVS was looking for opportunities to grow its supplier portfolio and distribute more acid and grow. And through that investigation and discovery of what they do with their product, I asked an employee of PVS, who reported to me, to try to set up an initial visit with the US Mag decision makers. (2/15/22, Trussell 13:2-11.)

8. One thing Trussell brought to US Mag's attention was that "if US Mag were to build a hydrochloric acid plant, and then if you [PVS] were to have a contract with US Mag, it would be another customer, another source of hydrochloric acid for [PVS]." (2/15/22, Trussell 21:20-25.)

9. Pertinent to US Mag's avoidance of neutralization costs, Mr. Trussell testified:
   Q: … [W]hat you're basically saying to US Mag is, US Mag, you
   have a fatal by-product which you have to get rid of or neutralize.
   If you put in a hydrochloric acid plant, you could turn that fatal
   byproduct into a valuable product, hydrochloric acid. Is that fair?
   A: Yes.
   (2/15/22, Trussell 23:4-10.)

10. Trussell testified extensively about the benefits he thought PVS could offer US Mag:
    Q: … What did PVS have that you thought would be
    advantageous or helpful to US Mag if it built a hydrochloric acid
    plant?

9

A:  Well, in no order of importance, PVS has been in the acid business for many years, in excess of 50 years, a well-capitalized company with an appropriate structure, broad customer base, product knowledge, strong sales force, plenty of equipment, trucks and railcars to be affected and to provide a high level of service and return for US Mag.  So that was our opportunity to demonstrate to US mag that PVS was capable.
Q:  Okay.  And it's your view it was?
A:  Absolutely.

(2/15/22, Trussell 26:16-27:5.)

11. Mr. Jones testified in accord with the comments of Mr. Trussell about the advantages to be gained from partnering with PVS.  He testified:

Q:  In your meetings with Mr. Trussell from PVS, do you recall if Mr. Trussell explained to your group, your team, that there were any advantages that he saw in US Mag, given this diagram and going to the right side, building a hydrochloric acid plant as opposed to reducing to a liquid acid and neutralizing?
A:  Yes. And the way I recall and understood was we are taking our chlorine and we could essentially go through a very similar process through this new unit, create a new product, so create the acid, and avoid the neutralization and sell it into a new market for revenue. That's the way I recall and understood the conversation.

(2/16/22, Jones 142:19-143:5.)

12. Mr. Jones added that "PVS was a large national reseller of hydrochloric acid. They could be our liaison into the market. We didn't have – US Magnesium did not have an entry into the market. We hadn't done this before. So that's the way I understood PVS, what their role would be, buy and sell into the market."  (2/16/22, Jones 144:6-20.)

13. Mr. Jones testified, "And looking back, it was a very expensive project for us." (2/16/22, Jones 153:7-14.)

14. Mr. Jones testified US Mag would never have made that investment without partnering with PVS.  "We didn't have an inroad into this market," he testified.  "This is -- again, if I step back, we are a very small team. We did not have a hydrochloric acid sales team. We did not have a sales force to be able to support that."  (2/16/22, Jones 144:6-20.)

15. Commenting on the advantages of working with PVS, Mr. Jones testified:

Q:  Okay. So from US Mag's point of view, why was that [netback profit sharing arrangement] attractive?
A:  It was attractive because, as I stated, PVS is a large reseller of hydrochloric acid. They had an established network. They knew the customer bases. They knew locations. They knew pricing. They were all knowledgeable. It was very important for US Magnesium

> to have that inroad into the marketplace to allow us, US
> Magnesium, to get our product sold with a large national reseller.

(2/16/22, Jones 150:4-12.)

16. Mr. Trussell knew that US Mag was relying on PVS to move its HCl into the market. (2/15/22, Trussell 30:14-18.)

### C.   US Mag's Alleged "Delay" in Start-Up of Operations for New HCl Plant

PVS's Trial Brief, filed shortly before the trial, made false allegations about US Mag's conduct under the Commercial Agreement.  PVS argued that it was US Mag alone that issued a press release announcing the plant start date in "the first quarter of 2014."  PVS argued that it "began leasing railcars promptly after signing the Commercial Agreement in June of 2013, and continued to do so through the beginning of 2014…"  However, PVS asserted, US Mag wrongfully did not start producing acid until spring of 2015.  "***So, for all of 2014***, and at least the first three months of 2015," PVS argued, it was "required to make lease payments for the railcars…"  "***By the time USMAG's plant was up and running, PVS was in the hole well over $1M in railcar costs alone.***"  "Certainly," PVS claimed, it "***could have sued USMAG for the damages it had caused PVS*** arising out of USMAG's unexcused failure to timely commence its HCl production. …  (See Dkt. 103, at 4-6.)

As the Court will recall, the parties designed the Commercial Agreement to not even commence until the new HCl plant was operational.  (Ex. 13, ¶ 1.a.)  The Court heard undisputed evidence, including the testimony of PVS's own past president, Scott Trussell, that PVS's woeful story was woefully false.  PVS and US Mag *jointly* issued the subject press release; PVS knew and expected construction delays, US Mag projected an actual start date of May 2015 and kept PVS informed and updated at all times during construction, PVS alone had the expertise to decide when to order railcars; the plant became operational by March 2015; and the 60 GATX railcars that PVS ordered were not ordered until after US Mag gave notice of the projected May 2015

11

operational date, and the railcars did not even start arriving into service for PVS until January of 2015. PVS presented *no* evidence that it spent a dime on railcar costs for US Mag in 2014. And, though asked to produce financial statements in discovery, PVS withheld the financial statements that would have refuted any purported "losses." In short, PVS's founding story was one falsehood after another.

17. At the time the parties signed the Commercial Agreement, construction on the US Mag plant had not yet begun. (2/16/22, Jones 147:6-12.)

18. The Commercial Agreement "doesn't even come into operation until the plant is planned, built, and operates at this level [104 tons per day over a 10-day period]." (2/16/22, Jones 147:17-148:4; see Ex. 13, ¶ 1.a.)

19. Mr. Trussell testified that he was "very much involved" in drafting this press release, and that the objective of getting the word out early was to dissuade others from entering the market. (2/15/22, Trussell 27:22-28:16; *see* Ex. 14.)

20. Describing his communications with US Mag during the construction period, Mr. Trussell testified:

> [T]his was frequent communication. Communication was very good. There was dialogue around, you know, project updates, critical equipment, railcar arrivals, production process. You know, employee engagement. There was no shortage of conversations around them, their progress, what they're trying to accomplish, what their timelines look like. And, you know, I was keeping them at that time abreast on market conditions so they could continue to report to their board, because it was a fairly significant investment. So they wanted regular timelines on market updates, and I was asking for regular timelines on completion dates.

(2/15/22, Trussell 24:10-25:2.)

21. Mr. Trussell testified there was never a time when he was denied information about the progress of the plant, because US Mag was an "open book." (2/15/22, Trussell 25:13-19; *see also* Trussell 36:20-37:2.)

22. Mr. Trussell testified that construction delays were common. "[T]ypically," he explained, "these plants, they rarely are delivered on time in terms of completion. It's not uncommon for there to be delays." (2/15/22, Trussell 35:7-20.)

23. US Mag brought forward an October 31, 2013 email in which Mr. Tissington projected that the HCl plant would be ready for operations in "May 15." (Ex. 15.) Trussell confirmed he understood that to mean May of 2015. (2/15/22, Trussell 108:16-25.)

12

24. Mr. Trussell conceded that PVS had "hundreds – literally hundreds of railcars that it leased in order to pick up and deliver the hydrochloric acid that it dealt in." (2/15/22, Trussell 20:15-18.) He estimated that PVS, "at any one time had 300 to 500 railcars."

25. "PVS [was] the expert leasing those railcars to take care of both its existing customers and anticipated volumes." (2/15/22, Trussell 37:3-10; *see also* Trussell 27:6-10.)

26. US Mag relied on PVS to determine when to order its own railcars needed for the Commercial Agreement. (2/16/22, Jones 149:4-8.)

27. Pertinent to timing of PVS's railcars to be used for the US Mag plant, Mr. Trussell testified:

> Q: … In respect of ordering the railcars, that is a decision that PVS was certainly qualified to make and it made on its own advice, correct?
> A: Yes.
> Q: Okay. And so knowing what risks might be encountered with the construction of the plant, PVS made its own decisions, let's order these railcars now, let's get them delivered whenever. That's PVS's call?
> A: Yes.

