## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| US MAGNESIUM, LLC,<br><br>     Plaintiff and Counterclaim Defendant,<br><br>v.<br><br>PVS CHLORALKALI, INC.,<br><br>     Defendant and Counterclaimant. | **MEMORANDUM DECISION AFTER A BENCH TRIAL: FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Case No. 2:16-cv-01021-JNP-DBP<br><br>District Judge Jill N. Parrish |

Plaintiff US Magnesium, LLC ("US Mag") and Defendant PVS Chloralkali, Inc. ("PVS") entered into a business arrangement for the sale of hydrochloric acid ("HCl") and the sublease of railcars to transport HCl. However, after the market for HCl deteriorated, issues arose between US Mag and PVS. US Mag eventually sued PVS for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing. ECF No. 2. PVS subsequently brought a counterclaim against US Mag for breach of contract and declaratory relief. ECF No. 7. A bench trial on the parties' claims was held on February 15–17, 2022. Based on the evidence presented at trial and the briefing of the parties, the court makes the following findings of fact and conclusions of law. The court finds in favor of PVS on US Mag's breach of contract and breach of the implied covenant of good faith and fair dealing claims. The court finds in favor of US Mag on PVS's breach of contract claim. Further, as a result of these conclusions, the court denies the parties' requests for declaratory relief as moot.

## FINDINGS OF FACT

I.    **Inception of US Mag and PVS's Business Relationship**

1. US Mag operates a magnesium production plant in Rowley, Utah. To make its magnesium, US Mag precipitates magnesium chloride from the Great Salt Lake, and then separates the magnesium chloride into magnesium and chlorine. The chlorine, in turn, can be sold, converted into other chemicals (such as hydrochloric acid or ferric chloride), or neutralized and discarded through specialized disposal services.

2. PVS is a reseller of HCl. In other words, PVS does not manufacture HCl; instead it: *first*, finds customers interested in purchasing HCl; *second*, purchases HCl from entities that are manufacturing and offering HCl for sale; and *third*, sells the HCl to customers. When it comes to the second step—acquiring the HCl from a seller—PVS typically operates under two types of agreements: (1) revenue-share agreements and (2) sales agreements. Under a revenue-share agreement, PVS and the seller share in the net revenue generated by PVS's resale of the seller's HCl. Under a sales agreement, PVS and the seller simply agree on a specific sales price for the seller's HCl, and then the seller sells and PVS purchases the seller's HCl for that price.

3. In or about 2013, Scott Trussell, then-president of PVS, contacted Cameron Tissington, US Mag's vice president of marketing and sales, to determine US Mag's interest in entering the high-grade HCl market.

4. US Mag did have interest in adding high-quality HCl to its product offerings. PVS learned that although US Mag currently lacked the facilities necessary to produce, load, and transport HCl, US Mag had abundant chlorine that could be converted into high-quality

HCl. US Mag also had an interest in avoiding the cost of neutralizing and disposing of excess chlorine.

5. PVS represented that it could provide US Mag with information regarding the design and construction of high-grade HCl plants. PVS also represented that it had market knowledge, customers, and an existing infrastructure by which US Mag could distribute its new product.

6. After discussions with PVS, US Mag decided to move forward with construction of a new HCl plant. Mr. Trussell provided insight about the HCl market and photographs of other plants' configurations, and he identified manufacturers that could supply components necessary for US Mag's new plant.

7. On June 13, 2013, before US Mag had begun construction on its HCl plant, US Mag and PVS executed the Commercial Agreement.

8. Under the Commercial Agreement, US Mag would produce high-grade HCl, which PVS would sell to U.S. consumers at prices negotiated by PVS. PVS agreed to broker at least half of US Mag's minimum projected annual output, or about 57,000 tons per year. On 60-days' notice from US Mag, PVS could have been obligated to take US Mag's entire output, anticipated to be approximately 114,000 tons.

9. The Commercial Agreement had a five-year term, which term would commence once US Mag began producing 104 tons of HCl per day over a 10-day period.

10. Because the market price of HCl could be variable, US Mag and PVS did not agree on a set purchase price. Instead, the parties agreed to "revenue share." After railcar, freight, and other expenses, US Mag would receive 77.5% of the net revenue and PVS would receive the remainder.

3

11. On June 19, 2013, US Mag issued a press release announcing the future construction of its new HCl plant. Mr. Trussell helped draft the press release. The press release stated that US Mag planned for its HCl to be available for sale in the first quarter of 2014. Mr. Trussell and US Mag were eager to put out the press release so as to deter others from entering the HCl market.

12. In anticipation of its obligations under the Commercial Agreement, PVS leased 60 new railcars. US Mag entered into its own lease agreements for 60 railcars. Because there could be a substantial delay between the date of execution of a railcar lease agreement before a lessee would receive HCl railcars from a lessor, the parties had to enter into their respective railcar lease agreements well before US Mag completed construction of its HCl plant.

## II.    US Mag's HCl Plant Experiences Setbacks

13. Although US Mag was an "open book" about construction progress and there was never a time when US Mag did not provide PVS with information as requested, US Mag's HCl plant experienced setbacks.

14. On October 31, 2013, in response to Mr. Trussell's inquiry as to "start-up" of the HCl plant, Mr. Tissington informed Mr. Trussell that US Mag's President, Ron Thayer, was "convinced of May 15," which included "2 months of start up debugging." Ex. 15.

15. On June 16, 2014, Mr. Trussell again asked about "the latest on start up," because he was "[d]oing some planning." Ex. 16.

16. Mr. Tissington responded: "Loading railcars September 1, 2014." *Id.* So, the anticipated start-up date was pushed from the first quarter of 2014 to May 15 to September 1.

17. On December 14, 2014, Mr. Tissington emailed Mr. Trussell, stating that US Mag was running the HCl plant "for the better part of a day and proved capacity." Ex. 17.

18. He also stated that US Mag had to replace some parts "due to failure." *Id.* Mr. Tissington further said that US Mag was "using all product produced internally to make coproducts." *Id.*

19. Three days later, Mr. Trussell asked Mr. Tissington if he (Mr. Trussell) could "start to route some cars to Rowley and if so how many." Ex. 18. Mr. Tissington told him no, saying, "the pattern is full ghost rider," quoting the movie, Top Gun. *Id.* Mr. Trussell responded saying, "[t]he costs are killing me." *Id.*

20. On December 27, Mr. Tissington told Mr. Trussell that US Mag "had a set back [] in [its] HCl plant," noting that the plant had suffered an unexpected electronic failure in its process controllers during the commissioning process. Ex. 19.

21. Finally, on April 8, 2015, Mr. Tissington sent a letter to Mr. Trussell announcing that US Mag's HCl plant had "operated at 50% of design volume for a production run of over 10 days during the month of February." Ex. 20. Mr. Tissington suggested that "for simplicity" the parties "consider March 1, 2015 as the official 'Commencement Date' for agreement purposes," and March 2015 would "be the first month of sales and revenue sharing." *Id.* Mr. Tissington also thanked Mr. Trussell for his patience and support during the HCl plant's commissioning.

22. Accordingly, although the agreement had been signed in June of 2013, the Commencement Date for shipping product under the agreement did not occur until nearly two years later—in March of 2015—because of the ongoing plant delays and malfunctions. However, such delays and setbacks were typical for construction activities of this sort.

23. For a short time after the "start date" of the Commercial Agreement, PVS purchased HCl from US Mag, then sold the material to its customers and split the revenue with US Mag according to the terms of the Commercial Agreement. Then problems arose.

### III.   Circumstances Surrounding the Parties' Transition from the Commercial Agreement to the Hydrochloric Acid Sales Agreement

24. By the late spring of 2015, the HCl market began to decline, and the price of HCl dropped. Because the Commercial Agreement was not commercially advantageous to PVS in such a market, Mr. Trussell (PVS) called Mr. Tissington (US Mag) to seek relief. PVS wanted to be released from its contractual obligations. Although there was a hardship clause in the Commercial Agreement, PVS did not invoke the hardship clause, or try to comply with its requirements.

25. PVS threatened to pull its railcars if US Mag did not agree to modify their contractual relationship. Without railcars, US Mag's ability to sell and deliver HCl into the market would have been impaired.