(2/15/22, Trussell 44:8-25.)

28. Mr. Trussell testified that before the US Mag plant became operational, he "ordered a specific group of 60 railcars with the intention that they be dedicated to use by US Mag." (2/15/22, Trussell 73:25-74:3; *see also* 2/15/22, Trussell 117:11-14.)

29. Of the three railcar lease agreements produced in this litigation, only one of them was for 60 railcars, and that was the GATX lease. (*See* Ex. 60, at PVS000296.)

30. Documents show that PVS told US Mag it had lost (wasted) in excess of $1.3 million on railcars that had been ordered for US Mag, but which had purportedly sat idle while PVS waited for the US Mag plant to become operational. (*See, e.g.*, Exs. 18, 22.) US Mag believed and relied on PVS's representations about its losses on the railcars. (2/16/22, Jones 157:2-7.)

31. During examination by PVS's counsel, Mr. Trussell initially testified that "a good number of the cars [that had been ordered for US Mag] just ended up being in storage." (2/15/22, Trussell 74:15-18.) He affirmed that he told Mr. Tissington "that the cost of the railcars which [he] couldn't put to use on the contract were killing [PVS]." (2/15/22, Trussell 78:1-5.)

32. Later, however, during Mr. Trussell's re-direct examination, it was pointed out that the GATX lease for 60 railcars was not executed until December 18, 2013, a few months *after* Mr. Tissington had projected a start date at the HCl plant of *May 2015*. (2/15/22,

13

Trussell 108:16-25, 109:5-18; see Ex. 60, at PVS000296.) It was also established that the US Mag plant became operational in or about March 2015. (*See* Ex. 20; 2/16/22, Jones 148:13-21.) Mr. Trussell conceded that the first batches of GATX railcars did not begin to arrive into service for PVS until January of 2015 (25 cars), with the remainder arriving into service between February and June of 2015. (2/15/22, Trussell 109:23-111:18, 112:7-16.) In other words, there was no substantial delay, no material "waste" of railcar expense because of US Mag.

33. Shown these documents, Mr. Trussell testified as follows:

> Q: *You did a whale of a job. You ordered these cars spot-on so that PVS wouldn't have any excess costs in connection with going live on the Commercial Agreement with US Mag, correct?*
> A: *It appears the timing did work out, yes.*

(2/15/22, Trussell 19-23.)

34. At the trial of this matter, PVS's counsel appeared to suggest that the GATX invoice that began billing for railcars in January of 2015 might have been somehow incomplete. But as the Court will recall, PVS proffered no documents to substantiate any allegation that it spent any money on railcars for US Mag at any time prior to January, 2015.

35. Incidentally, Mr. Trussell testified that after the US Mag HCl plant became operational, when US Mag was taking over the sublease obligations, PVS "allocated to US Mag -- just assigned to US Mag not the 60 cars ordered for US Mag, but different numbers of cars from GATX, Union, and American, rail companies." (2/15/22, Trussell 113:3-8, 114:11-17.) Mr. Trussell testified that before those 60 assigned cars were delivered to US Mag, PVS had had the cars in active use. (2/15/22, Trussell 113:9-114:10.)

## D. PVS's Claim of Hardship

PVS told the Court that the parties renegotiated the Commercial Agreement as an accommodation to PVS and an accommodation to US Mag. This is false. The renegotiation occurred strictly to benefit PVS, and based on PVS's false representation that it had wasted in excess of a million dollars on railcar costs. US Mag accommodated PVS merely as a gesture of good will, since it needed PVS to broker its product.

36. There came a time when PVS determined that the Commercial Agreement was disadvantageous to its interests. Mr. Trussell testified that he "felt that the sustainability of the contract [Commercial Agreement] as it was written would create an unnecessary financial hardship on PVS." (2/15/22, Trussell 49:12-50:14.)

14

37. There was economic "hardship" clause in the Commercial Agreement (Ex. 13, ¶ 14), but PVS did not invoke that clause and did not want to wait the 12-month period for ceasing operations under the clause.  Mr. Jones testified:

> Q:  All right. Now was there a hardship provision of the [commercial] agreement?
> A:  Yes, there was.
> Q:  All right. So did they say we'll play hardship and go through the provisions of the hardship agreement?
> A:  We did not go through the formality of the hardship.
> Q:  No. I'm asking did PVS say we want to declare hardship and go through the provisions of the commercial agreement for hardship?
> A:  No, they did not.
> Q:  That's a 12-month process?
> A:  Correct. The agreement keeps going for 12 months.

(2/16/22, Jones 154:14-25.)

38. Mr. Trussell's testimony on that point was in accord.  He stated:

> Q:  But US Mag did not put you through [compliance with the hardship clause], did they?
> A:  No.
> Q:  You came to them and said it's not working out for us, we're having a hard time, we need help. And they said, how can we help?
> A:  Yes.
> Q:  And that was the kind of relationship you had with US Mag over the time that you'd been dealing with them.  Real win-win kind of attitude?
> A:  Yes.
> Q:  Long-term, long vision?
> A:  Yes.

(2/15/22, Trussell 49:12-50:14.)

39. Mr. Trussell testified that US Mag was cooperative in regard to renegotiating terms, taking the long-term view of the parties' relationship.  He testified, "They [US Mag] recognized the hardship and valued the long-term, strategic relationship and partnership that we had built, and we're doing to accommodate some type of amendment to the existing agreement.  It was a – that's what I recall."  (*See* 2/15/22, Trussell 51:3-24.)

40. At the time PVS claimed hardship, PVS hinted that if the Commercial Agreement was not renegotiated, it might just "pull" the railcars – leaving US Mag with no way to transport its material, even if it might find buyers on its own.

> Q:  [Referring to Mr. Tissington's statement in Trial Ex. 21] And what did you mean when you said "USM could live without PVS"?
> A:  PVS had said -- well, Scott Trussell had said the Nicholsons are not going to do net revenue share if they lose money and

15

they're going to pull the cars. If you have an HCL plan[t] and you don't have cars, then you can't sell HCL. So essentially it was leverage for PVS not to provide cars to our business. So we had to have cars or we wouldn't be in the HCL business.

Q: But when you say that you could live without PVS, are you suggesting that US Magnesium felt at that point capable of marketing all of its HCL on its own?

A: No. But PVS was telling me they weren't going to market it for me if they were going to lose money. So I wasn't any worse off than I would be off with PVS that wouldn't sell my acid. If I didn't have cars to put acid in though, I couldn't make acid.

(Tissington Dep. 46:23-47:17.)

41. To be without railcars was, as Mr. Tissington testified, an untenable situation for US Mag. On that issue, Mr. Jones testified, "That was a concern of ours, of US Magnesium, was if they pulled the cars and we had to sell acid, we wouldn't have -- and had large volume, we wouldn't have enough railcars to do that. So it was an absolute concern they would pull their cars if the revenue share wasn't working for them." (2/16/22, Jones 155:1-9.)

42. When PVS proposed an amendment to the Commercial Agreement, one aspect of the new arrangement was that US Mag would take on the sublease obligations for 60 railcars. Mr. Trussell testified:

Q: And one of the things that you're proposing [when renegotiating Commercial Agreement] is, US Mag, we have to pay for all the railcars and railcar expense for the first half of your production. We want you to take that on. Correct?

A: Yes.

(2/15/22, Trussell 51:25-52:4.)

**E. US Mag Had No Desire to Abandon Commercial Agreement**

As shown by the evidence below, PVS's assertion that US Mag wanted to abandon the

Commercial Agreement was also false.

43. The Commercial Agreement had a "netback" revenue sharing provision by which PVS would cover transportation/railcar costs, and the parties would split any remaining profits, with US Mag taking the majority share (77.5%). PVS had to purchase at least 50% of US Mag's output; and, at US Mag's request, PVS would have to take 100%, provided US Mag had its own railcars to ship the second 50% of its output. (Ex. 13, ¶¶ 3.a., 7, 8.)

44. Mr. Trussell agreed that US Mag had advantages under the Commercial Agreement— including but not limited to US Mag's ability to sell up to 100% of its HCl output. (2/15/22, Trussell 38:1-3.)

16

45. Speaking to the advantages to US Mag under the Commercial Agreement, Mr. Trussell pointed out that US Mag was "receiving the majority of the benefit on the revenue sharing, assuming there's a positive revenue to share."  Mr. Trussell agreed there was "no real downside beyond the cost of producing the [HCl]."