26. The terms of the Commercial Agreement, as then constituted, were beneficial to US Mag. However, US Mag valued its relationship with PVS, and hoped PVS would continue to market and sell its HCl. As PVS was aware, US Mag also had an interest in avoiding the cost of neutralizing excess chlorine byproduct. Thus, US Mag agreed to release PVS from the Commercial Agreement and to instead negotiate a new agreement (the "HCl Sales Agreement").

27. On June 9, 2015, Mr. Trussell sent an email to Betsy Prudian (of PVS), cc'ing Mr. Tissington. Mr. Trussell's email started off by saying, "We have an interim deal . . . ." Ex. 29. Mr. Trussell continued, saying that, under the interim deal, PVS would sublease railcars to US Mag, which included the XL (or jumbo) railcars that were already at US Mag's

facility in Rowley, Utah. The smaller railcars would not be a part of the sublease program. The goal was to have 60 railcars included in the sublease program. In addition, the parties would not do any more revenue sharing. Instead, the parties would "transition to a delivered support price" agreement. *Id.*

28. As part of these renegotiations, the parties also discussed an arrangement whereby PVS, for a fixed period of one year, would purchase 3 railcars of HCl per week at $90 per ton, for its affiliate California Water Technologies ("CWT").

29. By mid-July 2015, the parties had worked out terms and were finalizing their written documents. For the CWT (fixed price and volume) commitment, PVS needed the approval of its parent company, PVS Chemicals, since PVS Chemicals had the primary relationship with CWT. Therefore, on July 17, 2015, Mr. Tissington (US Mag) met with Mr. Trussell (PVS) and David Nicholson, the president of PVS Chemicals (the "July 17 Meeting").[1]

30. As between Mr. Tissington (US Mag) and Mr. Trussell (PVS), the testimony concerning this July 17 Meeting was the same. Both witnesses testified that during the July 17 Meeting, the discussion was amicable, and Mr. Tissington and Mr. Trussell explained to Mr. Nicholson the new terms to which they had agreed. Specifically, Mr. Trussell (on behalf of PVS) and Mr. Tissington (on behalf of US Mag) had agreed that for the first year under the new agreement, PVS would purchase 3 railcars per week at a fixed price of $90 per ton for its affiliate CWT. On behalf of PVS Chemicals, Mr. Nicholson specifically approved this

---

[1] At the time of this meeting, Trussell had announced that he would be leaving PVS and going to work for FSTI, a competitor and client of PVS. Dave Nicholson had assumed responsibility for the operations of PVS, and had decided that, after a transition period, Jeff Stein would act as president of PVS.

CWT portion of the agreement. Mr. Nicholson then instructed PVS to issue a purchase order to US Mag reflecting the same.

31. Mr. Nicholson's testimony as to the July 17 meeting was the outlier. Mr. Nicholson testified that the discussion with Mr. Tissington was at times heated and adversarial. He testified that the subject of CWT came up only as an afterthought, and that parties reached no definitive agreement.

32. On the issue of these CWT discussions on July 17, the court finds Mr. Tissington's testimony to be credible. It also finds Mr. Trussell's testimony to be credible, particularly since the testimony was contrary to the interests of his own company. The court does not find Mr. Nicholson's testimony credible, particularly in light of subsequent written communications in which PVS's incoming president, Jeff Stein, confirmed the CWT commitment with Mr. Nicholson's knowledge and implicit approval.

33. In sum, the court finds that on July 17, 2015, the parties reached an oral agreement that during the first year under the HCl Sales Agreement, PVS would order 3 railcars (approximately 258 tons) per week, at $90 per ton, for delivery to its affiliate CWT. Further, PVS represented to US Mag that it would deliver a formal "blanket" purchase order memorializing this oral agreement.

34. On July 22, 2015, Mr. Trussell sent Mr. Tissington a final draft of the new HCl Sales Agreement and, as part thereof, a final draft of the Railcar Subleases, and an assurance that PVS was working on the formal CWT purchase order.

35. On July 24th, US Mag signed and returned the HCl Sales Agreement and the Railcar Sublease Agreements. At the same time, Mr. Tissington delivered an email stating that his

execution of these documents was conditional on PVS's honoring the CWT commitment.

Mr. Tissington stated:

> I've signed the attached agreement in 2 places. You'll need to do the same and send me an electronic version of the signed and executed agreement. . . .
>
> As we discussed, I am signing this agreement with the understanding that US MAG will receive a one year purchase order from PVS for 3 cars of HCl per week, delivered to CWT in California, at $90/ton. The reason that this is so important to me is that it firms up volume that US MAG can count on, at a known price, for a portion of the period represented by the agreement.

Ex. 49.

36. The same day that Mr. Tissington executed the HCl Sales Agreement and the Railcar Subleases, Mr. Trussell amicably resigned from PVS, leaving PVS's final act of signing the new HCl Sales Agreement and related documents to his successor, Jeff Stein.

37. Mr. Stein had not been involved in any of the negotiations between US Mag and PVS, and had not been present for the July 17 Meeting with PVS's parent company. However, Mr. Nicholson (of PVS's parent company) ordered Mr. Stein to issue the CWT purchase order, pursuant to the terms on which the parties had previously agreed. Mr. Stein understood this instruction as his "marching orders."

38. In that regard, in response to Tissington's email about the CWT commitment, Mr. Stein responded:

> I spoke to Dave [Nicholson]. We are all set, sorry for the confusion. I will be sending you executed documents later today. We will also be sending you the PO for 3 cars per week at $90 DEL to CWT . . . .

Ex. 54.

39. PVS's attorney, Jon Taub, returned signed copies of the HCl Sales Agreement and Railcar Subleases to US Mag on July 29, 2015.

**IV.    Terms of the HCl Sales Agreement**

40. Cameron Tissington executed the HCl Sales Agreement on behalf of US Mag on July 24,

2015. Jeff Stein executed the HCl Sales Agreement on behalf of PVS on July 28, 2015.

41. In its Recitals, the HCl Sales Agreement stated that US Mag and PVS had "mutually agreed

to terminate" the Commercial Agreement. Ex. 57. It further stated that the Commercial

Agreement was replaced with "this Sales Agreement and separate Railcar Subleases

(defined below), to be executed simultaneously with this Sales Agreement." *Id.* The Railcar

Sublease Agreement had to be split up into three separate agreements because there were

three different leasing companies involved.

A. *Provisions Regarding the Offer and Purchase of HCl*

42. The core of the HCl Sales Agreement was Paragraph 3, which contained the parties'

obligations regarding the offer and purchase of HCl. Paragraph 3 provided that:

> USMAG shall, at its sole discretion, offer a volume of Product each week
> ("Offered Volume") to PVS. The initial Offered Volume is a target of 600
> Tons of Product per week (for purposes of this Sales Agreement, the term
> "Ton" means a net ton of 2,000 pounds, otherwise commonly known as a
> "short ton" or "US short ton").  PVS shall be obligated to purchase the
> Offered Volume provided that:
>
> a.    USMAG provides a written report to PVS, as far in advance as
>       possible, of the quantities of Product that USMAG expects to offer
>       for sale;
>
> b.    USMAG uses its best efforts to make Product available to PVS in
>       relatively equal quantities and on a regular basis;
>
> c.    USMAG provides a minimum two weeks' notice on firm volume
>       available for sale and shipment during any shipment week. For
>       example, Product available for shipment during the week of June
>       15, 2015 will be communicated no later than the end of business on
>       June 1, 2015;
>
> d.    Unless mutually agreed, PVS is not obligated to purchase more than
>       600 tons per week;

> e.   PVS is not obligated to purchase more Product over a given period of time than it resells during the same period of time; and
>
> f.   The Parties mutually agree upon a Price for the Offered Volume in accordance with Section 6 of this Sales Agreement.

Ex. 57 ¶ 3.

43. In turn, Section 6 provided, in relevant part, "The Parties shall determine the price per Ton ('Price') to be paid by PVS for each shipment of Product on a shipment-by-shipment basis." *Id.* ¶ 6.

44. Accordingly, the HCl Sales Agreement was completely silent as to any minimum quantity of HCl that US Mag was required to offer to sell to PVS in any given period. The weekly volume of HCl that US Mag could offer to PVS was dependent upon US Mag's "sole discretion," and, thus, could be zero. *Id.* ¶ 3.