> Q:  So the market could go up, there would be nice profits, and market goes down, all US Mag is out is the cost of producing the HCl?
> A:  Correct.
> Q:  And you knew that if it didn't produce the HCl, it had to process it with a very similar process and pay for that, and then neutralize it, correct?
> A:  Yes.

(2/15/22, Trussell 41:17-42:9.)

46. Although Mr. Trussell remembered having had the subjective belief that "another motivation on US Mag's part for transitioning was to have greater control of the product in order to be able to ship this to customers other than PVS," Mr. Trussell did not testify about a single discussion or written communication constituting the foundation for that subjective belief.  He recalled no complaints from US Mag about the Commercial Agreement.  He testified:

> Q:  US Mag never once complained about the Commercial Agreement.  Fair?
> A:  Not that I recall, no.
> Q:  Never once said, oh, we've got to get out of this.  This is really a bad deal for us, did they?
> A:  Never.

(*See* 2/15/22, Trussell 81:24-82:3, 115:17-22, 49:6-11.)

47. When asked whether he remembered both PVS ***and US Mag*** being interested in making changes to the Commercial Agreement, he answered, "I don't recall the circumstances that way."  (2/15/22, Trussell 80:19-21.)

48. When Mr. Jones was asked whether US Mag had ever had any desire to get rid of the Commercial Agreement and take on the responsibility for the railcars, Mr. Jones testified, "Absolutely not."  He added that "[PVS] knew the marketplace. They were introducing us into the market. They had the railcars. We weren't responsible for the railcar payment."  Further, "[t]he revenue share was favorable for US Magnesium. And in a downturn market, it was great to have PVS because they knew where to market the acid. And, frankly, with the revenue share, we believed they would be motivated to try to get the best return on those even in a downturn market. They would still position the acid in the best places we could."  Finally, Mr. Jones stated, "[L]et's not forget that under the agreement, they would market at least 50 percent of our volume.  So it was consistent outlets for production."  (2/16/22, Jones 150:13-151:8; *see also* Jones 155:10-15.)

49. Mr. Jones added that the reason US Mag was willing to renegotiate terms is that

> We had put a lot of money into a new plant and we -- this was a partnership going forward. US Magnesium viewed it that way, and as a result PVS came to us and said this isn't working, and we said let's talk. So that was the initial reasoning behind it was good faith, let's work this out. What can work for both parties so we can go long term as partners.

(2/16/22, Jones 155:18-156:1.)

50. During cross-examination, Mr. Jones emphasized that "You guys [PVS] were the market experts.  You [PVS] knew the pricing.  You [PVS] knew the locations.  We [US Mag] had our railcars.  We [US Mag] would sell.  That was clear that we could sell to other consumers.  However, if we [US Mag] get just more railcars from PVS and no movement of product, now we're sitting on a lot of cars."  (2/16/22, Jones 263:8-22.)

51. Mr. Jones added:

> Q:  And did you ever recall a single meeting in which anyone from US Mag, before a claim of hardship by PVS, said, boy, we'd like to get ahold of those PVS cars?
> A:  I don't recall us saying, boy, we would like to get ahold of them. We had 60 of our own railcars. So I don't recall any time that we needed to bring on more cars without somewhere for that acid to go. That was critical, again, so PVS was there to move that acid in the railcars.

(2/16/22, Jones 151:22-152:4.)

52. Mr. Jones stated, "We were very happy with the Commercial Agreement." (2/16/22, Jones 262:18-24.)

## F.  Railcar Subleases Were Part of the Sales Agreement – i.e., PVS Purchases Under Sales Agreement Are Consideration for US Mag's Subleasing of Railcars

As the Court has seen throughout this litigation, there are many provisions in the Sales Agreement that reference and incorporate the Railcar Subleases; and the Railcar Subleases expressly state that they are being executed "pursuant to the Sales Agreement."  (*See* Exs. 57, Recitals, ¶¶ 4-5, and Schs. 2-3; Exs. 58, 60, 62.)  Those contract provisions are enumerated in detail in US Mag's proposed Findings and Conclusions, Section C; and, for the sake of efficiency, will not be repeated here.  When PVS brought a motion for summary judgment on the purported "independence" of the Railcar Subleases, this Court stated that it would like to hear

18

extrinsic evidence about the parties' contractual intent on integration.  As the Court has now seen, the testimony at trial was unequivocal—the Railcar Subleases and Sales Agreement were part of the same contract.

53. Mr. Trussell testified that the consideration exchanged by the parties in the Sales Agreement was that PVS would purchase 600 weekly tons of US Mag's HCl, while US Mag would take on the obligation for 60 railcars.  (2/15/22, Trussell 17-21.)  Mr. Trussell added:

> Q:  And in that Sales Agreement did you intend, as part of that Sales Agreement, that US Mag is going to take on the obligation of the lease agreements for 60 cars?
> A:  Yes.

(2/15/22, Trussell 61:5-23; *see also* Trussell 62:22-63:5.)

54. US Mag expected PVS to sell the product coming out of its HCl plant, which US Mag would then use the railcars to deliver.  (2/16/22, Jones 16-19.)  Mr. Jones testified:

> Q:  So under the sales agreement, you're paying the lease costs on the railcars and PVS, you understand, is going to sell the hydrochloric acid that US Mag will deliver in those railcars?
> A:   Correct.

(2/16/22, Jones 159:6-11.)

55. Trussell further testified that the "only" reason the railcar subleases were memorialized in "separate" documents is that there were three distinct lessors involved.  (2/15/22, Trussell 61:5-23.)

56. Asked whether it was his intent that US Mag could expect PVS to buy 600 tons under the Sales Agreement, while US Mag refused to make the lease payments, Mr. Trussell answered, "Of course not."  (2/15/22, Trussell 63:20-64:2.)

57. US Mag's former VP of Sales, Cam Tissington, likewise testified that the "railcar riders" or "railcar lease agreements" were part of the Sales Agreement.  (Tissington Dep. 113:12-114:7; see also Tissington Dep. 114:22-115:25.)

58. US Mag's current Senior Sales Engineer testified that the railcar subleases were part of the Sales Agreement.  (2/16/22, Jones 174:14-17.)  Mr. Jones testified that the purpose for "separate" railcar subleases was to accommodate the distinct lessors.  (2/16/22, Jones 160:2-24; *see also* Jones 170:14-24.)

**G. CWT Commitment**

PVS has long argued there was never a commitment with respect to volumes for its affiliate, California Water Technologies. This, too, was shown to be false—not only by the testimony of Scott Trussell, but also by the testimony of Jeffrey Stein, who could not and did not deny his written confirmations of the CWT deal.

59. Mr. Tissington and Mr. Jones both testified that PVS made certain promises with respect to volumes committed to a PVS affiliate, California Water Technologies (CWT). Referring to his July 17, 2015 meeting in Detroit with Scott Trussell and David Nicholson, Mr. Tissington testified that at the July 17 meeting, "What was discussed and what all three of us agreed to was that US Magnesium would sell three cars a week to PVS-CWT for 12 months at $90 a ton delivered." Asked whether he told PVS that he would need a purchase order, Mr. Tissington testified, "I didn't. They told me they would give me a blanket purchase order for that business." (Tissington Dep. 125:21-127:11.)

60. Mr. Tissington explained that the CWT commitment "was compensation for me letting them out of the prior agreement and moving to the Sales Agreement, and they [Dave Nicholson and Scott Trussell] understood that. (Tissington Dep. 125:21-127:11.)

61. Mr. Jones likewise affirmed the specifics of the CWT agreement, adding, "It was important for us because it was a way that we had a volume commitment at a firm price to a location for a firm period of time. As a reason we went away from the Commercial Agreement, it was something that was confirmed, ready to go, as we were going to be taking on the railcar leases as well." (2/16/22, Jones 161:23-162:12; *see also* Jones 165:15-166:4.)

62. Mr. Trussell, PVS's former president, testified that the parties finalized the CWT commitment during a July 17, 2015 meeting in Detroit. Mr. Trussell testified repeatedly about the fact of the agreement and its specific details. (*See* 2/15/22, Trussell 52:25-53:11, 54:10-19, 55:10-13, 57:6-58:2, 65:20-66:2.) He stated, by way of example:

> Q And would you tell the Court what US Mag is asking for as consideration to switch from the commercial agreement to the sales agreement, part of which involves them taking on 60 railcars?
> A Yes. One of the considerations was that California Water Technologies would purchase three railcars a week for a period of 12 months at $90 a ton delivered.