45. Similarly, the HCl Sales Agreement was completely silent as to a minimum quantity of HCl that PVS was required to purchase from USMAG in any given period.

46. In addition, nothing in the HCl Sales Agreement could be construed as establishing an exclusive relationship between the parties. There was no provision that required US Mag to sell HCl (in any amount) exclusively to PVS, and there was no provision that required PVS to purchase HCl (in any amount) exclusively from US Mag.

47. Indeed, the testimony at trial established that, at the time the parties negotiated and executed the HCl Sales Agreement, US Mag was aware that PVS had ongoing contracts with other suppliers of HCl. In addition, prior to the HCl Sales Agreement, and throughout the course of the parties' performance under the HCl Sales Agreement, US Mag sold HCl to customers other than PVS.

48. Both Mr. Stein, who executed the HCl Sales Agreement on behalf of PVS, and Mr. Nicholson, the President and CEO of PVS's parent company, did not believe that: (1) the HCl Sales Agreement precluded PVS from purchasing products from other suppliers; (2) the HCl Sales Agreement required them to buy 600 tons per week from US Mag as long as PVS had any customer anywhere willing to buy that amount from PVS; or (3) PVS was required to bring every sales opportunity to US Mag. Moreover, Mr. Nicholson believed that PVS would never have entered into such an agreement with US Mag; he noted that a minimum purchase obligation was part of the Commercial Agreement and that a minimum purchase requirement was rejected in negotiations for the HCl Sales Agreement. Mr. Nicholson also noted that if the contract were understood to mean that PVS had to stop buying from other suppliers to buy a minimum of 600 tons per week from US Mag, PVS would have been in breach of several other contracts and did not regard the HCl Sales Agreement as requiring that exclusivity.

49. Even Garrett Jones, on behalf of US Mag, admitted that US Mag understood that PVS had other suppliers and that at times it would make no commercial sense for PVS to buy HCl from US Mag rather than from one of PVS's other suppliers.

50. On August 4, 2015, Mr. Tissington sent an email, with PVS president Jeff Stein copied, to the parties' respective logistic personnel. The email clarified and amended the HCl Sales Agreement. In the email, Mr. Tissington wrote:

> Michael & Brian,
>
> Jeff [Stein] and I have changed the protocol for new business (out with the Scott—in with the new) going forward.  It should make life a little simpler.
>
> 1. USMag will inform PVS that we have product to sell.
> 2. PVS will inform USMag of the location and price needed.

> 3.  USMag will look at the price and freight rate and agree with the price or pass on the business.
>
> At the present time and the foreseeable future (next six months) USMag has 600 tons per week of product available to sell to PVS . . . .

Ex. 65.

51. To the above email, Mr. Stein (PVS's president) replied, "Yes, this is my understanding."

Ex. 66.

52. According to Mr. Tissington, a primary purpose for this "new" protocol was that PVS would no longer require a "written report" of available volumes under Paragraph 3(a) of the HCl Sales Agreement, but instead US Mag would communicate available volumes informally, such as by phone.

53. Even under the new protocol, though, there was no minimum quantity that US Mag was required to offer to PVS each week, and there was no minimum quantity that PVS was required to purchase each week. In addition, the price of any HCl that was offered and purchased remained to be determined.

54. Moreover, Paragraph 14 of the HCl Sales Agreement stated that:

> Each sale or delivery made by USMAG pursuant to this Sales Agreement shall stand as a separate contract, and the failure of any delivery to conform to PVS's requirements shall not be deemed a breach of contract as to others, or a breach of this Sales Agreement as a whole.

Ex. 57 ¶ 14.

B.    *Provisions Regarding the Sublease of Railcars*

55. Under the HCl Sales Agreement, US Mag expressly assumed the obligation to transport its HCl to PVS's end customers, paying all "Railcar Sublease" expenses. Paragraph 4 of the HCl Sales Agreement stated, in pertinent part:

> USMAG is responsible for all transportation and related expenses in connection with each shipment of Product—including, without limitation, all Railcar Sublease expenses pursuant to Section 5 of this Sales Agreement and all other lease and sublease costs and other expenses related to the railcars and trucks used to ship the Product from the Facility to the Product's destination(s) . . . .

*Id.* ¶ 4.

56. Paragraph 5 of the HCl Sales Agreement added, in pertinent part:

> The Parties acknowledge that PVS currently leases . . . the 60 railcars listed in the attached Schedule 2 and which the Parties now wish to transfer from PVS to US Mag . . . . Simultaneously with the Parties' execution of this Sales Agreement, and effective as of the Commencement Date, PVS and USMAG shall enter into three separate railcar sublease agreements . . . in substantially the same form as the attached Schedule 3, with one Railcar Sublease for each Railcar Lessor . . . , pursuant to which, USMAG shall sublease the Transferred Railcars.

(*Id.* ¶ 5.)

57. In accord with this Paragraph 5, US Mag and PVS executed three Railcar Subleases (a different sublease for each of the three original lessors, for 60 railcars in total), at or about the same time that they executed the HCl Sales Agreement.

58. Schedule 2 to the HCl Sales Agreement, entitled "Railcars to be Subleased to US MAG," specifically identified each railcar that would be subject to the Railcar Subleases. The number of railcars subject to the Railcar Subleases was in accord with the number of railcars that the parties deemed necessary for the transportation of the HCl that the parties anticipated PVS would be purchasing from US Mag each week under the HCl Sales Agreement.

59. Schedule 3 to the HCl Sales Agreement was a template "Railcar Sublease Agreement," identical in form to the Railcar Subleases that were ultimately executed by the parties, with modifications only to reflect the different original lessors. Notably, when the parties signed

14

the HCl Sales Agreement, they also signed the template Railcar Sublease Agreement that constituted Schedule 3 to the HCl Sales Agreement.

60. Relatedly, Paragraph 24 of the HCl Sales Agreement, entitled "SCHEDULES," stated as follows:

> If a document or matter is disclosed in any Schedule to this Sales Agreement, it shall be deemed to be disclosed for all purposes of this Sales Agreement without the necessity of a specific repetition or cross-reference.

*Id.* ¶ 24.

61. The court finds it significant that the Recitals in each of the Railcar Subleases stated:

> Effective as of the Effective Date of this Sublease, the Parties are entering into a Hydrochloric Acid Sales Contract dated as of June 1, 2015 (the "Sales Agreement") pursuant to which US MAG has agreed to sell Product (as defined in the Sales Agreement) to PVS. *The Parties are entering into this Sublease pursuant to the Sales Agreement.*

Exs. 58, 60, 62 (emphasis added).

62. Mr. Trussell intended that US Mag would take on the obligations of the subleases *as part of the HCl Sales Agreement*. He believed that each of the Railcar Subleases had to be memorialized in a different instrument because there were three separate lessors involved. Indeed, that was the only reason for the separate documentation. Mr. Trussell understood that if US Mag had not executed the Railcar Subleases or not paid for the same, he would have thought US Mag to be in breach of the HCl Sales Agreement.

63. Mr. Tissington likewise understood that the HCl Sales Agreement, standing alone, was incomplete if it did not include each of the Railcar Subleases.

64. US Mag's Sales Engineer, Garrett Jones, who at all relevant times worked under Mr. Tissington, also viewed the Railcar Subleases to be an integral part of the HCl Sales Agreement.

C.    *Other Provisions in the HCl Sales Agreement*

65. Paragraph 25 of the HCl Sales Agreement provided the following:

> The terms and conditions of this Sales Agreement constitute the entire understanding between the Parties relating to the subject matter of this Sales Agreement, and this Sales Agreement supersedes all prior and contemporaneous agreements (including, without limitation, the Existing Agreement), understandings, negotiations and discussions of the Parties, whether oral or written, and there are no representations or other agreements between the Parties with respect to the subject matter of this Sales Agreement, except as specifically set forth in this Sales Agreement. This Sales Agreement is expressly limited to the terms and conditions contained in this Sales Agreement, and neither Party's terms and conditions in acknowledging or accepting this Sales Agreement or in issuing purchase orders, releases or shipping instructions under this Sales Agreement or other documents shall alter in any way the provisions of this Sales Agreement, unless signed by a duly authorized representative of the other Party. Neither Party shall be bound by any change in, addition to or waiver of any of the provisions of this Sales Agreement unless approved in writing by its authorized representative.