(2/15/22, Trussell 54:13-19.)

63. Mr. David Nicholson was an officer of PVS's parent company and was present for the July 17, 2015 meeting in Detroit, where the CWT deal was finalized orally. As the Court will recall, Mr. Nicholson testified that at the July 17th meeting in Detroit, Mr. Tissington

20

was combative and hostile.  He stated the meeting was "very tense"; Mr. Tissington went "ballistic" and "nuts" and had a tone that left Mr. Nicholson "shocked"; and that he purportedly "felt like I was being extorted."  (2/17/22, Nicholson 478:16-480:10.)  This hyperbolic characterization of the meeting is not credible in light of the testimony from PVS's own Scott Trussell.  Speaking of the emotional tone of the July 17, 2015 meeting in Detroit, Mr. Trussell testified:

> Q:  Okay. Let me ask you this. Was there any argument or heated discussion about whether that was fair or not fair?
> A:  Not at all.

(2/15/22, Trussell 57:6-58:2.)

64. Commenting on the discussion at the July 17, 2015 meeting in Detroit, Mr. Tissington stated:

> Q:  Did Mr. Nicholson tell you that -- at that meeting that PVS was not interested in entering into such an arrangement [for CWT]?
> A:  No.  I remember him thinking it was fair.  And Scott Trussell as well.  Scott thought it was very fair.
> Q:  So it was an easy sell on your part?
> A:  We're talking about contracts that are very important with a lot of moving parts, so I wouldn't say anything about it is easy, but we all thought it was fair. It wasn't the 600 ton, it was three cars a week.  That's fair.

(Tissington Dep. 127:19-128:5.)

65. At trial Mr. Nicholson testified that during the July 17, 2016 meeting, aside from a single casual remark while the parties were exiting the room, "We never talked about CWT." (2/17/22, Nicholson 482:11-16.)  Again, that testimony is not credible.  It is radically different from the testimony of both Mr. Trussell and Mr. Tissington.  And, it flies in the face of uncontroverted written communications between the parties, as further shown below.

66. The day Mr. Tissington signed the Sales Agreement, he stated:

> I've signed the attached agreement in 2 places.  …  As we discussed, I am signing this agreement with the understanding that USMAG will receive a one year purchase order from PVS for 3 cars of HCL per week, delivered to CWT in California at $90/ton. The reason that this is so important to me is that it firms up volume that USMAG can count on, at a known price, for a portion of the period represented by the agreement.  (Ex. 52.)

67. On or before July 28, 2015, Mr. Tissington's email (Ex. 52) was forwarded to Mr. Nicholson, with a humorous comment about Mr. Trussell having printer problems.  "If he [Mr. Trussell] signed the documents" Mr. Tissington said, tongue-in-cheek, we would have to change the title block to President of Drama."  (Ex. 52.)

21

68. Mr. Nicholson's response to these emails is in stark contrast to his testimony about Mr. Tissington's purported hostility and combativeness at the Detroit meeting. Mr. Nicholson wrote, in casual humor to match Tissington's, "Cam, I laughed out loud when I read your last line below. Thank you for your patience in working through this drama. …" (Ex. 53.) As the Court can see, Mr. Nicholson wrote not a word to dispute Mr. Tissington's representations about the CWT agreement. (Ex. 53.)

69. Mr. Stein, for his part, responded directly to the portion of Mr. Tissington's email that addressed CWT. ***Copying Mr. Nicholson***, Mr. Stein wrote:

> I spoke to Dave [Nicholson]. We are all set, sorry for the confusion. I will be sending you the executed documents later today. We will also be sending you **the** PO for 3 cars per week at $90 DEL to CWT. I look forward to working with you and USM. Talk to you soon.

(Ex. 54 (emphasis added).)

70. In light of the above communications alone, Mr. Stein and Mr. Nicholson strain all credulity to assert that there was never a CWT deal. But as the Court saw at trial, the parties exchanged *many* written communications confirming and memorializing this CWT commitment; and US Mag's contemporaneous internal communications reflect the same. (*E.g.*, Exs. 44, 45, 51, 54, 55, 65, 66, 67, 69, 72.) The Court can see that in response to US Mag's many inquiries, clarifications, and follow-up comments regarding the CWT commitment, as reflected in these emails, never once did PVS dispute that it had committed to one-year of 3 railcars/week for CWT, at $90/ton. As one example, in Exhibit 65, Mr. Tissington identified the specific terms of the CWT deal; and in Exhibit 66, Mr. Stein (then PVS's president) answered, "Yes, this is my understanding, and we will be getting the CWT orders on the books, three railcars per week, shortly. Thanks." (2/16/22, Stein 310:13-22.)

71. In Mr. Stein's deposition, which was quoted at trial, he testified,

> [P]rior to this -- prior to this correspondence, we -- meaning PVS -- ***were working off the assumption that there was a PO for one year from June, July, whatever the -- keeps changing.*** The times keep changing as far as when the PO was going to start and when these three railcars per week were going to start…

(2/16/22, Stein 312:8-314:1.)

72. At trial, Mr. Stein appeared to vaguely suggest that PVS harbored some secret intent contrary to what was openly expressed in the parties' emails. But his testimony on that issue was, again, not credible. He testified:

> Q: In that [deposition] testimony [as quoted in paragraph 68 above] you are referring to the CWT agreement that Mr. Cam has earlier confirmed in his emails, correct?
> A: I'm working off of -- yeah, I'm working off of Cam's assumption on that, yes.
> Q: Well, you don't talk about *his* assumption in this

22

testimony. You are talking about we were working off *the* assumption that there was a PO for one year, correct? [Emphasis added.]

A:  We were working off the assumption that Cam had that there was a PO for one year.

Q:  But that's not what you say in your depo. You don't say we're working off *his* assumption. You're saying we were working off *the* assumption that there was a PO.  And that PO would come from PVS, correct?  [Emphasis added.]

A:  I'm reading what it says. We were working off the assumption -- we were working off the assumption.  The assumption was that -- my understanding from Cam -- he thought that there was a PO for one year.

(2/16/22, Stein 313:22-315:14.)

73. Confronted with his failure to ever deny the CWT commitment in the parties' many emails, Mr. Stein tried to dodge the issue by simply being vague:

Q:  But, in any case, no response back comes with any suggestion about, gee, we don't know what you're talking about in terms of the deal with CWT, correct?

A:  I don't know that.

(2/16/22, Stein 317:24-318:2.)

74. After dodging the issue for several questions, Mr. Stein finally testified as follows:

Q:  … Do you know of a single piece of correspondence, memo, note on a napkin, anything from PVS to US Mag saying we do not have a deal on CWT, 90 bucks a ton, three railcars per week for a year?

A:  I don't know of any correspondence to what you asked with the exception of what I stated earlier.

(2/16/22, Stein 319:6-12.)

75. As late as August 27, 2015, a full month after the parties executed the Sales Agreement, Mr. Tissington clarified for PVS, "And I am looking for 3 cars per week (not 2) at the CWT $90/ton."  To this, Mr. Stein answered, "Thanks, Cam, we will make sure we are shipping the 3 cars per week to CWT and will be placing 3 additional orders to the oil patch in Texas at $60 per ton DEL.  (Ex. 72; *see also* 2/16/22, Stein 319:23-320:5.)

76. For Mr. Trussell, **_as PVS's president_**, there was no question Mr. Nicholson had authority to commit PVS for CWT.

Q:  But David [Nicholson], as you [Scott Trussell] understood it, at the July 17th, 2015 meeting, as you understood it, he had the authority to commit PVS to the CWT agreement?

A: Yes.  That was my understanding.

(2/15/22, Trussell 65:20-66:2.)  Again, if PVS secretly believed it had no authority to commit itself on behalf of its affiliate CWT, that belief was deceptively withheld from

23

US Mag.  But, incidentally, *PVS presented no evidence showing that it actually lacked authority to make a commitment on behalf of CWT*.

77. Mr. Nicholson's testimony goes so far as to suggest an outright fraud against US Mag. Despite the many clear emails stating firms numbers for volume and frequency of CWT transactions, Mr. Nicholson testified:

> Q:  Did you give any direction to Mr. Stein about shipping or not shipping railcars to CWT?
> A Yeah. I said, you know, Cam is volatile. So why don't we just give him a few orders. I don't know what Scott committed to. And a PO can be for one car. It can be for one week. It can be -- you know, POs usually aren't for a year. Usually contracts are longer. And I said give him a PO and give him some cars if CWT can take them.