Ex. 57 ¶ 25.

66. Paragraph 20 of the HCl Sales Agreement provided that:

> If any provision of this Sales Agreement is or becomes invalid or illegal in whole or in part, such provision shall be deemed amended, as is nearly possible, to be consistent with the intent expressed in this Sales Agreement, and if such is impossible, that provision shall fail by itself without invalidating any of the remaining provisions not otherwise invalid or illegal, provided that this provision shall not preclude a court of competent jurisdiction from refusing to sever any provision, if severance would be inequitable to either Party, and this Sales Agreement shall be enforced to the fullest extent permitted by law.

*Id.* ¶ 20.

D.    *CWT*

67. CWT was never mentioned in the HCl Sales Agreement that was executed between US

Mag and PVS. However, US Mag and PVS agreed that, in connection with the HCl Sales

Agreement, US Mag would sell, for a period of one year, three railcars of HCl a week to CWT for $90 per ton.

68. First, as mentioned above, in a July 28, 2015 email (copying Mr. Nicholson) replying to Mr. Tissington's statement that he was signing the HCl Sales Agreement contingent upon the one-year order of 3 railcars per week at $90 per ton for CWT, Mr. Stein stated:

> I spoke to Dave [Nicholson]. We are all set, sorry for the confusion. I will be sending you executed documents later today. *We will also be sending you the PO for 3 cars per week at $90 DEL to CWT.*

Ex. 54 (emphasis added).

69. One week later, on August 4, 2015, Mr. Tissington sent an email stating, "[W]e haven't seen the PV[S]-CWT orders. Do you have a planned start date for the purchases." Ex. 67. To this inquiry, Mr. Stein answered:

> Yes, lets [sic] plan for the morning of the 19th and *per my earlier email the 3 r/c's [railcars] per week will commence shortly*.

*Id.* (emphasis added).

70. In a separate email, also sent on August 4, 2015, Mr. Tissington wrote:

> We are working under the assumption that 3 cars each week (86 tons each) will move to PVS-CWT leaving 3 cars for other ship to locations such as Sweetwater Texas.

Ex. 65. To this email, Mr. Stein responded, in pertinent part, "[W]e will be getting the CWT orders on the books (3 R/Cs per week) shortly." Ex. 66.

71. On August 19, 2015, Mr. Tissington sent a formal letter to PVS's Jeff Stein, copying Mr. Nicholson (who, as set forth above, was in attendance at the July 17 meeting where the parties finalized terms for the CWT commitment). Mr. Tissington stated, in pertinent part:

> US Magnesium is also expecting PVS to provide a purchase order for three cars of Hydrochloric Acid per week, at $90 per ton, for delivery to CWT, California. The Sales Agreement was signed on July 29 and we have

> received orders for only two cars per week for the past three weeks. US Magnesium expects PVS to order the previously agreed upon quantity and to make up the shortfall.

Ex. 69. Neither Mr. Stein nor Mr. Nicholson responded to this communication by, in any way, denying the fact of, or the details associated with, PVS's CWT commitment.

72. On August 26, 2015, Mr. Stein sent an email that incidentally referenced a PVS commitment for "2-3 per week to CWT." Ex. 72. Mr. Tissington responded, in pertinent part, "And I am looking for 3 cars per week (not 2) at the CWT $90/ton." *Id.* To this, Mr. Stein responded, "Thanks, Cam, we will make sure we are shipping the 3 cars per week to CWT." *Id.*

73. With respect to Mr. Stein's understanding of CWT volumes, Mr. Stein did not deny that the parties had reached certain terms; he only purported to have been confused about when the one-year obligation would begin. He stated, "[w]e – meaning PVS – were working off the assumption that there was a PO for one year from June, July, whatever the – keeps changing." Tr. Trans. 313:17-19. Moreover, Mr. Stein did not deny that PVS had made a commitment on CWT volumes at $90 per ton, 3 railcars per week, for one year.

74. Mr. Jones believed that US Mag would not have entered into the HCl Sales Agreement without PVS's commitment for the CWT sales, nor would US Mag have agreed to sublease the railcars without PVS's promise to buy a weekly volume of HCl under the HCl Sales Agreement.

75. In contrast, Mr. Nicholson denied that PVS and US Mag ever reached an agreement for CWT sales. Mr. Nicholson further testified that he directed PVS to provide CWT orders to US Mag because he did not know what Mr. Trussel had committed to. The court finds Mr. Nicholson's testimony relating to a CWT commitment to lack credibility.

76. Further, on the issue of whether the parties had a meeting of the minds on the issue of CWT sales, the court finds it probative that after the parties executed the HCl Sales Agreement, there were many weeks in which PVS did order 3 railcars per week; and, regardless of the volume ordered, PVS always paid $90 per ton, even after the time when PVS claimed the market would no longer support that price.

## V.    The Parties' Performance Under the HCl Sales Agreement

### A.   CWT Sales

77. As shown on US Mag's record of sales, PVS sometimes purchased the agreed three railcars (258 tons per week) for CWT, but more often did not. As mentioned above, when the CWT transactions occurred, PVS paid $90 per ton—apparently with some reluctance. By the end of the one-year CWT commitment period, PVS was deficient in CWT purchases by 5,717 tons, or 42.6% of its CWT obligation.

78. PVS's one-year commitment for CWT volumes was a material inducement for US Mag allowing PVS to escape its obligations under the Commercial Agreement, and for US Mag accepting the sublease obligations for 60 railcars.

### B.    Non-CWT Sales

79. On September 15, just six weeks into the parties' performance under the HCl Sales Agreement, Mr. Tissington emailed Mr. Stein telling him US Mag "had premature failure in one of the main units of [its] HCL synthesis unit at Rowley Utah," and that the estimated rebuild time was 3 weeks. Ex. 78. He also said the failure occurred when US Mag had "no inventory" in its system, so US Mag could not "accept PVS orders until the unit is back on time." *Id.* He also said October 6 was the planned restart date.

80. That same day, Brandi Allen (at PVS) emailed various people at US Mag asking US Mag to send "3 orders" to FSTI, one of PVS's customers in Texas. Ex. 75. Mike Wawrzyniak (PVS) responded to Ms. Allen's email, saying he had been "informed of some plant issues," and asking whether US Mag would at least be able to get the cars requested by Ms. Allen that week. *Id.* He said it was "very important" to PVS to get those railcars shipped. *Id.* Brian Alford (US Mag) responded that US Mag was "unable to confirm the orders for shipment" that week. *Id.* Mr. Wawrzyniak then asked whether PVS could get at least 1 or 2 railcars of acid for the customer, if it could not get all three railcars. Garrett Jones repeated (nearly verbatim) Mr. Tissington's email to Mr. Stein on September 15, saying US Mag did not have any inventory. So US Mag could not accept any orders from PVS "until the unit is back on time." *Id.*

81. Six days later (September 21), Mr. Tissington told Mr. Stein that US Mag had "restarted the HCl synthesis unit" and it was "running [] well." Ex. 78. He said US Mag would have "3 lightweight (CWT) cars" by that night and planned to continue filling "light loads as a priority until [US Mag had] significant inventory for PVS." *Id.* Mr. Tissington suspected it would be two to three weeks before US Mag had "enough inventory to resume shipments to PVS Texas due to maintenance time outages" that were "needed to complete repairs of the unit." *Id.*

82. On September 22, 2015, Deon Knott (at PVS) emailed Katie Barnes and Brian Alford at US Mag saying she "desperately" needed their assistance, because PVS needed "1 more car[] to load [that] week to ship to Texas." Ex. 133. Ms. Barnes forwarded Ms. Knott's email to Mr. Tissington, asking him how he wanted her to proceed. Mr. Tissington

responded, "no." *Id.* That same day, Ms. Barnes told Ms. Knott that US Mag was "unable to meet this order." *Id.*