(2/17/22, Nicholson 487:15-22.) The plan, in other words, was to string US Mag along, *deceptively allowing US Mag to believe there was a deal in order to secure the benefit of offloading the Railcar Subleases*, and then later pretend there had never been a deal to begin with.

78. There is no dispute that a commitment for "3 railcars" per week for CWT would amount to approximately 258 tons per week, since each CWT railcar could accommodate approximately 86 tons. (2/16/22, Jones 162:17-163:7; *see also* Ex. 65.)

79. In briefing, PVS has sometimes suggested that emails (relating to CWT) could not modify or add to the parties' formal Sales Agreement.  That, as shown in the proposed Findings and Conclusions submitted by US Mag, is a legally erroneous position.  In any event, Mr. Trussell testified that when he negotiated the Sales Agreement on behalf of PVS, he did not intend for anything in that agreement to prohibit the CWT deal. (2/15/22, Trussell 104:7-11.)  He testified:

> Q:  … That deal with CWT was completely consonant with your understanding of how the sales agreement would work?
> A: Yes.
> Q: Because what we have -- nothing there. What we have here is the two parties saying, hey, we're agreeing on the location, the ship to, we're agreeing on the price, we're agreeing on the amount, and we're agreeing on the term, correct?
> A: Correct.

(2/15/22, Trussell 106:2-10.)

80. It is also noteworthy that, according to undisputed evidence, PVS had a business practice of transacting business, and agreeing to terms, via informal emails.  Mr. Trussell testified:

> Q:  But it's very often that you'll send a proposal in an email, maybe on a sale, you'll get a response back, yes, we agree, and you regard that as binding on you and them?
> A: Yes.

(2/15/22, Trussell 106:20-24.)

81. The evidence was undisputed that US Mag honored, but PVS breached, the CWT commitment, as shown below.

82. Mr. Jones testified that during the first year under the Sales Agreement, there was never a week in which US Mag did not have 258 tons available for shipment to CWT.  (2/16/22, Jones 177:23-178:1; *see also* Jones 186:24-187:12.)  Notably, this was true even during the weeks in which the US Mag plant was shut down for maintenance.  (2/16/22, Jones 178:2-6.)

83. Mr. Jones testified:

> Q:  And did US Mag notify, constantly, PVS it had volume for
> CWT?
> A:  Yes, we did.  There were multiple emails that were
> communicated as well as multiple phone calls.

(2/16/22, Jones 178:7-10.)

84. Trial Exhibits communicating the availability of CWT include, for example, Exhibits 69, 77, 81, 84-86.  The parties' written documents also reference phone calls between the parties discussing the availability of the HCl necessary to fill the CWT deal.  (*E.g*., Exs. 96, 97.)

85. As reflected in Trial Exhibit 138, PVS failed to purchase the agreed 3 railcars per week for CWT.  A summary of PVS's deficiencies in respect of CWT volumes is provided on Trial Exhibit 226.  (*See also* 2/16/22, Jones 179:10-15; Jones 183:15-185:11.)  By the end of the first year under the Sales Agreement, PVS was deficient in CWT purchases by 5,717 tons, or about 42.6% of its total CWT commitment—which US Mag deemed to be a material breach of the Sales Agreement.  (2/16/22, Jones 189:1-8.)

86. Before US Mag brought suit in this matter, PVS never disputed that it had breached the CWT commitment.  (*See, e.g.,* Exs. 203, 205.)

## H.  PVS's Obligation to Purchase Non-CWT Volumes

The Sales Agreement provided that US Mag had the option to sell PVS a "target" of 600 tons of HCl per week.  The Sales Agreement included six conditions of sale, including that US Mag gave written notice of available volume; US Mag used best efforts to provide consistent volume; US Mag gave two weeks' notice of firm volumes; PVS, absent express agreement, was not obligated to take more than 600 tons per week; PVS was not obligated to purchase more than it resold during the same period; and the parties had to agree on price.  (Ex. 57, ¶ 3.)

25

PVS has used these terms to suggest that this was only an "agreement to agree," with no binding effect on either party.  That position ignores fundamental facts about PVS's business and the nature of the "option" contract at issue.  PVS, as set forth above, was a broker.  Like any other broker (real estate broker, mortgage broker, insurance broker), PVS assumed the role of bringing two transacting parties together – in this case, an HCl supplier, US Mag, with HCl customers all over the country.  Because PVS's role was a broker, US Mag was essentially paying PVS (in the form of commissions, mark-ups, and assumption of the Railcar Subleases) *for information.*  PVS had exclusive access to pricing and location information, making it impossible for US Mag to know price or location unless PVS provided that information in good faith.  As the Court heard at trial, that testimony came not only from US Mag's witnesses, but also from PVS's witnesses.  The parties' "new protocol," by which they agreed to close weekly transactions informally, made PVS's obligation to inform US Mag of price and location explicit.  That new protocol, again, is uncontested by the witnesses from both sides.  The Court can plainly see what PVS promised to do in respect of non-CWT volumes; and the Court can determine, based on objective facts, that PVS did not do what it promised.

87. Mr. Tissington testified that after the parties executed the Sales Agreement, he delivered a letter to Jeff Stein, in which he informed PVS of US Mag's available volume and agreed to a "new protocol" for closing transactions.  (*See* Tissington Dep. 155:3-14.)  Mr. Tissington testified:

> Q:  All right. And that 600 tons per week is the total amount that USMAG was committing itself to make available to PVS including sales to CWT?
> A:  Yes. And it could have been more than that if we had product available and they wanted to buy.
> Q:  Now as far as your use of the phrase, quote, "balance of calendar year 2015," would you agree that you are not committing yourself in that letter to sales after the balance of 2015?
> A:  I wouldn't agree at all.  The Sales Agreement we entered into was 600 ton a week, the determined Sales Agreement.

(Tissington Dep. 153:2-20.)

88. During the trial, US Mag showed the Court an email chain in which the parties memorialized their "new protocol" for closing transactions. (Ex. 65, 66.)  In this email, Mr. Tissington stated (in pertinent part):

> Michael & Brian,
> Jeff and I have changed the protocol for new business (out with the Scott – in with the new) going forward.  It should make life a little simpler.
>
> 1.  US Mag will inform PVS that it has product to sell.
> 2.  PVS will inform US Mag of the location and the price needed.
> 3.  US Mag will look at the price and freight rate and agree with the price or pass on the business.

89. Mr. Tissington testified that the objective of the new protocol was to "get away from the protocol of writing these formal letters."  (Tissington Dep. 155:3-14.)  He testified:
> Jeff Stein and I also changed the protocol to make it easier in that we would have conversations. I would say if I have product available, he would tell me location and price, and I would say yes we can handle it or not.  So we simplified this protocol of forecasting volume availability.

(Tissington Dep. 153:2-20.)

90. Like Mr. Tissington, Mr. Jones testified that this new protocol affected the terms of the Sales Agreement, in that "it made it less formal.  It restated what would need to be done to conclude transactions."  (2/16/22, Jones 293:7-15.)

91. Mr. Stein did not dispute the new protocol.  Responding to the email in which Mr. Tissington set forth the protocol's requirements, Mr. Stein responded, "Yes, this is my understanding."  (Ex. 66.)

92. At trial, Mr. Stein repeatedly confirmed the same "understanding."  He testified, among other things, that the email chain discussing the protocol (Exs. 65-66) was "sent to my director of the supply cha[in] named Brian Alford," and it was ***"a way for them to understand the transactions and how it was going to be placed because they were the people that are going to be in charge of placing the orders."***  (2/16/22, Stein 316:11-18.)

93. Later, Mr. Stein added, ***"this is a protocol, a way for us to conduct business on a day-to-day basis."***  (2/16/22, Stein 327:1-5.)

94. Stein further testified that unless PVS fulfilled its obligations under the "protocol," there was no way an HCl transaction could close between the parties.  He stated:
> Q:  … But my question was ***in order for US Mag to send a railcar to a customer that PVS has arranged, US Mag is going to need from PVS a location, correct?***
> A:  ***That's correct.***

> Q:  *And in order for US Mag to say yes or no to a price for that tonnage to that location, it's going to need a price from PVS, correct?*
> A:  *Correct.*
> Q:  All right. If you don't give them a price and location, they cannot give you a yes or no, can they?
> A:  I'm sorry. Repeat that, please?
> Q:  Sure. *It says, three, US Mag will look at the price and the freight rate and agree with the price or pass. They can't do number three until you give them the location and the price that you need. Fair?*
> A:  *Fair.*

(2/16/22, Stein 316:19-317:11.)