83. On September 25, 2015, Mr. Stein emailed Mr. Tissington saying PVS had "an opportunity to supply ~ 40,000 wet tons into Sioux City, IA for 2016." Ex. 78. He asked Mr. Tissington whether US Mag was interested in "supplying some or all of that requirement." *Id.* He told Mr. Tissington that "DEL pricing would need to be in the $70's to start," but there might be "room for upside later in the year." *Id.* On September 30, Mr. Stein asked Mr. Tissington "when is a good time to review the HCl opportunity for shipments to Sioux City and the Ferric Chloride to St. Louis and Minneapolis." Ex. 79. On October 2, 2015, Mr. Tissington responded that, with respect to the HCl to Sioux City, he could "offer $73/ton" and US Mag could "lock it in for a year" if PVS needed it to. *Id.* He said, however, that US Mag could "only handle 20,000 of the 40,000 wet ton per year requirement." Ex. 82. Mr. Tissington also said US Mag's HCl plant was "limping with boiler issues." *Id.* US Mag had "made some intermediate fixes to the boiler tubes in order to produce enough for PVS-CWT" and US Mag hoped to "be done with the full rebuild in another week." *Id.*

84. That same day (October 2), Mr. Tissington emailed Ward Johnson (US Mag), saying US Mag was shipping "only 3 PVS-CWT light load cars" that day. Pl.'s Ex. 202. He said US Mag would need "three for next week which may mean" Mr. Johnson would "need to offload product from full cars." *Id.*

85. On October 5, Mike Wawrzyniak (PVS) emailed Brian Alford (US Mag) asking whether PVS could "resume shipping 6 cars [that] week." Ex. 133. Mr. Alford responded that US Mag did not "have the capacity to resume the 5 car/week shipment." *Id.*

21

86. On October 6, 2015, Mr. Tissington emailed Mr. Stein, with the subject line "Cam's screw up." Mr. Tissington said that US Mag was "finishing up the unplanned maintenance" on the HCl plant, but "repairs took longer than [his] 'padded' estimate." Ex. 83. So "normal shipments [would] be delayed until after Friday October 16." *Id.*

87. On October 13, Mike Wawrzyniak (PVS) emailed Brian Alford (US Mag) saying PVS was "[p]robably sending cwt orders today. Most likely 3." Ex. 84. He then asked, "How many more on top of that can you give me?" *Id.* Mr. Alford responded that US Mag could get PVS "an extra car this week if needed—total of 4." *Id.* That same day, Deon Knott (PVS) attempted to place an order for a customer named Cooper Eunice. Mr. Alford responded that US Mag could "handle CWT" but "not Eunice this week." *Id.*

88. On October 23, Mr. Stein asked Mr. Tissington whether the HCl plant was "back to full strength." Ex. 88. On November 3, 2015, Mr. Tissington responded to Mr. Stein's email, saying the HCl plant's "burner" was "finally up and running after the unplanned outage." *Id.* He said US Mag was "running hard to build some inventory" and US Mag was finally in a position where it could "accept orders from customers again." *Id.*

89. Once US Mag's plant was back to full strength, there were some weeks when PVS did quote US Mag a price and location; US Mag accepted the price and location; and the transaction closed. However, there were other weeks in which PVS vaguely suggested to US Mag a price and/or at least a general location; US Mag accepted the price and/or general location; and nothing appears to have ever come of it. At trial, Mr. Stein conceded that he

sometimes put out "feelers" with US Mag, merely to explore possibilities and not with the present intent to close a transaction.[2]

90. In January of 2016, by which time PVS had not satisfied the CWT commitment for many weeks, and had not quoted US Mag any price or location for non-CWT volumes for many weeks, PVS reached out with the vague suggestion of a transaction in "Texas," without any specific price point—except for a general comment that "pricing" had "come down even more to mid to high 40's." Ex. 119. Mr. Tissington expressed surprise that prices had purportedly dropped to that level in Texas, and indicated that US Mag would not support that price point. Specifically, Mr. Tissington said, "Frankly $65/ton isn't good enough to get me to put rail cars down there never mind $50/ton." *Id.* Mr. Tissington also said US Mag was "able to place [its] volume in the Rocky Mountain States," and although prices in that region had "deteriorated," they were "certainly better than Texas." *Id.* In short, in his January 19, 2016 e-mail to Mr. Stein, Mr. Tissington informed PVS that: (1) US Mag would reject any opportunity that PVS may have to sell US Mag's HCl in Texas unless the price to US Mag exceeded $65/ton (i.e., there was no point for PVS to offer $65-or-less per ton pricing because US Mag would reject it); and (2) US Mag was continuing to sell HCl on its own without PVS's involvement.

91. Following January 2016, it appears there was just one occasion when PVS vaguely informed US Mag of a pending non-CWT transaction. In that regard, a record of a March

---

[2] There were some weeks in which PVS proposed a price and location *in lieu of* its obligation to take 3 railcars per week for its affiliate CWT. For these weeks, US Mag rejected PVS's proposals or sometimes made a counter-proposal, but no such renegotiation led to revised terms from the parties' CWT deal. Thus, the CWT deal remained unaffected. The record shows that PVS repeatedly asked US Mag to be released from its obligation to take the CWT volumes at $90 per ton.

22, 2016 phone call maintained by US Mag stated, "PVS asked if we [US Mag] were interested in Sioux City Iowa for 10,000 wtpa [wet tons per annum] and we stated that we were." PVS does not appear to have quoted a price for that transaction, and the transaction apparently never closed.

**VI.    PVS's Late Payments**

92. Beginning in January 2016 and continuing through that summer, PVS fell seriously delinquent on its payments to US Mag for volumes of HCl that had actually been previously supplied.

93. An email dated April 1, 2016 reflected 16 invoice payments that were overdue by up to 86 days. By mid-May 2016, 10 late invoices were still outstanding, with delinquencies up to 121 days.

94. Paragraph 8 of the HCl Sales Agreement stated:

> USMAG will invoice PVS for each shipment at time of shipment, payable net 30 days from the date of invoice. *USMAG reserves the right, among other remedies, to suspend further shipments in the event PVS fails to pay for any invoice when payment becomes due*, absent any bona fide dispute relating to the payment, delay in receiving paperwork, or other normal reasons for delay in payment.

Ex. 57 ¶ 8 (emphasis added).

95. In this litigation, US Mag is not seeking damages arising from PVS's failure to pay for delivered HCl, and there appears to be no dispute that PVS eventually paid for the HCl that US Mag had supplied. However, the late payments contributed to US Mag's belief that PVS had breached the HCl Sales Agreement.

**VII.    US Mag Declares Breach of Contract**

96. On July 6, 2015, US Mag informally declared PVS to be in breach of the HCl Sales Agreement.[3] Specifically, Mr. Tissington sent an email to Mr. Stein saying PVS had purchased only "96 cars of HCl for PVS-CWT" during the period of June 2015 through June 2016, whereas the "agreement with Scott and David" and the "expectation" was 156 cars. Ex. 104. Mr. Tissington said US Mag considered PVS to "be in breach of their obligations." He also said that the "agreement with Scott and David also provided for USM to sublease 60 rail cars from PVS and to pay monthly fees." *Id.* Mr. Tissington said it was "USMs [sic] intention to suspend payments on the subleased HCl cars." *Id.*

97. On July 27, 2016, US Mag made its last payment on the railcars, covering sublease payments for June 2016.

98. Mr. Nicholson (PVS) testified that when he spoke to Mr. Tissington (US Mag) in the summer of 2016, Mr. Tissington was upset and demanded that PVS take back its railcars.

99. Garrett Jones testified that after July of 2016, US Mag offloaded HCl from some of the railcars subleased from PVS, and that other PVS-subleased railcars that had already been filled with HCl were sent out to US Mag's customers if those cars happened to be first in line at US Mag's facilities.

100. Documents confirm that some of the railcars subleased from PVS were used to store and transport US Mag's HCl after the date on which US Mag ceased doing business with PVS. US Mag, therefore, did use some of the PVS-subleased railcars to transport material to non-PVS customers. However, there was testimony that the railcars had always been deemed fungible, such that railcars subleased from PVS could be used to transport material to US Mag's non-PVS customers, and, conversely, US Mag's independently-leased railcars could

---

[3] US Mag later formally declared breach on August 23, 2016.

be used to transport material to PVS customers. US Mag's document showing PVS transactions does, in fact, show that many of the PVS transactions were fulfilled using railcars that US Mag had not subleased from PVS.