95. When confronted with the mandatory language of the protocol, Mr. Stein tried to equivocate, but again was not credible.  He testified

> Q:  The first provision of the protocol is US Mag will inform PVS that we have product to sell. Did I read that correctly?
> A:  Yes.
> Q:  And that's mandatory. That's will, right? Not may, right?
> A:  If you say will is mandatory, then that's fine. I don't have a legal position on that.
> Q:  Well, when you say you will do something, are you saying the same as you may do something?
> A:  I'm not here to defend will or may.

(2/16/22, Stein 315:19-316:4.)

96. US Mag's reliance on PVS's disclosure of information was also referenced in the testimony of Mr. Jones, which proceeded as follows:

> Q:  … Let's look at the last -- excuse me, the second proviso, which is PVS will -- not may, will inform US Mag of the location and the price needed. Is there any way that US Mag could ship out a tank car full of hydrochloric acid without PVS -- to one of PVS's customers, without PVS giving you the location and the price and you agreeing to sell?
> A:  We could not.
> Q:  Okay. And the only entity that can come up with the location and the price under the sales agreement is PVS, correct?
> A:  They were supposed to provide it to us, yes.
> Q:  All right. And the third is US Mag will look at the price and freight weight and agree or pass?
> A:  Correct.
> Q:  Could US Mag look at a price and freight weight and agree or not agree unless PVS fulfills the second provision of the protocol that it will inform US Mag of the location

28

and the price needed?
A:  We could not.
(2/16/22, Jones 181:25-182:19.)

97. Mr. Tissington testified that PVS knew all along that US Mag had the 600 tons of available volume, because (pursuant to the informal protocol) the parties communicated frequently by phone.  He testified:

Q:  [Referring to Trial Exhibit 65] So when you use the phrase "foreseeable future (next six months)," you're talking about a period of time that extends beyond six months?
A:  ***The agreement that USMAG and PVS had was for 600 ton a week.*** I'm putting this in terms for two supply chain guys that PVS is Mike, our Brian, so they can get their arms around it.  Because both of them didn't really understand how it would work.   Mike wanted to know how much product he could have, Brian wanted to know how much he could ship.  ***I put this in terms for them.  But our agreement was for 600 tons per week.  <u>And I talked to Stein -- not as much as I talked to Scott, but we talked. He knew we had 600 ton available.</u>***
Q:  So when you used the phrase "six months," you weren't trying to limit the period of time that you were making product available, is that what you're saying?
A:  ***I was not.  And in fact Stein somewhere around this time came in and asked if he could have another 20,000 ton and I said, "We'll look at it."***
Q:  ***But your prior answer was that you were not limiting your offer to six months only, that as far as you were concerned product was available after six months?***
A:  ***Correct.***
(Tissington Dep. 151:9-152:9; *see also* 2/16/22, Jones 177:8-14.)

98. Mr. Jones testified that US Mag had a regular practice and procedure of reaching out to buyers, to discuss available volumes and try to close sales.  In that regard, Mr. Jones testified:

Q:  Was there a business practice at US Mag, when you were part of this team during the term of this sales agreement, that US Mag deliberately contacted PVS to advise it of the volume it had and urge it to buy?
A:  Yes.
Q:  Okay. What was that business practice?
A: The practice was we want to be in continued communication not only with PVS but with our customers. That's the way US Magnesium does it, is we are on the phone. We're sending emails. We're doing whatever we can to communicate. We did that weekly, sometimes multiple times a week. Specifically to PVS, we were on the phone with them, our team, weekly.

29

(2/16/22, Jones 178:22-179:9; *see also* 2/16/22, Jones 268:11-269:2.)

99. Mr. Jones testified that, aside from the time when the plant was shut down for maintenance, there was a never a time when US Mag did not notify PVS of available non-CWT volumes—i.e., 342 tons for non-CWT customers per week:

> Q:  And the obligation on the non-CWT would be 342 tons per week.  Was there ever a week on the non-CWT that US Mag did not notify PVS that it had product, at least the 342 tons of the non-CWT, except for the time you've identified the plant was under maintenance?
> A:  They were advised that we had product, yes, except for the time the plant was down.

(2/16/22, Jones 187:5-12; see also Jones 192:4-11, 177:15-22.)

100.   Importantly, Mr. Stein's testimony was in accord.  He stated:

> Q:  There was never a time, that you recall, that anyone from US Mag told you that US Mag did not have available 600 tons except for when the plant was shut down, that I just talked about, correct?
> A I don't know that for sure, no.

(2/16/22, Stein 323:15-19.)

101.   Asked whether PVS made non-CWT purchases during the first year of the Sales Agreement, Mr. Jones answered, "Very few."  (2/16/22, Jones 196:13-17.)

102.   According to Mr. Stein, PVS sometimes put out feelers, to explore in the abstract whether US Mag would have any "interest" in a non-specific transaction at a vague price or price-range.  Mr. Stein testified:

> Q:  So a lot of times when we see these emails from PVS to US Mag saying can you support a price in Texas at this rate, or in Sioux City, it may signal there's no deal. You're just seeing if your salesmen can go out and maybe cook up a deal, right?
> A:  It depends. It could be -- we could have a situation where we have an existing customer already and we're going to switch suppliers. It could be a situation like this where it may be a competitive bid or a request for proposal.  It's case by case.
> Q:  But there wouldn't be any question, would there, if you sent -- under the new protocol, if you sent to US Mag will you sell ten tons of HCl at $80 a ton to XYZ corporation, correct?  There wouldn't be any question. That's an order.
> A:  Not necessarily.
> Q:  You may have just been chumming to see what they'll do?
> A:  Yeah. Like I just said, there's different situations.  It would be on a case-by-case basis. Each one would be different.

(2/16/22, Stein 322:2-21.)

103. The record reveals how PVS informed (or did not inform) US Mag of non-CWT transactions.   Instances of this include the following:

a. On August 19, 2015, Mr. Stein and Mr. Tissington met in person to discuss future transactions.  Mr. Stein sent a follow-up email stating, "Thanks for coming in today.  Per our discussion please see below a list of ship-to's UP Direct.  PVS would need to sell at $60-$65 delivered.  Let me know if you have any interest."  Mr. Stein then identified seven different locations – scattered throughout Texas, Arkansas, Oklahoma, and New Mexico.  Mr. Tissington responded, "We will sell PVS at the low end of your target price range ($60/ton for any of the seven locations that you indicated.  We would like to sell the 3 cars per months starting immediately." (Ex. 71.)   Some of those transactions did close. (*See* Ex. 138, showing shipments to Oklahoma and Texas in late August/early September.)

b. On August 31, 2015, PVS asked, "Would you consider shipping R/C's to our Detroit or Chicago terminals in lieu of CWT at $90 per ton DEL." As Mr. Jones explained at trial, US Mag was not willing to renegotiate the CWT deal. (2/16/22, Jones 198:19-24, 289:7-13.)  To Mr. Stein's Chicago proposal, Mr. Tissington responded, "It isn't good for me economically. … I have to pass." (Ex. 73.)

c. On September 25, 2015, while the US Mag plant was down for maintenance, Mr. Stein wrote to Mr. Tissington, "We have an opportunity to supply ~40,000 wet tons into Sioux City, IA for 2016.  Do you have any interest in supplying some or all of that requirement?  We understand that the DEL pricing would need to be in the 70s to start however there may be room for upside later in the year.  If you are interested lets [sic] discuss early next week." (Ex. 79.)  Due to volume constraints,[4] and at Mr. Stein's invitation, US Mag expressed interest in supplying 20,000 of the total 40,000 tons.  On September 30, 2015, Mr. Tissington wrote, "[P]lease let me know when is a good time to review the HCl opportunity for shipments to Sioux City…" (Ex. 79.)  A few days later, he added, "HCL Sioux City.  You indicated that a price in the 70's might work.  I can offer $73/ton and we can lock it in for a year if you need us to.  Unfortunately we can only handle 20,000 of the 40,000 wet ton per year requirement." (Ex. 82.)  As shown by the lack of reference to Sioux City on Exhibit 138, that transaction never closed.

d. On November 18, 2015, after maintenance on the US Mag plant was complete, PVS breached the CWT commitment by (again) ordering only 2 railcars and not 3, as promised.  (Ex. 93.)  In the same email chain in which PVS ordered only 2 cars for CWT, PVS's logistics manager vaguely requested 3 railcars for customer shipments, "***considering CWT only ordered 2 this week***." (Emphasis added.)  Once again, therefore, PVS was trying to suggest a transaction in lieu of CWT.