101. Mr. Jones testified that PVS did not have a central facility for receiving railcars and, therefore, US Mag could not return PVS's railcars without first receiving word from PVS on PVS's desired receiving location. Mr. Jones testified that when US Mag sought to return the subleased railcars to PVS, PVS did not provide a return destination.

102. In the fall of 2017, US Mag requested permission from PVS to sub-sublease the railcars. However, PVS could not agree to an assignment of the US Mag subleases without written consent from PVS's lessors. And under the principal leases, even if the principal lessors consented to the assignment of the subleases, PVS would be liable for any lack of compliance by any US Mag sub-sublessee. As a result, the cars were never sub-subleased.

103. The railcars were finally returned to PVS in late 2017 and early 2018 after PVS provided movement locations to US Mag.

## VIII.  US Mag Sues PVS and PVS Countersues US Mag

104. On September 30, 2016, US Mag sued PVS for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing.

105. On November 15, 2016, PVS filed a counterclaim against US Mag for breach of contract. PVS also sought declaratory relief.

## CONCLUSIONS OF LAW

### I.    Choice of Law

1. "When deciding diversity cases, federal courts apply the law of the state in which they are sitting. This includes applying the state choice of law rules." *Tucker v. R.A. Hanson Co.*, 956 F.2d 215, 217 (10th Cir. 1992) (internal citation omitted). "In Utah[, courts] apply the

'most significant relationship' approach as described in the Restatement (Second) Conflict of Laws in determining which state's laws should apply to a given circumstance." *Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1059 (Utah 2002). Under the "most significant relationship" test, courts consider "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil [sic], residence, nationality, place of incorporation and place of business of the parties" to determine which law applies. *See* Restatement (Second) Conflict of Laws § 188 (1971).

2. Here, the court concludes that Utah has the most significant relationship to the contract at issue. US Mag has its principal place of business in Salt Lake City, Utah; the HCl plant at the core of the contract is located in Utah; and, to a large extent, performance of the contract occurred in Utah. In addition, in the HCl Sales Agreement, the parties agreed "that for purposes of personal jurisdiction and venue, all lawsuits related to or arising out of [the] Sales Agreement [would] be brought only in the state or federal courts located in the State of Utah, USA." Ex. 57 ¶ 18. Moreover, in the Railcar Sublease Agreements, it was specified that the "Sublease[s] shall be governed by and interpreted in accordance with the laws of Utah." Exs. 58 ¶ 20(c); 60 ¶ 20(c); 62 ¶ 20(c); *see also Schneider Fin. v. Stillwater Trucking*, No. 2:18-CV-609, 2019 U.S. Dist. LEXIS 69415, at *4 (D. Utah Apr. 23, 2019) ("In contract disputes, Utah courts apply the law chosen by the parties if they have made an effective choice." (internal quotation marks omitted)). The parties agree that it is appropriate to apply Utah law here. Thus, the court will apply Utah law to resolve this contract dispute.

## II.    Integration of the HCl Sales Agreement and Railcar Subleases

3.   Under Utah law, "[i]f the parties intended to create one contract, the number of documents that memorialize the agreement is irrelevant." *Sacramento Baseball Club v. Great N. Baseball Co.*, 748 P.2d 1058, 1060 (Utah 1987); *see also id.* ("No rule of law . . . precludes the parties from using two written instruments rather than one to effectually carry out their agreement." (citation omitted)); *Sparrow v. Tayco Constr. Co.*, 846 P.2d 1323, 1326 (Utah Ct. App. 1993) ("Where documents are executed 'substantially contemporaneously and are clearly interrelated, they must be construed as a whole and harmonized, if possible.'" (citation omitted)); *Sharp v. Clark*, 13 Utah 510, 519 (1896) ("The contract may be contained in several instruments, which, if made at the same time, between the same parties, and in relation to the same subject, will be held to constitute but one contract." (citation omitted)).

4.   Under Utah law, "[t]he cardinal rule in construing any contract must be to give effect to the intentions of the parties." *Atlas Corp. v. Clovis Nat. Bank*, 737 P.2d 225, 229 (Utah 1987). In examining whether parties intended to enter one overarching agreement, the Utah Supreme Court has focused on whether the multiple documents were executed by the parties for only one purpose. *See Sacramento Baseball Club*, 748 P.2d at 1060. In *Bullfrog Marina, Inc. v. Lentz*, 501 P.2d 266, 269 (1972), the parties signed two separate contracts— an employment contract and a lease agreement—dated within two weeks of one another. The trial court found that the two contracts should be interpreted as one agreement because they were intended to operate together to facilitate the operation of a houseboat rental business. *Id.* at 270. The Utah Supreme Court affirmed, holding that "where two or more instruments are executed by the same parties contemporaneously, or at different times in the course of the same transaction, and concern the same subject matter, they will be read

28

and construed together so far as determining the respective rights and interests of the parties, although they do not in terms refer to each other." *Id.* at 271.

5.  Here, the court holds that the HCl Sales Agreement and the Railcar Subleases constitute a single, integrated contract. Specifically, the court concludes that the HCl Sales Agreement and the Railcar Subleases were executed by the parties for only one purpose—that is, to replace the pre-existing Commercial Agreement and to facilitate the future sale of US Mag's HCl to PVS. Indeed, the Recitals to the HCl Sales Agreement provided that "the Parties mutually agreed to terminate the Existing Agreement *and replace it with this Sales Agreement and separate Railcar Subleases (defined below), to be executed simultaneously with this Sales Agreement*." Ex. 57 (emphasis added).

6.  Moreover, the HCl Sales Agreement and Railcar Subleases were executed contemporaneously and frequently referred to each other. *See, e.g.*, Ex. 57 ¶ 5 ("RAILCAR SUBLEASES: . . . Simultaneously with the Parties' execution of this Sales Agreement, and effective as of the Commencement Date, PVS and USMAG shall enter into three separate sublease agreements."); *id.* ¶ 4 ("USMAG is responsible for all transportation and related expenses in connection with each shipment of Product—including, without limitation, all Railcar Sublease expenses pursuant to Section 5 of this Sales Agreement."); Exs. 58, 60, 62 ("Effective as of the Effective Date of this Sublease, the Parties are entering into a Hydrochloric Acid Contract dated as of June 1, 2015 (the 'Sales Agreement') pursuant to which USMAG has agreed to sell Product (as defined in the Sales Agreement[)] to PVS. The Parties are entering into this Sublease *pursuant to* the Sales Agreement." (emphasis added)).

7. The court is persuaded by Mr. Trussell's testimony that he intended that US Mag would take on the obligations of the railcar subleases as part of the HCl Sales Agreement, and that the only reason that the railcar subleases were memorialized in separate instruments was because there were three separate lessors of railcars involved.

8. The court is also persuaded by Mr. Trussell's testimony that if US Mag had not executed the Railcar Subleases nor paid for the same, he would have thought US Mag to be in breach of the HCl Sales Agreement. Mr. Tissington likewise testified that the HCl Sales Agreement, standing alone, was incomplete if it did not include each of the Railcar Subleases, and Garrett Jones, US Mag's Sales Engineer, also testified that he viewed the Railcar Subleases to be an integral part of the HCl Sales Agreement.

9. Therefore, the HCl Sales Agreement and the three Railcar Subleases constituted a single contract. *See Sacramento Baseball Club*, 748 P.2d at 1060; *Sparrow*, 846 P.2d at 1326; *Sharp*, 13 Utah at 519.

### III.    The New Protocol

10. Paragraph 25 of the HCl Sales Agreement provided that "[n]either Party shall be bound by any change in, addition to or waiver of any of the provisions of this Sales Agreement unless approved in writing by its authorized representative." Ex. 57 ¶ 25.

11. The court holds that, through the email exchange between Mr. Tissington and Mr. Stein on August 4, 2015, the parties modified the HCl Sales Agreement to incorporate the "new protocol." Specifically, Mr. Tissington emailed the parties' respective logistic personnel, with Mr. Stein copied, to inform them that the new protocol for new business was as follows: "1. USMag will inform PVS that we have product to sell. 2. PVS will inform USMag of the location and price needed. 3. USMag will look at the price and freight rate

and agree with the price or pass on the business." Ex. 65. To this email, Mr. Stein replied, in part, "Yes, this is my understanding." Ex. 66. Because Mr. Tissington and Mr. Stein were authorized representatives of the parties and approved the new protocol in writing and in good faith, the court concludes that the new protocol was effectively integrated into the HCl Sales Agreement.