---

[4] The 40,000-ton volume requested by Mr. Stein would have been substantially more than the 600 tons/week (31,200 tons/year) anticipated by the Sales Agreement—and that is not even taking into account the pre-committed CWT volumes of 258 tons/week, which was supposed to have continued through the first half of 2016.

Note, PVS did not inform US Mag of a price or a location.  US Mag's Katie Barnes responded, "US Magnesium will honor the 2 railcars for customer shipment, but not 3.  You are welcome to place a 3rd order for CWT if needed." That week, as shown on Exhibit 138, PVS brokered two railcars to CWT and two to Monahans, Texas.

e.  For the next 8 weeks, PVS did not inform US Mag of any price or any location for any non-CWT volumes.  Meanwhile, as shown on Exhibits 138, and 226, PVS's CWT purchases were not in accord with the parties' Agreement.  With a requirement of 3 railcars per week, PVS purchased, respectively, 2 cars (week of Nov. 16); 0 cars (week of Nov. 23); 5 cars (week of Nov. 30); 2 cars (week of Dec. 7); 0 cars (week of Dec. 14); 2 cars (week of Dec. 21); 5 cars (week of Dec. 28); 2 cars (week of Jan. 4); and 2 cars (week of Jan. 11).  For these 9 weeks alone, this represented a 35% shortfall (20 cars ordered versus 27 car obligation).

f.  It was in this context that on January 19, 2016, PVS again vaguely put out "feelers" for a non-CWT transaction to an undisclosed location in Texas.  Mr. Tissington rejected this vague pitch; and, as the Court heard at trial, Mr. Jones explained this rejection as follows:
Q:  So do I understand that US Mag is -- this is January 19th -- not accepting that volume?
A:  That is correct. We were not accepting.
Q:  Why not?
A:  What we had run into is *there were not consistent offers being brought to US Magnesium*, whereas under the simplified protocol, we will inform we have volume available. PVS will advise a price and location. And US Magnesium will accept or deny the offer. When we received this, this was not a good offer for some of the business we had locally. *They were few and far between. This was not one of continual offers.  So at this given time, this wasn't an opportunity we wanted to pursue.* (2/16/22, Jones 201:3-15.)

g.  Mr. Jones testified, and PVS did not contest, that there were no instances before January 16, 2022, when US Mag rejected a price/location.
Q:  Okay. But let me ask you this. Before this January 16th communication, was there ever a single instance in which PVS proposed a price and location and you didn't agree to what they proposed?
A:  No, we did not.
(2/16/22, Jones 201:16-19.)

h.  Mr. Jones likewise testified, and PVS did not contest, that there were no instances *after* January 16, 2022, when US Mag rejected a price/location.
Q: After this January 16th communication, was there any other offer from PVS, a non-CWT, that was passed up by US Mag?
A:  No.

(2/16/22, Jones 202:5-8.)

    i. After the January 2016 communication just discussed, and before the time US Mag declared breach in July of 2016, there was only one occasion on which PVS again vaguely suggested a non-CWT transaction. On or about March 22, 2016, Mr. Tissington recorded a "Report of Call" which stated, "PVS asked if we were interested in Sioux City Iowa for 10,000 wtpa and we stated that we were." That transaction never closed.

104. PVS's substantial failure to take the promised CWT volumes, and complete failure to take any non-CWT volumes, caused US Mag to experience a glut of full railcars stacking up on its railcar tracks. Mr. Jones testified:

> Q: In Exhibit 130, turn to -- it's Bates number 6695, in Exhibit
> 130. This is again an interoffice memo dated January 12th, 2016.
> Do you see that?
> A: Yes.
> Q: It's sort of a status report on where you are, and it says we have
> 65 full railcars at Rowley. What does that signify?
> A: It signifies that there are 65 full hydrochloric acid railcars
> sitting on the tracks at Rowley, Utah, so starting to increase
> significantly.
> Q: Do they need to be moved?
> A: They do need to be moved. We have track space that we need
> to move product off of.

(2/16/22, Jones 203:5-17.)

105. By the spring of 2016, PVS was once again complaining that it was suffering economic hardship; and PVS was trying to use such "hardship" to escape its CWT obligations. (*See* Exs. 96, 97.) However, the Court should note that there is no more evidence in support of this instance of "hardship" than there was for PVS's alleged railcar lease "hardship" or "losses" in 2014-15. PVS has neither produced nor proffered a shred of evidence that it suffered any economic losses in 2016 (or any other time).

106. Importantly, unlike the Commercial Agreement, the parties' Sales Agreement did not include an economic "hardship" clause. It contained only a standard "force majeure" clause, which excused PVS's performance for such unavoidable calamities as war, fire, earthquake, and so forth. (Ex. 57, ¶ 12.) PVS, not having a hardship clause to invoke and without any other leverage against US Mag (such as by withdrawing railcars from US Mag), simply stopped performing altogether.

107. Trial Exhibit 146 purports to show PVS's sales during the period covered by the Sales Agreement. Mr. Jones testified that if the prices and locations identified on Trial Exhibit 146 had been offered to US Mag, US Mag would have accepted those transactions. (2/16/22, Jones 228:22-230:1.) When challenged by PVS's attorney during cross-examination, Mr. Jones testified as follows:

Q:  And to the extent the price stayed in that range over the next period of time, do you think PVS had to come back every week and say are you ready to do a deal at 65 a ton now? Are you ready now? Have you changed your mind?

A:  I don't recall that there were numerous offers being made that we could have that opportunity.  ***Going back to that protocol that we reviewed in another exhibit not too long ago, we inform -- we will inform PVS we have volume available. PVS will provide a location and a price, and US Magnesium will accept or deny that specific request.***  So this is one. There are not numerous that I can say, well, okay, to this particular Texas location, $65 a ton isn't good enough. Fifty into the 40's, as Mr. Stein said. ***Where are the offers? There are probably some other prices, other locations in other regions -- or other locations.  PVS buys and sells all over the country.***
So I struggle -- the reason I'm saying is I struggle that -- so PVS had to come back? ***<u>No, you had to make offers.</u> You had to let us know here, I've got an opportunity, and let US Magnesium accept or reject.***

Q:  What if it didn't have any customers in the west who weren't already supplied and they had no need for your supply?

A:  ***We wouldn't have known that. I don't know how US Magnesium would know exactly what PVS is selling and where they're selling if they don't communicate with us to say here's where the pricing is in this particular region.*** I've got an opportunity for three railcars at X amount, would you like it? We will at that time say, yeah, let's take that, or no, we will not.

Q:  Just so I'm clear, because we don't need to debate it, but the bottom line is your view of the obligation is if PVS had any customer anywhere in the country that it was going to sell to, up to 600 tons, they had to bring that opportunity to US Mag?

A:  ***<u>They had to bring opportunities to sell 600 tons per week.</u>***

(2/16/22, Jones 266:11-277:23.)

108.  With 600 weekly tons as the "target" under the Sales Agreement, and taking into account the weeks in which the US Mag plant was down for maintenance, PVS's non-CWT purchases were deficient by 90% by the end of the first year.  (2/16/22, Jones 191:17-192:3, Jones 179:10-18.)

109.  On July 6, 2016, US Mag declared breach.  (Ex. 104.)

110.  After US Mag declared PVS to be in breach, it stopped payments under the Railcar Subleases.  (2/16/22, Jones 282:12-22.)

111.  Prior to the time US Mag filed suit from breach of the Sales Agreement, PVS never denied that it was in breach.  (2/16/22, Jones 212:1-4.)