## IV.   CWT Sales Agreement

12. Under Utah's general statute of frauds, "every agreement that by its terms is not to be performed within one year from the making of the agreement" is void "unless the agreement, or some note or memorandum of the agreement, is in writing, signed by the party to be charged with the agreement." UTAH CODE § 25-5-4(1)(a).

13. Moreover, under the Utah Commercial Code, "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." UTAH CODE § 70A-2-201(1). However, there is a "between merchants" exception to this rule. Specifically, "[b]etween merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of Subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received." UTAH CODE § 70A-2-201(2).

14. Furthermore, "[i]n the statute of frauds context, '[o]ne or more writings, not all of which are signed by the party to be charged, may be considered together as a memorandum . . . if there is a nexus between them." *Reynolds v. Bickel*, 307 P.3d 570, 574 (Utah 2013) (citation

omitted). "A nexus for statute of frauds purposes is indicated 'by express reference in the signed writing to the unsigned one, or by implied reference gleaned from the contents of the writings and the circumstances surrounding the transaction.'" *Id.* (citation and alteration omitted).

15. In addition, "[r]edundancies across statutes are not unusual events in drafting, and so long as there is no positive repugnancy between two laws, a court must give effect to both." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) (citation and internal quotation marks omitted). Because the CWT Sales Agreement was, by its terms, not to be fully performed within one year from the making of the agreement and contemplated the sale of goods worth more than $500, the agreement "should be analyzed with reference to both" the general statute of frauds under Utah law and the Utah Commercial Code. *See Beautiful Jewellers Private, Ltd. v. Tiffany & Co.*, No. 06 Civ. 3085 (KMW), 2007 U.S. Dist. LEXIS 20263, at *7 (S.D.N.Y. Mar. 21, 2007).

16. Here, there is sufficient written evidence of the CWT Sales Agreement to satisfy the statute of frauds. Specifically, after the parties executed the HCl Sales Agreement and the Railcar Subleases,[4] Mr. Stein, on behalf of PVS, acknowledged and accepted the CWT Sales Agreement in multiple emails. These emails were signed by Mr. Stein, PVS's agent. *See* UTAH CODE § 46-4-201(3), (4) ("If a law requires a record to be in writing, an electronic record satisfies the law. . . . If a law requires a signature, an electronic signature satisfies the law."); *see also Waddle v. Elrod*, 367 S.W.3d 217, 229 (Tenn. 2012) ("Mr. Reed's typed

---

[4] Paragraph 25 of the HCl Sales Agreement provided that "this Sales Agreement supersedes all prior and contemporaneous agreements (including, without limitation, the Existing Agreement), understandings, negotiations and discussions of the Parties, whether oral or written, and there are no representations or other agreements between the Parties with respect to the subject matter of this Sales Agreement, except as specifically set forth in this Sales Agreement." Ex. 57 ¶ 25.

name at the end of the email constitutes an 'electronic signature.' As the agent of Ms. Elrod, Mr. Reed's signature on the email confirming the terms of the settlement agreement satisfies the signature requirement of the Statute of Frauds." (internal citation omitted)); *McClare v. Rocha*, 86 A.3d 22, 27 (Me. 2014) ("[T]he sender's name on an email satisfies the signature requirement of the statute of frauds." (citing *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 296 (7th Cir. 2002))).

17. Moreover, on August 19, 2015, Mr. Tissington, on behalf of US Mag, sent confirmation of the CWT Sales Agreement to Mr. Nicholson and Mr. Stein, on behalf of PVS's parent company and PVS, respectively. In the letter, Mr. Tissington wrote, "US Magnesium is also expecting PVS to provide a purchase order for three cars of Hydrochloric Acid per week, at $90 per ton, for delivery to CWT, California." Ex. 69. Mr. Tissington signed the letter. Neither Mr. Nicholson nor Mr. Stein objected to the written confirmation of the contract within ten days. Therefore, because both US Mag and PVS are merchants, the "between merchants" exception to the Utah Commercial Code's statute of frauds was satisfied. *See* Utah Code § 70A-2-201(2).

18. In addition, although the writings that the parties exchanged with one another after the HCl Sales Agreement was executed did not explicitly state that the CWT Sales Agreement would be for a period of one year, all of the writings specified that PVS would purchase three railcars of HCl *per week*. Accordingly, all of the writings, including those signed by Mr. Stein, acknowledged that the CWT Sales Agreement would be an ongoing, multi-week obligation. The email exchange between Mr. Tissington and Mr. Stein on July 24 and 28, 2015 establishes that this ongoing obligation was for the fixed period of one year. *See* Ex. 54 (Mr. Tissington: "I am signing this agreement with the understanding that USMAG will

receive *a one year* purchase order from PVS for 3 cars of HCL per week, delivered to CWT in California, at $90/ton." Mr. Stein: "I spoke to Dave [Nicholson]. We are all set, sorry for the confusion. . . . We will also be sending you the PO for 3 cars per week at $ 90 DEL to CWT." (emphasis added)). Because of the circumstances, there is a nexus between this email exchange and the parties' other communications regarding the CWT Sales Agreement after the HCl Sales Agreement was executed.

19. Therefore, the court holds that the CWT Sales Agreement—three railcars of HCl per week, for a period of one year, at $90 per ton—satisfied both the general Utah statute of frauds and the Utah Commercial Code statute of frauds. Furthermore, because Mr. Tissington and Mr. Stein, authorized representatives of US Mag and PVS, respectively, approved of the CWT Sales Agreement in writing and in good faith through their email exchanges, the court holds that the CWT Sales Agreement was added to the HCl Sales Agreement. (*See* Ex. 57 ¶ 25.) The court further holds that the CWT Sales Agreement was integrated into the HCl Sales Agreement based on Mr. Tissington's representation that, on behalf of US Mag, he was "signing [the HCl Sales Agreement] with the understanding that USMAG" would obtain the benefit of the CWT Sales Agreement. Ex. 54. Indeed, the court is persuaded by Mr. Jones's (US Mag) testimony that US Mag would not have entered into the HCl Sales Agreement without PVS's commitment for the CWT sales.

20. PVS argues that the CWT Sales Agreement was never integrated into the parties' HCl Sales Agreement. The court disagrees. But if this were true, it would not help PVS's position in this litigation. Recall Mr. Tissington's email stating that his execution of the HCl Sales Agreement was conditional on the CWT Sales Agreement. If PVS had not agreed to the CWT Sales Agreement, then Mr. Tissington's email accepting the terms of the HCl Sales

Agreement would have constituted a counteroffer because Mr. Tissington proposed additional terms not included in the original contract. "An offeree's proposal of different terms from those of the offer constitutes a counteroffer, and no contract arises unless the original offeror accepts it unconditionally." *Cea v. Hoffman*, 276 P.3d 1178, 1186 (Utah Ct. App. 2012). Thus, absent PVS's acceptance of the CWT Sales Agreement, US Mag terminated its power to accept the original offer when it stated that its acceptance was contingent on the existence of the CWT Sales Agreement. *See id.*

21. If the court were to accept PVS's version of the events as true, then PVS would have had to accept the additional CWT terms to form a valid contract under the HCl Sales Agreement. And, as discussed above, that acceptance would have to satisfy the statute of frauds. But PVS claims that it either (1) never accepted those terms or (2) its acceptance did not satisfy the statute of frauds. Therefore, if PVS never agreed to the CWT Sales Agreement, it could not have accepted the HCl Sales Agreement, and no valid contracts were formed between the parties.

22. Further, the HCl Sales Agreement and the three Railcar Subleases constituted a single contract. Thus, if the HCl Sales Agreement never existed, then the Railcar Subleases are also unenforceable. Accordingly, PVS cannot enforce its Railcar Subleases without an enforceable CWT Sales Agreement.