112. After the date US Mag declared PVS to be in breach, US Mag did not need the PVS railcars, but was prepared to return them to PVS, so long as PVS provided a destination. (2/16/22, Jones 211:8-12, 213:10-13.)  Mr. Jones testified:

> Q:  Now in terms of railcars, you had ordered 60 railcars for excess under the commercial agreement. And then under the sales agreement, you took on additional 60 cars?
> A:  That is correct.
> Q:  Okay. Given the failure of PVS to purchase hydrochloric acid from US Mag, did you have a use for those railcars?
> A:  No. They were just -- many of them were just sitting on the track.
> Q:  And you've told PVS we're not going to pay any more by reason of the default?
> A:  We did.
> Q:  Okay. And if PVS had written and said we want those railcars back, what would have been your response?
> A:  Absolutely. When do you want them placed.
> Q:  And before you can place them, what do you need from PVS?
> A:  We need to have a disposition, location, or another term would be destination.
> Q:  All right. And as I understand it, your facility is jammed with railcars that you can't use.
> A: We have a lot of commodity cars on our track, including hydrochloric acid.
> Q:  In respect of the sales contract, before you declared breach, did you use some of your own cars to ship PVS product?
> A:  I would imagine we did. I don't recall exactly what cars, but I would assume we did.
> Q:  Is that what you meant by fungible?
> A:  Yes. Fungible to me, for the record, is it's a railcar.

(2/16/22, Jones 294:8-295:14.)

113. US Mag, not owning the railroad, had to await a "disposition location" in order to send any car away from the US Mag facility.  (2/16/22, Jones 213:19-214:9.) The railcars, by that time, were a "hindrance."  (2/16/22, Jones 215:2-4.)

114. Trial Exhibit 130 showed the abundance of railcars creating problems for US Mag all the way through the fall of 2016.  (*See* Ex. 130, at USM0009968, -6881.)  The testimony was that, due to the congestion of railcars at the US Mag facility, US Mag did not seek prompt return of the railcars it shipped out to customers, but rather allowed the railcars to remain at the destination points.  (2/16/22, Jones 242:5–243:13.)

115.   The Court reviewed two written notices of breach, delivered from US Mag to PVS. (*See* Exs. 104, 117.)  US Mag's internal communications also document phone calls wherein PVS's officers or executives did not deny that a breach had occurred.  (*See* Exs. 203, 204.)  On that issue, Mr. Stein testified:

> Q:  Do you know of any communication, after this Exhibit 4 was sent, wherein PVS said we're not in breach of the sales agreement and there is no deal on CWT, or anything like that?
> A:  Again, I don't recall. I'd have to wait and see if there are other exhibits relative to our response to this email, but I don't recall.

(2/16/22, Stein 324:18-24.)

### I.   US Mag's Damages as calculated by Mr. Hoffman

116.   US Mag presented a damages analysis prepared by Rick Hoffman of Lone Peak Valuation.  Mr. Hoffman determined US Mag's damages by adding together US Mag's lost profits, then subtracting the additional railcar expenses that US Mag would have incurred had PVS fully performed.  Finally, Mr. Hoffman added the costs for neutralization of US Mag's excess chlorine.  (*See* Exs. 213-224.) US Mag has provided a more detailed analysis of the method applied in these Hoffman schedules in the Proposed Findings of Fact and Conclusions of Law, and therefore will not repeat the same here.

117.   Taking into account lost profits for CWT and non-CWT transactions, railcar expenses that would have been necessary to accommodate full performance under the Sales Agreement, and neutralization costs, Mr. Hoffman determined that US Mag's damages were $350,741. (Ex. 227.)

118.   US Mag's Trial Exhibit 226 is an accurate summary comparing US Mag's offered volumes for CWT and non-CWT transactions to the volumes that PVS took and paid for.  (*See* 2/16/22, Jones 216:4-217:21.)

119.   As shown on Mr. Hoffman's schedules, which were marked as Exhibits 213-224, Mr. Hoffman determined that US Mag's lost profits for CWT transactions were $264,358; lost profits from non-CWT sales were $1,084,125, respectively.

120.   Pertinent to the issue of neutralization costs, US Mag cannot manufacture magnesium, its principal product, without also producing chlorine as a "fatal byproduct."  (2/15/22, Trussell 15:16-21.)

121.   Mr. Jones showed the Court a diagram of plant operations, with the "left side" being the process that led to neutralization, but the "right side" being the process that yielded high-grade HCl for commercial sales.  (2/16/22, Jones 140:14-141:13.)

122. Mr. Jones testified that whether the chlorine follows the "left side" (neutralization) or the "right side" (high-grade HCl production), "they're very similar processes, similar cost structures."  (2/16/22, Jones 140:14-21.)

123. Mr. Jones explained that following PVS's breach, although the high-grade HCl plant was idled, US Mag was not able to avoid overhead and production costs, because the chlorine still had to be converted to low-grade HCl and neutralized.  He testified:

> Q:  So it looks like the HCl plant was fully idled for that year, correct?
> A:  Yes.
> Q:  And during that year you didn't have the overhead of operating the plant, including the overhead of whatever costs are associated with producing HCl, correct?
> A:  No, that's not correct. We still had different parts of the plant. This would lead me back to the neutralization. There is a very similar cost to neutralize, to go create that from the chlorine, to reduce into that acid stream, to then use limestone to neutralize, to deposit in the tailings pond. Very similar costs, structure, and process to the synthesis unit, the high strength. So we still had people working. We still had utilities. We still had -- we were still functioning that portion of the plant even if we weren't producing high strength, 36 percent acid.
> Q:  You're saying it doesn't save any money to shut the [HCl] plant down for a year?
> A:  No, it doesn't save money. The reason it doesn't save money is I've got all the cost of the neutralization. I can't market it. It's essentially a waste product that goes into the tailings pond.

124. US Mag was not able to sell the excess chlorine that it accumulated due to PVS's failure to purchase HCl.  (*See* 2/16/22, Jones 256:16-22.)

125. Trial Exhibit 205 showed the US Mag "recipe" for neutralizing chlorine, with costs at $14.77 per ton.  (2/16/22, Jones 220:10-19, 221:6-24, 225:1-7)

126. Mr. Hoffman determined that, at a rate of $14.77 per ton, US Mag incurred $542,607 to neutralize the chlorine that it could not sell due to PVS's breaches.  (Ex. 218.)

**J.  Alternative Damage Calculation Presented by Mr. Jones Respecting US Mag Overpayment on the Railcar Subleases**

127. As an alternative means of calculating damages, Mr. Jones testified that US Mag had overpaid on the railcar sublease expenses.

128. As discussed above, the premise upon which US Mag accepted responsibility for the railcar lease payments was that PVS would broker 600 tons of US Mag's HCl per week—including, but not limited to, HCl for its affiliate CWT.  The evidence showed

37

that for the first year alone, PVS fell **_70.1% short_** on its total (CWT & non-CWT) obligations.  (Ex. 226.)

129.  It is undisputed that US Mag paid $606,900 on the railcar subleases for the first year alone.  (2/16/22, Jones 214:15-19.)  Mr. Jones testified:

> Q:  You paid $606,900 for the railcars that you couldn't use. So if you were allowed not to pay 70 percent of the railcar expense, how much did US Mag overpay?
> A:  Roughly $425,000.

(2/16/22, Jones 242:1-4.)

130.  The math respecting this alternative damage calculation was straightforward:

j.  US Mag made sublease payments to PVS totaling $606,900 prior to the declaration of PVS's breach.

k.  Matching PVS's breach to the lease payments made, 70.1% of the lease payments made to PVS equates to $425,436.90.

l.  Therefore, US Mag's damages by overpayment on the railcar subleases is $425,436.90.

## III.    CONCLUSION

Based on the evidence presented, the language of the controlling documents, and applicable case law, we respectfully urge the Court to find that the Sales Agreement, Railcar Subleases, and CWT commitment are part of a single written agreement, that the agreement was materially breached by PVS, that US Mag should be awarded its damages, and that PVS should take nothing under its counterclaim.

DATED this 1st day of April, 2022.

BURBIDGE | MITCHELL

 /s/ Richard D. Burbidge
Richard D. Burbidge
Attorneys for Plaintiff US Magnesium, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of April, 2022, the foregoing was served via

electronic filing upon the following:

Timothy C. Houpt
THoupt@joneswaldo.com
Paul R. Smith
PSmith@joneswaldo.com
JONES WALDO HOLBROOK & McDONOUGH, PC
170 South Main Street, Suite 1500
Salt Lake City, Utah 84101-1644
*Attorneys for PVS Chloralkali*


Jonathan S. Taub *(Admitted Pro Hac Vice)*
jtaub@pvschemicals.com
PVS CHEMICALS, INC.
10900 Harper A venue
Detroit, Michigan 48213-3364


/s/ Kathy Christopherson