## V.    Enforceability of Paragraph 3 of the HCl Sales Agreement

23. The core of the HCl Sales Agreement was Paragraph 3. Paragraph 3 provided, in part, that "USMAG shall, at its sole discretion, offer a volume of Product each week ('Offered Volume') to PVS. The Initial Offered Volume is a target of 600 Tons of Product per week. . . . PVS shall be obligated to purchase the Offered Volume provided that: . . . The

35

Parties mutually agree upon a Price for the Offered Volume." Ex. 57 ¶ 3. As modified by the "new protocol," the parties agreed that: "1. USMag will inform PVS that we have product to sell. 2. PVS will inform USMag of the location and price needed. 3. USMag will look at the price and freight rate and agree with the price or pass on the business." Ex. 65. The court concludes that Paragraph 3 of the HCl Sales Agreement is unenforceable as an agreement to agree or indefinite quantities contract.

24. "To form an enforceable contract, the parties must have a 'meeting of the minds . . . on the essential terms of the contract.'" *Bloom Master Inc. v. Bloom Master LLC*, 442 P.3d 1178, 1182 (Utah Ct. App. 2019) (citation omitted). "So long as there is any uncertainty or indefiniteness, or future negotiations or considerations to be had between the parties, there is not a contract." *Id.* (citation omitted); *see also Utah Golf Ass'n v. City of N. Salt Lake*, 79 P.3d 919, 921 (Utah 2003) ("An unenforceable agreement to agree occurs when parties to a contract fail to agree on material terms of the contract 'with sufficient definiteness to be enforced.'" (citation omitted)); *GeoMetWatch Corp. v. Hall*, No. 1:14-cv-00060-JNP, 2019 U.S. Dist. LEXIS 142189, at *32 (D. Utah Aug. 20, 2019) ("Utah follows the common law precept that agreements to agree are generally unenforceable because they leave open material terms for future consideration." (internal quotation marks omitted)). "Contractual terms are sufficiently definite when they are capable of being enforced." *Bloom Master*, 442 P.3d at 1182 (internal quotation marks omitted).

25. Here, material terms of Paragraph 3 of the HCl Sales Agreement were insufficiently definite to be enforced. Specifically, even under the new protocol, the quantity term was uncertain and indefinite. In fact, whether US Mag sold any HCl to PVS was at US Mag's "sole discretion." *See* Ex. 57 ¶ 3; Ex. 65 ("USMag will look at the price and freight rate

and agree with the price or pass on the business."). There was no minimum quantity that US Mag was required to offer or sell to PVS each week, and no minimum quantity that PVS was required to purchase from US Mag each week. Because the quantity of HCl that US Mag was required to sell PVS under the HCl Sales Agreement was "dependent upon the will, wish, want, or desire" of US Mag, it is unenforceable. *See Gull Lab'ys, Inc. v. Diagnostic Tech., Inc.*, 695 F. Supp. 1151, 1153 (D. Utah 1988) ("Certain types of contracts have been held unenforceable because one party's promise was not binding as to that party. For example, an 'indefinite quantities contract,' a contract where the buyer agrees to purchase and the seller agrees to supply whatever quantity of goods the buyer chooses to purchase from the seller, is unenforceable because the buyer's promise from seller is considered illusory. This is because the buyer is not bound by his 'promise' since he is not obligated to buy even a minimal amount of seller's product. To make an indefinite quantities contract enforceable, the buyer must agree to purchase from seller at least a guaranteed minimum quantity of goods or services." (internal citations omitted)).

26. Moreover, even under the new protocol, the price of any HCl sales remained to be determined. *See* Ex. 57 ¶ 3(f) ("PVS shall be obligated to purchase the Offered Volume provided that: . . . The Parties mutually agree upon a Price for the Offered Volume."); *id.* ¶ 6 ("The Parties shall determine the price per Ton ('Price') to be paid by PVS for each shipment of Product on a shipment-by-shipment basis."); Ex. 65 ("USMag will look at the price and freight rate and agree with the price or pass on the business."). Therefore, in addition to the quantity term, the price term—another material term—was left open for future consideration. *See GeoMetWatch*, 2019 U.S. Dist. LEXIS 142189, at *32. The fact that these material terms remained to be resolved for each HCl sale under the HCl Sales

Agreement was reflected in the parties' agreement that "[e]ach sale or delivery made by USMAG pursuant to this Sales Agreement shall stand as a separate contract." Ex. 57 ¶ 14.

27. Because "[t]he Court cannot inject material terms into a contract where the parties have not agreed to terms, but instead have merely 'agreed to agree' on material terms at some point in the future," *see Reagan v. Bankers Tr. Co.*, 863 F. Supp. 1511, 1520 (D. Utah 1994), the court concludes that Paragraph 3 of the HCl Sales Agreement—even with the new protocol—is unenforceable. *See Bloom Master*, 442 P.3d at 1182; *Utah Golf Ass'n*, 79 P.3d at 921; *GeoMetWatch*, 2019 U.S. Dist. LEXIS 142189, at *32.

## VI.    Severability of Paragraph 3 of the HCl Sales Agreement

28. "In Utah, contract provisions are severable if the parties intended severance at the time they entered into the contract *and* if the primary purpose of the contract could still be accomplished following severance." *Sosa v. Paulos*, 924 P.2d 357, 363–64 (Utah 1996) (emphasis added); *see also Sprouse v. Jager*, 806 P.2d 219, 224 (Utah Ct. App. 1991) ("In Utah, a provision of a contract is severable depending on the intent of the parties at the time they entered into the contract. This intent should be ascertained first from the four corners of the instrument itself, second from other contemporaneous writings concerning the same subject matter, and third from the extrinsic parol evidence of the intentions." (citation omitted)).

29. Here, the court holds that Paragraph 3 of the HCl Sales Agreement is not severable from the rest of the contract. Specifically, as stated previously, Paragraph 3 was the core of the HCl Sales Agreement; without it, the primary purpose of the Sales Agreement—a long term agreement regarding the sale and purchase of HCl to replace the Commercial Agreement— could not be accomplished.

30. In addition, based on the terms of the contract and the testimony of Garrett Jones (US Mag), the court is persuaded that the parties executed the Railcar Subleases to facilitate the transportation of the HCl that the parties anticipated PVS would purchase from US Mag under the HCl Sales Agreement. Accordingly, the court concludes that, in the absence of the HCl purchase agreement contained in Paragraph 3, the parties would not have agreed to the Railcar Subleases. Likewise, the court concludes that the parties would not have entered into the CWT Sales Agreement in the absence of the agreement regarding the sale of additional volume of HCl.

31. Moreover, although it is clear from the HCl Sales Agreement that severance of an invalid contract provision was the parties' preferred remedy, it is also clear that the parties contemplated the possibility that a contract provision would not be severable and endorsed such a finding "if severance would be inequitable to either Party." *See* Ex. 57 ¶ 20 ("If any provision of this Sales Agreement is or becomes invalid or illegal in whole or in part, such provision shall be deemed amended, as is nearly possible, to be consistent with the intent expressed in this Sales Agreement, and if such is impossible, that provision shall fail by itself without invalidating any of the remaining provisions not otherwise invalid or illegal, *provided that this provision shall not preclude a court of competent jurisdiction from refusing to sever any provision, if severance would be inequitable to either Party*." (emphasis added)). Because the primary purpose of the contract would be defeated if the court severed Paragraph 3 of the HCl Sales Agreement, it would be inequitable to the parties for the court to do so. Thus, the court refuses to sever Paragraph 3 of the HCl Sales Agreement and, therefore, concludes that the entire contract—including the Railcar Subleases and CWT Sales Agreement—is void.

39

32. Because the entire contract is void, the court finds in favor of PVS on US Mag's breach of contract claim. Moreover, because Utah courts "have 'consistently rejected the notion of a free-standing implied covenant of good faith and fair dealing in the absence of a contract,'" *Vander Veur v. Groove Entm't Techs.*, 452 P.3d 1173, 1180 (Utah 2019) (citation omitted), the court also finds in favor of PVS on US Mag's breach of the implied covenant of good faith and fair dealing claim.

33. Likewise, because the entire contract is void, the court finds in favor of US Mag on PVS's breach of contract claim.

## CONCLUSION AND ORDER

For the foregoing reasons, the court finds in favor of PVS on US Mag's breach of contract and breach of the covenant of good faith and fair dealing claims. Further, the court finds in favor of US Mag on PVS's breach of contract claim. Based on these conclusions, the court also denies as moot the parties' requests for declaratory relief.

DATED August 26, 2025

BY THE COURT

Jill N. Parrish
United States District Court Judge